1  Jamin S. Soderstrom, Bar No. 261054
   jamin@soderstromlawfirm.com
2  SODERSTROM LAW PC
   3 Park Plaza, Suite 100
3  Irvine, California 92614
   Tel: (949) 667-4700
4  Fax: (949) 424-8091

5

6  *Counsel for Plaintiffs, Putative Class Members,*
   *and Aggrieved Employees*

7

8                    **UNITED STATES DISTRICT COURT**

9                  **EASTERN DISTRICT OF CALIFORNIA**

10

11 LIONEL HARPER and DANIEL SINCLAIR,    | Case No.   2:19-cv-00902-WBS-DMC
   individually and on behalf of all others similarly
12 situated and all aggrieved employees,    | **DECLARATION OF JAMIN S.**
                                            | **SODERSTROM IN SUPPORT OF**
13              Plaintiffs,                  | **PLAINTIFF HARPER'S MOTION TO**
                                            | **COMPEL FURTHER DISCOVERY**
14 v.                                       | **RESPONSES AND PRODUCTION OF**
                                            | **DOCUMENTS AND ESI**
15 CHARTER COMMUNICATIONS, LLC,

16              Defendant.                   | Judge:            Hon. Dennis M. Cota
                                            | Hearing Date:     June 3, 2020
17                                          | Hearing Time:     10:00 a.m.
                                            | Location:         Courtroom 304
18                                          |                   Redding Fed. Courthouse
                                            |                   2986 Bechelli Lane
19                                          |                   Redding, CA 96002
                                            | Trial Date:       February 9, 2021
20

21

22

23

24

25

26

27

28

<u>DECLARATION OF JAMIN S. SODERSTROM</u>

I, Jamin S. Soderstrom, am an attorney duly licensed to practice law in the State of California and before this Court. I am the founding shareholder of Soderstrom Law PC, counsel of record for Plaintiffs Lionel Harper and Daniel Sinclair in this case and in the arbitration that was completed on April 25, 2019. The facts set forth in this Declaration are based on my own personal knowledge and, if called as a witness, I could and would competently testify to the facts set forth herein.

1.      Attached as **<u>Exhibit 1</u>** is a true and correct copy of the meet and confer emails exchanged between me and counsel for Defendant Charter Communications, LLC ("Charter") from March 5 to May 15, 2020. Attachments to the emails are not included. These emails followed a lengthy meet and confer letter I sent to Charter dated December 18, 2019, and they relate to multiple teleconferences I had with Charter's counsel from January to May 2020. As shown in the emails, Harper's counsel identified months ago specific "main positions" covered by the Outside Salesperson Class and/or Commissions Class definitions and Charter committed to trying to identify any other positions that would fall within these classes. *See* March 5, 2020 Email. Charter also represented that further responses and documents would be forthcoming weeks before they were actually sent, and it promised to provide "some more clarity regarding the scope of class discovery" over two months ago without ever taking the position that discovery should be limited to only Account Executives and the Redding office. *See* March 27, 2020 Emails; *see also* April 10, 2020 Emails (promising to have information on "exactly which positions are included . . . shortly"); April 29, 2020 (promising "Our client is working as hard as they can to get this information and these documents during these incredibly trying times" and asking Plaintiffs to withdraw the second discovery motion). Charter already lost its preemptive "scope" and "ascertainability" arguments in connection with its motion to strike, and Charter has failed to convince Judge Shubb to bifurcate discovery into pre-certification and post-certification phases or into class certification and merits phases (which is impossible because the close of fact discovery is four days after the class certification hearing and which is unrealistic because representative PAGA claims are not subject to class certification requirements). Charter's recently adopted discovery arguments are simply repackaged attempts to prevail on arguments it already lost at least once.

2.      Attached as **<u>Exhibit 2</u>** is a true and correct copy of the meet and confer emails exchanged between me and Charter's counsel from May 20 to May 21, 2020. Attachments to the emails are not included. Charter adopted its hardline discovery position for the first time on May 20, 2020 after twice committing to meet and confer in good faith on the scope and timing of class and representative PAGA discovery so that Harper would agree to withdraw two prior discovery motions addressing these same Interrogatories and RFPs. It also demanded that Plaintiffs substantiate with hard evidence—without the benefit of any class or representative PAGA discovery—that Harper is likely to prevail on his class and representative PAGA claims when Charter has exclusive access to all of the relevant witnesses and exclusive possession of all of the relevant records and policies. As shown below, the records and information Plaintiffs have obtained to date strongly suggest that Charter misclassified its "direct sales" employees as exempt during their required "training weeks" and that Charter has no policy or practice of giving signed copies of its Commission Plan or getting signed receipts when it hires commission-eligible employees. Charter also refuses to accept that it lost its preemptive motion to strike Plaintiffs' class and representative PAGA allegations and that Judge Shubb has ordered that all discovery (individual, class, representative PAGA, and merits) is "open" and must be completed by the end of August 2020.

3.      Attached as **<u>Exhibit 3</u>** is a true and correct copy of the Interrogatories that I served on Harper's behalf on September 27, 2019.

4.      Attached as **<u>Exhibit 4</u>** is a true and correct copy of Charter's responses to Harper's Interrogatories which Charter served on November 21, 2019.

5.      Attached as **<u>Exhibit 5</u>** is a true and correct copy of the Requests for Production ("RFPs") that I served on Harper's behalf on September 27, 2019.

6.      Attached as **<u>Exhibit 6</u>** is a true and correct copy of Charter's responses to Harper's RFPs, which Charter served on November 21, 2019.

7.      Attached as **<u>Exhibit 7</u>** is a "Time Detail" report that Charter produced related to Harper's employment. The Time Detail confirms Charter: (1) can easily identify, sort, collect, and produce electronic records using its internal systems; (2) groups its employees in broad categories, such as "MRKTG" (marketing), which includes but is not limited to Harper's specific "Account Executive"

position; (3) does not keep track of daily or weekly hours worked for employees it considered "exempt," even during training weeks when a sales employee is performing training and not "outside sales." Only Charter can confirm what other "direct sales" positions have similar records created based on similar corporate policies and practices. If Charter does not maintain these same or similar records for other positions that it classified as "exempt" outside salespersons, it should simply say so. If Charter does maintain these same or similar records for other positions, those records are relevant to showing Charter has common policies and practices that apply statewide.

8.      Attached as **Exhibit 8** is the "Offer Letter" that Charter produced related to Harper's employment. The Offer Letter confirms Charter: (1) keeps records of how it described the positions that it classified as "exempt" outside salespersons; (2) tells employees they are not eligible for overtime without considering their "training weeks" when they are not even arguably performing "outside sales" for a majority of their working hours; (3) identifies which employees and which positions are "eligible to participate in the Company's Commission Plan;" and (4) identifies the starting dates for such employees, which are the dates by which Charter must give a *signed* copy of the commission plan and get a *signed* receipt). Other onboarding records and training records make no reference to proving a commission plan or obtaining an acknowledgment or signature, which confirms that Charter does not have a policy or practice of actually giving signed copies and getting signed receipts.

9.      Attached as **Exhibit 9** is a training "Transcript Report" that Charter produced related to Harper's employment. The Transcript Report confirms Charter: (1) categorizes its employees, including but not limited to Account Executives, into broader business units such as "Marketing;" (2) can easily identify, sort, collect, and produce such records; (3) classifies such positions as "exempt;" (4) has formalized methods for tracking its training programs for such positions; and (5) expects trainees to complete "assessments" for at least the first two weeks of employment in a sales position before they can start trying to make sales in the field. Harper's report shows his training lasted more than three weeks. There is no suggestion or indication that Charter only has a training program for Account Executives in Redding, California. Rather, the reasonable inference based on Charter's own records is that Charter creates and implements formalized sales training programs statewide (perhaps companywide) that apply to all positions that Charter classifies as "exempt" outside salespersons. If

these same or similar records do not exist for other positions, Charter should simply say so. If Charter does maintain these same or similar records for other positions, those records are relevant to showing Charter has common policies and practices that apply statewide.

10.     Attached as **Exhibit 10** is a "Job Requisition" that Charter produced related to Harper's employment. The Job Requisition shows Charter: (1) maintains formal descriptions of the positions it classifies as "exempt" outside salespersons; (2) offers "professional training" to its salespersons (confirmed by its formal multi-week training program shown in the Transcript Report); (3) keeps track of what positions are "Commission Eligible;" and (4) has business units such as "Marketing," departments such as "direct sales," and formalized support protocols for "Sales & Marketing" that do not appear to be office or product/service specific. If these same or similar records do not exist for other positions, Charter should simply say so. If Charter does maintain these same or similar records for other positions, those records are relevant to showing Charter has common policies and practices that apply statewide.

11.     My investigation during the past 18+ months has focused largely on Charter's misclassification of salespersons as "exempt" during their mandatory training weeks when they are not asked, required, or expected to spend a majority of their working hours performing "outside sales" activities. Other companies properly treat sales *trainees* as nonexempt employees until their training is completed and they start spending most of their working hours performing "outside sales." The records and other information I have been able to obtain show that Charter uses identical or substantially similar training requirements for multiple sales positions, and Charter misclassifies all of its sales *trainees* as exempt. My investigation has also focused on Charter's failure to give *signed* copies of its Commission Plans and get *signed* receipts. The existence or nonexistence of such records is equally relevant: if they exist, Charter may not have violated Labor Code § 2751. If they do not exist, Charter violated the express terms of Labor Code § 2751. As far as I have been able to ascertain, Charter has never produced any signed copies or signed receipts for any sales employees, including Plaintiffs and other employees who are not named parties in this action and who held positions other than Account Executive. I identified for Charter as early as March 5, 2020 the following relevant positions that are clearly covered by the allegations in the FAC: Account Executives, Direct Sales Representatives, Outside Sales

Representatives, and Retail Sales Associates (an "inside" sales position that was also commission-eligible). I have not come across any information that shows or suggests Charter's classification, training, wage payment, meal period, rest break, commission calculation and payment, or termination policies are office-specific or location-specific. Rather, as shown above, every record Charter has produced to date shows or strongly suggests that each Charter office or location in California follows the same corporate policies and protocols that apply statewide, and that most records are collected or maintained in an electronically searchable and producible manner on a statewide or companywide level rather than an office-specific level. Disclosure of the information and production of the records sought by Harper's discovery requests is likely to *confirm* the existence of statewide policies for multiple positions and *confirm* statewide violations of various Labor Code provisions, as Plaintiffs have alleged in the FAC.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. This Declaration was executed on May 27, 2020 at Irvine, California.

By: _____
Jamin S. Soderstrom
*Counsel for Plaintiffs, Putative Class Members,*
*and Aggrieved Employees*