1   MORGAN, LEWIS & BOCKIUS LLP
    Kathryn T. McGuigan, Bar No. 232112
2   kathryn.mcguigan@morganlewis.com
    300 South Grand Avenue
3   Twenty-Second Floor
    Los Angeles, CA  90071-3132
4   Tel:    +1.213.612.2500
    Fax:   +1.213.612.2501
5
    MORGAN, LEWIS & BOCKIUS LLP
6   Zachary W. Shine, Bar No. 271522
    zachary.shine@morganlewis.com
7   Nicole L. Antonopoulos, Bar No. 306882
    nicole.antonopoulos@morganlewis.com
8   One Market, Spear Street Tower
    San Francisco, CA  94105
9   Tel:    +1.415.442.1000
    Fax:   +1.213.612.2501
10
11  Attorneys for Defendant
    Charter Communications, LLC
12
13                  UNITED STATES DISTRICT COURT
14                  EASTERN DISTRICT OF CALIFORNIA
15

16  LIONEL HARPER and DANIEL SINCLAIR,          Case No. 2:19-cv-00902-WBS-DMC
    individually and on behalf of all others similarly
17  situated and all aggrieved employees,        **MEMORANDUM OF POINTS AND
                                                 AUTHORITIES IN SUPPORT OF
18              Plaintiff,                        CHARTER COMMUNICATIONS,
                                                 LLC'S MOTION FOR SUMMARY
19       vs.                                     JUDGMENT OR, IN THE
                                                 ALTERNATIVE, SUMMARY
20  CHARTER COMMUNICATIONS, LLC,                 ADJUDICATION**

21              Defendants.                      Date:    February 8, 2021
                                                 Time:    1:30 p.m.
22                                               Dept:    Courtroom 5
                                                 Judge:   Hon. William B. Shubb
23
24
25
26
27
28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
  SILICON VALLEY

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ IV

II.  FACTUAL BACKGROUND ................................................................................ 2

    A.   Charter Communications. ........................................................................ 2

    B.   The Account Executive Position Is An Exempt Outside Sales Position ............... 2

    C.   Charter Hired Plaintiffs As Account Executives. ...................................... 4

        1.   January 2015 – Charter Hired Sinclair As An AE. ........................... 4

        2.   September 2017 – Charter Hired Harper As An AE. ......................... 4

    D.   Charter Gave Plaintiffs Copies Of Their Signed Commission Plans And Plaintiffs Signed Acknowledgments Of Receipt. ...................................... 5

    E.   Plaintiffs Attended Several Days Of Different Sales-Related Trainings Toward The Beginning Of Each Of Their Employments. ............................ 6

        1.   Sinclair Attended 4.5 Days Of Sales Training In Colorado. .............. 6

        2.   Harper Attended Ten Days Of Sales Training In Redding, California. ....................................................................................... 6

    F.   Sinclair Failed To Meet Charter's Expectations For The AE Position. ............... 7

    G.   Harper Failed To Meet Charter's Expectations For The AE Position. .................. 8

    H.   Charter Terminated Plaintiffs' Employment On April 4, 2017 (Sinclair) And March 12, 2018 (Harper). ............................................................. 8

    I.   On April 19, 2018, Harper Initiated The Litigation Process By Asserting Employment-Related Claims Against Charter. .......................................... 9

    J.   Charter Timely Provided Plaintiffs Copies Of Their Personnel Records And Wage Statements. ........................................................................... 9

    K.   On September 14, 2018, Harper Filed A PAGA Letter With The LWDA. ........... 10

    L.   On November 19, 2018, Harper Sought A Ruling From JAMS That His Claims Were Not Arbitrable. ................................................................ 10

    M.   On May 3, 2019, Harper Filed This Lawsuit Against Charter. On December 13, 2019, Sinclair Joined The Lawsuit Via The First Amended Complaint. ........................................................................................... 10

III.  LEGAL ARGUMENT ...................................................................................... 11

    A.   Summary Judgment Or Adjudication Of Plaintiffs' Claims Is Appropriate. ......... 11

    B.   Charter Properly Classified Plaintiffs As Exempt Outside Salespersons – Plaintiffs' First (Minimum Wage), Second (Overtime), Third (Meal Periods), And Fourth (Rest Periods) Causes Of Action, As Well As All Derivative Causes Of Action, Fail As A Matter Of Law. .................................. 11

        1.   The Outside Salesperson Exemption. ............................................. 11

        2.   Charter Realistically Expected Plaintiffs To Customarily And Regularly Spend More Than 50% Of Their Time Outside The Office – Plaintiffs' Substandard Performance Cannot Save Them. ........... 13

        3.   Plaintiffs Engaged Exclusively In Sales Activities. ............................ 14

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

- i -

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|

4. Training Provided To Plaintiffs Does Not Impact Their Exempt Status. ................................................................................ 16

    a. Plaintiffs' Several Days Of Sales-Related Training Supports Their Classification As Exempt Outside Salespersons. ............... 16

    b. Plaintiffs Cannot Selectively Carve Out Certain Days Or Weeks As A Basis For Their Misclassification Allegations. ....... 18

C. Sinclair's Claims Are Time-Barred. ...................................................... 21

D. Plaintiffs' Fifth Cause Of Action Regarding Commissions Fails. ........................ 22

1. There Is No Private Right Of Action Under Labor Code § 2751. ............ 22

2. Charter Provided Harper With A Signed Commission Plan And Harper Signed An Acknowledgment Of Receipt. ................................... 23

3. Plaintiffs' Labor Code § 204 Claim Fails Because Charter's Commission Plans Comply With Labor Code § 204. .............................. 24

4. Plaintiffs' Labor Code §§ 221, 223 and 224 Claims Fail Because Charter Never Deducted, Reduced, Clawed Back, Or Otherwise Reconciled Plaintiffs' Commissions. ................................................... 24

6. Sinclair's Commission-Related Claims Are Time-Barred. ...................... 25

E. Plaintiffs' Sixth Cause Of Action For Wage Statement Violations Fails. .............. 26

1. The Wage Statement Claim Is Derivative. ............................................ 26

2. The Wage Statement Claim Is Time-Barred And Plaintiffs Cannot Show Actual Damages. ...................................................................... 26

3. The Wage Statements Were Compliant. ................................................ 27

4. Meal And Rest Period Violations Cannot Form The Basis Of A Wage Statement Claim. ............................................................................... 28

F. Plaintiffs' Seventh Cause Of Action For Waiting Time Penalties Fails. .............. 28

1. Plaintiffs' Waiting Time Penalty Fails With Their Other Claims. ........... 28

2. Plaintiffs Cannot Recover Waiting Time Penalties For Meal And Rest Period Violations. ..................................................................... 29

G. Plaintiffs' Eighth Cause Of Action For Violation Of Labor Code §§ 226 and 1198.5 Fails Because Charter Timely Provided Copies Of Plaintiffs' Personnel Records And Wage Statements. ............................................. 30

1. Charter Timely Provided Harper Copies Of His Employment Records. ........................................................................................... 30

2. Charter Provided Sinclair With Timely And Complete Copies Of His Employment Records. ................................................................. 32

H. Plaintiffs' Ninth Cause Of Action For Alleged UCL Violations Fails. .............. 32

I. Harper's PAGA Claim Fails. ................................................................ 32

1. Harper Cannot Establish Any Predicate Violations. ............................. 32

2. Harper's PAGA Claim Is Time-Barred. .............................................. 33

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

- ii -

Case No. 2:19-cv-00902-WBS-DMC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**TABLE OF CONTENTS**
(continued)

**Page**

IV.     CONCLUSION ................................................................................................................ 34

Case No. 2:19-cv-00902-WBS-DMC

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)..................................................................................................11

5

6

*Angeles v. U.S. Airways, Inc.*,
   2013 WL 622032 (N.D. Cal. Feb. 19, 2013)...............................................................26

7

*Barnick v. Wyeth*,
   522 F.Supp.2d 1257 (C.D. Cal. 2007)................................................................ *passim*

8

9

*Beard v. International Business Machines Corporation*,
   2019 WL 1516592 (N.D. Cal. 2019)...........................................................................22

10

*Betancourt v. OS Rest. Servs., LLC*,
   2020 WL 2570839 (Cal. App. 2d Apr. 30 2020) ........................................................29

11

12

*Brody v. AstraZeneca Pharmaceuticals, LP*,
   2008 WL 6953957 (C.D. Cal. June 11, 2008) ......................................................14, 15

13

14

*Bush v. Vaco Tech. Servs.*,
   LLC, 2018 WL 2047807 (N.D. Cal. May 2, 2018)......................................................33

15

*Calderone v. United States*,
   799 F.2d 254 (6th Cir. 1986).......................................................................................11

16

17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).....................................................................................................11

18

*Chavez v. Time Warner Cable, LLC*,
   728 F. App'x 645 (9th Cir. 2018) ................................................................................24

19

20

*Chen v. Lee*,
   2005 WL 3445523 (Cal. Ct. App. 2005)......................................................................34

21

22

*Christopher v. SmithKline Beecham Corp.*
   635 F.3d 383 (9th Cir. 2011)........................................................................................17

23

*City of Oakland v. Hassey*,
   163 Cal.App.4th 1477 (2008).......................................................................................25

24

25

*Culley v. Lincare Inc.*,
   236 F. Supp. 3d 1184 (E.D. Cal. 2017)........................................................................29

26

*Cuvillier v. Alta Colleges, Inc.*,
   2003 WL 25742943 (C.D.Cal. 2003)...........................................................................15

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

iv

DB2/ 39221617.6

*Dillon v. Cloughetry Packing, LLC*,
    2018 WL 6333689 (C.D. Cal. Sep. 4, 2018)......................................................................26, 28

*Dixon v. Zabka*,
    2014 WL 6084351 (D. Conn. Nov 13, 2014) .............................................................................19

*Esparza v. Safeway, Inc.*,
    36 Cal.App.5th 42 (2019)..........................................................................................................33

*Garnett v. ADT LLC*,
    139 F. Supp. 3d 1121 (E.D. Cal. 2015).................................................................................27, 28

*Gomez v. J. Jacobo Farm Labor Contractor, Inc.*,
    334 F.R.D. 234 (E.D. Cal., 2019) ..............................................................................................26

*Guerrero v. Halliburton Energy Servs., Inc.*,
    231 F. Supp. 3d 797 (E.D. Cal. 2017) ........................................................................................30

*Guilfoyle v. Dollar Tree Stores, Inc.*,
    2014 WL 66740 (E.D. Cal. 2014)...............................................................................................18

*Harris v. Best Buy Stores, L.P.*,
    2016 WL 4073327 (N.D. Cal. 2016)...........................................................................................30

*Ingels v. Westwood One Broadcasting Svcs., Inc.*,
    129 Cal. App. 4th 1050 (2005)...................................................................................................32

*Jewel Tea Co. v. Williams*,
    118 F.2d 202 (10th Cir. 1941).......................................................................................16, 17, 20

*Johnson v. Santos*,
    148 Cal. App. 3d 566 (1983) ......................................................................................................34

*Johnson v. Serenity Transp., Inc.*,
    141 F. Supp. 3d 974 (N.D. Cal. 2015) ........................................................................................26

*Jones v. Spherion Staffing, Inc.*,
    2012 WL 3264081 (C.D. Cal. 2012)......................................................................................28, 30

*Karl v. Zimmer Biomet Holdings, Inc.*,
    2019 WL 5677543 (N.D. Cal. Oct. 31, 2019)..............................................................12, 14, 15

*Kastor v. Sam's Wholesale Club*,
    131 F.Supp.2d 862 (N.D. Tex. 2001)..........................................................................................19

*Kirby v. Immoos Fire Prot., Inc.*,
    53 Cal. 4th 1244 (2012) .............................................................................................................29

*Krantz v. BT Visual Images*,
    89 Cal. App. 4th 164 (2001).......................................................................................................32

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

v

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

*Lane v. Humana Marketpoint, Inc.*
2011 WL 2181736 (D. Idaho 2011).................................................................17

*Ling v. P.F. Chang's China Bistro, Inc.*,
245 Cal. App. 4th 1242 (2016)........................................................................30

*Liu v. Win Woo Trading, LLC*,
2016 WL 3231518 (N.D. Cal. June 13, 2016)................................................30

*Maddock v. KB Homes, Inc.*,
2007 WL 2221030 (CD. Cal. 2007)................................................................12

*McDonald v. Antelope Valley Cmty. Coll. Dist.*,
45 Cal.4th 88 (2008) .......................................................................................33

*McKinney v. United Stor–All Ctrs. LLC*,
656 F.Supp.2d 114 (D.D.C. 2009)...................................................................19

*Mikhak v. University of Phoenix*,
2016 WL 3401763 (N.D. Cal. June 21, 2016)................................................23

*Monzon v. Schaefer Ambulance Service, Inc.*,
224 Cal.App.3d 16 (1990)...............................................................................18

*Morales v. Compass Group, PLC*,
2014 WL 5304913 (C.D. Cal. 2014)...............................................................18

*Muldrow v. Surrex Sols. Corp.*,
208 Cal.App.4th 1381 (2012)....................................................................15, 16

*Murphy v. Kenneth Cole Prods.*,
40 Cal. 4th 1094 (2007) ..................................................................................26

*Murray v. Stuckey's, Inc.*,
50 F.3d 564 (8th Cir. 1995).............................................................................19

*Naranjo v. Spectrum Sec. Servs., Inc.*,
40 Cal.App.5th 444 (2019).........................................................................28, 29

*Nielsen v. DeVry, Inc.*
302 F.Supp.2d 747 (W.D. Mich. 2003).....................................................17, 18

*Noe v. Superior Court*,
237 Cal. App. 4th 316 (2015)..........................................................................30

*Nordquist v. McGraw-Hill Broadcasting Co.*,
32 Cal.App.4th 555 (1995)..............................................................................18

*Ortega v. J.B. Hunt Trans., Inc.*,
258 F.R.D. 361 (C.D. Cal. 2009)....................................................................27

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

vi

*Pac. Gas & Elec. Co. v. Jesse M. Lange Distrib., Inc.*,
2005 WL 3507968 (E.D. Cal. Dec. 21, 2005)...................................................................22

*Peabody v. Time Warner Cable, Inc.*,
59 Cal.4th 662 (2014) .......................................................................................................24

*Perez v. RadioShack Corp.*,
2005 WL 2897378 (N.D. Ill. 2005).....................................................................................19

*Ramirez v. Yosemite Water Co.*,
20 Cal. 4th 785 (1999) ..................................................................................1, 12, 13, 14

*Ramos v. Garcia*,
248 Cal. App. 4th 778 (2016)...........................................................................................30

*Rojas-Cifuentes v. ACX Pacific Northwest Inc.*,
2016 WL 6217060 (E.D. Cal. Oct. 15, 2016) ....................................................................22

*Schmidt v. Eagle Waste Recycling, Inc.*
598 F.Supp.2d 928 (W.D. Wisc. 2009), *aff'd*, 599 F.3d 626 (7th Cir. 2010) .........................16

*Singer v. Becton, Dickenson & Co.*,
2008 WL 2899825 (S.D. Cal. 2008) ..................................................................................22

*Singletary v. Teavana Corp.*,
2014 WL 1760884 (N.D. Cal. Apr. 2, 2014) ......................................................................30

*Smith v. Rent-A-Center, Inc.*,
2019 WL 3004160 (E.D. Cal. July 10, 2019) .....................................................................23

*Swafford v. Int'l Bus. Machines Corp.*,
383 F.Supp.3d 916 (N.D. Cal. Apr. 7, 2019) .....................................................................22

*Tanis v. Southwest Airlines, Co., et al*,
2019 WL 1111240 (S.D. Cal. Mar. 11, 2019) ....................................................................23

*Vicko Ins. Serv. Inc. v. Ohio Indem. Co.*,
70 Cal. App. 4th 55 (1999)...............................................................................................30

*Yadira v. Fernandez*,
2011 WL 4101266 (N.D. Cal. Sep. 8, 2011).......................................................................32

*Young v. United Parcel Service, Inc.*,
135 S.Ct. 1338 (2015) .....................................................................................................21

**Statutes**

Bus. & Prof. Code § 17200 (California Unfair Competition Law )..........................................11, 32

Cal. Civ. Code § 1633.1 *et seq.*.........................................................................................23

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

vii

Cal. Code Civ. Proc.
    § 338 ................................................................................................................21
    § 340(a) .......................................................................................21, 26, 27, 33

Cal. Code Regs. tit. 8, §§ 11040(1)(C), (2)(M) ..........................................11, 12, 18

Cal. Lab. Code
    § 201 ................................................................................................................29
    § 203 .........................................................................................................29, 30
    § 204 .......................................................................................................*passim*
    § 204(a) ...........................................................................................................24
    § 221 .......................................................................................................*passim*
    § 223 .......................................................................................................*passim*
    § 224 .......................................................................................................*passim*
    § 226 .......................................................................................................*passim*
    §226(a) .............................................................................................................28
    § 226(b) .......................................................................................................9, 10
    § 226(b) ...........................................................................................................31
    § 226(j) ............................................................................................................27
    § 226(j) ............................................................................................................27
    § 226.7 .................................................................................................28, 29, 30
    § 432 ................................................................................................................30
    § 1171 ..............................................................................................................11
    § 1198.5 ...........................................................................................................31
    § 1198.5 ...........................................................................................2, 30, 31, 32
    § 1198.5(e) ......................................................................................................30
    § 1198.5(n) ........................................................................................................9
    § 2751 .................................................................................................1, 22, 23
    § 2751(b) .........................................................................................................22
    § 2752 ..............................................................................................................22

Private Attorneys General Act ("PAGA") ............................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................11

**Other Authorities**

Wage Order No. 4–2001 (1)(C) ..............................................................................11

Wage Order No. 4–2001 (2)(M) ..............................................................11, 12, 18

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I. <u>INTRODUCTION</u>

"Not a fan of being stuck in the office? This role will keep you on the go. Working door-to-door in local neighborhoods, you'll match companies with the customized services that best fit their needs." That is how Charter Communications, LLC ("Charter") presents the Business Account Executive ("AE") position; an outside sales position.

Charter's realistic expectation is that all AEs, including former Charter AEs Lionel Harper and Daniel Sinclair (collectively "Plaintiffs"), customarily and regularly spend more than 50% of their work day outside the office selling Charter's services directly to small and medium-sized businesses within a defined territory. As Plaintiffs' manager, Andrea Benner, Manager, Sales Business Accounts, succinctly put it, "[a]ccount executives should spend most of their time in the field … It's the job." Benner Depo. 103:1-11, 88:14-91:15 ("We are a field-based sales organization … the purpose of [an account executive's] job is to be in the field, knocking that door and meeting that customer face-to-face.").

Plaintiffs, both poor performers and both terminated when they failed to return from medical leave, now argue that because they disregarded Charter's realistic expectations for the AE position, failed to meet their sales objectives, and unilaterally chose to spend less than 50% of their time outside the office, they should be allowed to evade the valid outside salesperson exemption. The California Supreme Court is clear, "an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption." *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 802 (1999). Because Charter properly classified Plaintiffs as exempt under the outside salesperson exemption, Plaintiffs' first (minimum wage), second (overtime), third (meal periods), fourth (rest periods), sixth (wage statements), seventh (waiting time penalties), and ninth (unfair competition) causes of action, fail as a matter of law.

Plaintiffs' fifth cause of action for alleged "unlawful calculation, deduction, and payment of commission wages" in violation of California Labor Code §§ 2751, 204, 221, 223 and 224 also fails because, Harper never earned a commission, Sinclair's commission-related claims are time-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

1

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

barred, there is no private right of action under Labor Code § 2751, Charter provided Plaintiffs with copies of their commission plans for which they acknowledged receipt, and Charter's commission plans and practices comply with Labor Code §§ 204, 221, 223 and 224. Plaintiffs' eighth cause of action for violation of Labor Code §§ 226 and 1198.5 fails because Charter timely provided Plaintiffs copies of their employment records. Harper's tenth cause of action for civil penalties under the Private Attorneys General Act ("PAGA") fails because Harper cannot establish any predicate violations and, even if he could, his PAGA claim is time-barred.

Because all of Plaintiffs' causes of action fail as a matter of law, Charter respectfully requests that this Court enter summary judgment or, in the alternative, summary adjudication, in favor of Charter.

## II.     FACTUAL BACKGROUND

### A.     Charter Communications.

Charter is a broadband connectivity company and cable operator serving business and residential customers under the Spectrum brand, among others. Declaration of Andrea Benner ("Benner Decl."), ¶ 3. Charter utilizes outside salespersons, called Account Executives, to sell its services directly to small and medium-sized businesses. *Id.*

### B.     The Account Executive Position Is An Exempt Outside Sales Position.

A Charter AE is an outside salesperson. *Id.* AEs are responsible for going door-to-door, selling Charter's phone, internet and television services directly to small and medium sized businesses in an assigned geographic area. Undisputed Fact ("UF") 4. Charter advertises the AE position as follows:

> Not a fan of being stuck in the office? This role will keep you on the go. Working door-to-door in local neighborhoods, you'll match companies with the customized services that best fit their needs. Independent workers will find a freedom, entrepreneurial spirit and unlimited earning potential that they'll love. Earn the opportunity to "own your day" and work like a self-employed business owner – but without any risks attached. To qualify, you'll need at least one year of experience in a customer service or outside sales role.

Benner Decl., ¶ 5. The AE position is targeted to people who "enjoy being on the go and out of the office," are "self-motivated," and "independent and goal oriented." Benner Decl., ¶¶ 5, 12, Ex. B. Qualifications for the position include, but are not limited to, prior experience in a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

2

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   prospecting, cold-calling sales role; success in a previous sales position; a valid driver's license;

2   car insurance; a satisfactory driving record and the use of a reliable personal vehicle; and

3   experience working with the public. *Id.*

4          Charter expects AEs to customarily and regularly spend more than 50% of their work

5   hours outside of the office visiting businesses and engaging in other sales-related activities. UF 4.

6   A typical day for an AE starts at approximately 8:00 a.m. and ends at approximately 5:00 p.m.

7   Benner Decl., ¶¶ 10-13, Ex. A. Charter instructs AEs to, "look forward to the day in three

8   blocks:" (1) "in the office" from 8:00 a.m. – 10:00 a.m. (2 hours); (2) "outside the office" from

9   10:00 a.m. – 3:00 p.m. (5 hours); and (3) "back in the office" from 3:00 p.m. – 5:00 p.m. (2

10  hours) (at least 55.6% outside of the office). *Id.* Andrea Benner, Manager, Sales Business

11  Accounts, who managed Plaintiffs Lionel Harper and Daniel Sinclair, expected AEs on her team,

12  including Plaintiffs, to be outside the office selling from at least 10:00 a.m. – 4:00 p.m. (at least

13  66.7% of their work time). Benner Decl., ¶¶ 12-13.

14         Charter expects AEs to perform minimal work inside the office. UF 6. If an AE does not

15  have any morning sales meetings scheduled with prospective customers, the 8:00 a.m. – 10:00

16  a.m. period is generally spent in the office attending a morning sales call with the regional sales

17  manager, preparing sales proposals, setting up appointments with prospective customers, and

18  monitoring existing sales. UF 4.

19         Thereafter, Charter expects AEs to spend the majority of the day, from at least 10:00 a.m.

20  – 3:00 p.m. or 4:00 p.m., outside the office visiting businesses in an attempt to sell Spectrum

21  services. *Id.* Charter emphasizes that "out of the office" is "where the heavy lifting is done" and

22  "[t]he objective here is to be customer-facing," including, "door-to-door knocking, visiting

23  scheduled appointments, giving quotes to prospects, managing escalations as they arise," and,

24  "[o]verall, showing customers the great products we offer and how much they can save." *Id.*

25  Charter expects AEs to meet "daily minimum goals" every day, including, physically visiting 25-

26  30 businesses, preparing two proposals, attending two pre-arranged appointments with potential

27  customers, scheduling two new appointments, and closing one sale. UF 5. Charter provides AEs

28  with a "leads list" every month that contains the name and address of approximately 200-275

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

3

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1    local businesses within an assigned territory. *Id.*; Declaration of Zachary Shine ("Shine Decl."),

2    Ex. A, Sinclair Depo. 119:21-25; Ex. B, Harper Depo. 104:16-105:7.[1] AEs are required to visit all

3    of the viable businesses on their list in person and attempt to sell Spectrum services to the

4    business or otherwise note that the business is no longer active. *Id*. AEs at Charter's Redding,

5    California location regularly visit businesses as far as 45 minutes outside of Redding. Sinclair

6    Depo. 95:3-96:10; Ex. B, Harper Depo. 98:16-99:16.

7        Charter expects the end of a typical day, from approximately 3:00 p.m. or 4:00 p.m. – 5:00

8    p.m., to be spent back in the office following up on sales, meeting with the sales manager, filling

9    out the disposition report, and closing out any non-viable leads on the leads list. Benner Decl.,

10   ¶ 4-14, Exs. A-B. AEs are solely focused on sales – they do not perform installations, general

11   customer service, or construction. UF 3.

12       C.      **Charter Hired Plaintiffs As Account Executives.**

13           1.       **January 2015 – Charter Hired Sinclair As An AE.**

14       On January 5, 2015, Charter hired Sinclair as an AE in Redding, California. UF 1. Sinclair

15   understood the job of an AE was to sell Spectrum services. Sinclair Depo., 52:3-20. He explained

16   the job was presented as an outside sales position, which was appealing to him. *Id*. at 47:24-51:6.

17   He was attracted by the prospect of earning commissions and the ability to "own his own day."

18   *Id*. During Sinclair's employment, he had two managers – Wade Smith and Andrea Benner. *Id*. at

19   61:13-62:22. Both were located in Medford, Oregon. *Id*. They did not directly supervise Sinclair's

20   day-to-day activities. *Id*.

21           2.       **September 2017 – Charter Hired Harper As An AE.**

22       On September 18, 2017, Charter hired Harper as an AE in Redding, California. UF 2.

23   Harper understood an AE at Charter would spend a large portion of his time outside the office

24   engaged in door-to-door sales. Harper Depo. 69:6-15. Being on the go, out of the office, was an

25   attractive part of the AE position for Harper. *Id*. He was "self-motivated," "goal oriented," and

26   attracted to the ability to earn commissions based on his sales. *Id*. at 66:8-17. The fact that the job

27

28

---

[1] All references to the Sinclair, Harper and Benner depositions refer to the deposition excerpts attached as Exhibits A-C to the Shine Declaration.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

4

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1    was advertised as allowing him to "own your day" was also appealing. *Id*. at 67:8-14. Benner was

2    Harper's manager during his entire employment. *Id*. at 79:18-80:23. Since she was located in

3    Medford, Oregon, Benner did not directly supervise Harper's day-to-day activities. *Id*.

4    **D.    Charter Gave Plaintiffs Copies Of Their Signed Commission Plans And**
     **Plaintiffs Signed Acknowledgments Of Receipt.**

5

6    Charter provides all AEs with an electronic copy of their commission plan, for which all

7    AEs are required to acknowledge receipt. Benner Decl. ¶¶ 20-22, Ex. G; Benner Depo. 115:15-

8    116:6, 124:11-126:16. During the time Charter employed Plaintiffs, Charter directed newly hired

9    AEs to log on to a program called "Synygy" to access compensation and commission

10   information, including a copy of their commission plan. *Id*. Upon first accessing Synygy, or if a

11   new commission plan was implemented, AEs were prompted with a screen listing the documents

12   they were required to acknowledge, with a note stating, "Plan Acknowledgments: Please

13   Acknowledge These Plan Changes." *Id*. AEs were directed to click the box next to the signed

14   "AE Commission Plan" for that particular period. *Id*. After reviewing the plan, AEs were required

15   to click the acknowledge box, which read, in part, "I acknowledge, by my acceptance below, that

16   I have read, understood, and agree to comply with the terms and conditions of the attached plan

17   document." *Id*. Only by reviewing the commission plan and affirmatively acknowledging review

18   and receipt by clicking the acknowledgment box, could AEs "clear" the acknowledgment page

19   and gain access to Synygy. *Id*.

20   Charter gave Sinclair a signed copy of his commission plan and Sinclair acknowledged

21   receipt. UFs 14-15. When asked at deposition whether he accessed Synygy during his

22   employment with Charter, Sinclair responded, "I assume I did." Sinclair Depo. 81:25-82:24. He

23   also stated that if Charter required him to access Synygy and electronically acknowledge receipt

24   of his commission plans, which it did, he would have done so. *Id*. at 79:6-82:24, 90:11-92:8. He

25   also admitted he accessed information about his commission earnings, which could only be done

26   through Synygy. *Id*. at 73:20-74:16, 79:6-82:24.

27   Charter also gave Harper a signed copy of his commission plan and Harper acknowledged

28   receipt. UFs 12-13. Charter's records show that on September 29, 2017, at 2:36 p.m., Harper

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

5

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

accessed Synygy using his unique username and password and electronically signed the

acknowledgment and receipt affirming he received and reviewed a copy of his commission plan.

Benner Decl. ¶ 23.

Under the terms of the commission plans applicable to Harper and Sinclair, AEs earned

commissions on a monthly basis. UF 16. Charter then paid AEs for their earned commissions on a

monthly basis once the commission was earned. UF 17. Under the commission plans applicable

to Plaintiffs, commissions were not "earned" until several different criteria were met. *Id*. The

commission plans did not provide for any deductions, reductions, claw backs or reconciliations

initiated by Charter. UF 20. They also did not provide for an "advance" or "loan" that Charter

could recoup in the case of, for example, a return, refund or chargeback. UF 21.

**E.     Plaintiffs Attended Several Days Of Different Sales-Related Trainings Toward The Beginning Of Each Of Their Employments.**

**1.     Sinclair Attended 4.5 Days Of Sales Training In Colorado.**

In January 2015, Sinclair travelled to Colorado for 4.5 days of sales-related training. UF 7.

Sinclair admitted the goal of the training was to assist AEs in successfully selling Charter

products and services. *Id*. ("the goal was to make us familiar with the products so we could sell

them."). *Id*. The format was a mix of live instruction, videos, and interactive role playing. Sinclair

Depo. 232:5-234:23. During these 4.5 days, Sinclair learned about Charter's products and

services, engaged in course work, and participated in simulated sales activities. *Id*. These 4.5 days

amount to less than 1% of Sinclair's employment with Charter. Sinclair Depo. 268:17-19; Benner

Decl., ¶ 31, Ex. L.

**2.     Harper Attended Ten Days Of Sales Training In Redding, California.**

In late September and early October 2017, Harper attended 10 days of sales-related

training in Redding, California. UF 8. The goal of the training was to familiarize AEs with

Charter's sales practices and the products and services they were selling. *Id*. Charter described

this training as follows:

> Over the course of the next ten (10) days we will introduce and review participants
> to the world of Charter and Spectrum Business products and services through
> interactive exercises and activities, covering our amazing suite of tools, products,
> strategies and best practices we require of you, our BAEs, so that you are well

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

Case No. 2:19-cv-00902-WBS-DMC

DB2/ 39221617.6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

equipped to go out in the field and make the best sales presentation possible. *Id*. The trainings included live, interactive, video conferences, interactive online modules, and training outside the office, including shadowing more experienced salespersons. *Id*.; Harper Depo. 193:23-194:5. Harper explained the training was "primarily sales-related training" so that he could gain "an understanding of Charter's sales practices and the products and services I was selling." *Id*. Harper's ten days of sales-related training amount to less than 6% of Harper's short employment with Charter. Harper Depo. 78:16-79:17; Benner Decl., ¶ 35, Ex. P.

**F.     Sinclair Failed To Meet Charter's Expectations For The AE Position.**

During Sinclair's and Harper's employment, Charter required all AEs, including Sinclair and Harper, to meet or exceed certain monthly sales goals. UF 9. Sinclair failed to meet Charter's expectations for the AE position, including failing to meet sales goals, and failing to spend enough time outside the office selling Charter's services. UF 10. On October 19, 2015, several months after Sinclair began his employment, Charter issued Sinclair the first of many written corrective actions related to his failure to meet Charter's expectations for the AE position. *Id*. Specifically, Charter issued a verbal warning and required Sinclair to report his daily activities, "to ensure he is performing at a level that will get [h]is signed and installed numbers up to standards." *Id*. A few months later, on April 4, 2016, Charter issued Sinclair a second verbal warning and corrective action regarding his continued substandard performance. *Id*. Charter advised, "Sinclair has not produced sales results that meet the requirements outlined in the Spectrum business standards of performance." *Id*. In particular, Sinclair was not spending enough time outside the office visiting prospective customers. *Id*. Benner expressly told Sinclair, "[y]ou must focus your efforts on reaching new customers to sign" and "selling from your lead list." *Id*. She explained, "you are not adding enough new business contacts to your funnel. The only way you are going [to] meet the requirements to [] meet quota is to ***increase your field activity***. Your goal each day need[s] to be to connect with a minimum of 30 leads per day to ensure you have enough contact[s] to follow up with." *Id*. (emphasis added). In July 2016, Benner completed an "Incident Investigation Report" regarding Sinclair's continued substandard performance and recommended a final warning. *Id*. Benner again informed Sinclair that he must spend more time

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

7

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  outside the office visiting prospective customers ("not enough leads are being worked"). *Id*.

2  Sinclair admitted Benner was telling him he was "not doing enough." *Id*.

3      **G.      Harper Failed To Meet Charter's Expectations For The AE Position.**

4          Harper failed to meet Charter's expectations for the AE position, including failing to meet

5  sales goals, and failing to spend enough time outside the office selling Charter's services. UF 11.

6  On January 5, 2018, just three months after Harper was hired, Charter issued a verbal warning

7  concerning his sales performance and placed him on a performance improvement plan ("PIP").

8  *Id*. Harper was advised that he failed to meet the minimum sales target for December 2017 and

9  was trending "below expectations" for January 2018. *Id*. During Harper's employment, in order

10 to earn *any* commission, an AE was required to reach the "Minimum PSU Threshold" of at least

11 15 connected Primary Service Units ("PSUs") per commission period. *Id*. Harper's commission

12 statements show he never earned a commission during his employment with Charter because he

13 failed to generate at least 15 connected PSUs in any commission period (October 2017 = 0 PSUs;

14 November 2017 = 2 PSUs; December 2017 = 7 PSUs; January 2018 = 4 PSUs; February 2018 =

15 2 PSUs). UF 19.

16         On January 11, 2018, Benner instructed Harper that in order to meet Charter's

17 expectations for the AE position, Harper would need to spend more time outside the office

18 visiting prospective customers, explaining, it "all starts with ***increasing your daily activity***. Your

19 (sic) had 5 door swings yesterday, no appointments and no sales. ***You need to increase your***

20 ***activity to the minimum of 30-40 doors*** which will give you the opportunity to fill your funnel

21 with viable opportunities." Benner Decl, ¶¶ 17-18, 32-33, Exs. D-E, M-N. (emphasis added). On

22 January 26, 2018, Benner prepared a written corrective action and further PIP based on Harper's

23 continued failure to increase his sales activity and meet Charter's expectations. *Id*.

24      **H.      Charter Terminated Plaintiffs' Employment On April 4, 2017 (Sinclair) And**
                 **March 12, 2018 (Harper).**
25

26         On August 4, 2016, Sinclair began an extended leave of absence. Benner Decl., ¶ 31, Ex.

27 L. He remained on leave from August 4, 2016 through his termination on April 4, 2017. UF 31.

28 The last day Sinclair performed any work for Charter was in July 2016. UF 30. On or about

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

8

Case No. 2:19-cv-00902-WBS-DMC

DB2/ 39221617.6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

February 3, 2018, Harper took a medical leave of absence. Benner Decl., ¶ 34, Ex. O. He remained on leave though his termination on March 12, 2018. UF 33. The last day Harper performed any work for Charter was January 30, 2018. UF 32.

**I.      On April 19, 2018, Harper Initiated The Litigation Process By Asserting Employment-Related Claims Against Charter.**

On April 19, 2018, Harper initiated the litigation process by asserting employment-related claims against Charter with JAMS. Shine Decl., ¶ 5, Ex. D; Harper Depo. 221:2-224:11. Harper was not represented by counsel at the time. *Id.* ("No, I do not have representation.").

**J.      Charter Timely Provided Plaintiffs Copies Of Their Personnel Records And Wage Statements.**

Charter timely provided Harper copies of his personnel records and wage statements. UFs 26-27. On June 5, 2018, Harper's current counsel, Jamin Soderstrom, sent a letter to Charter requesting Harper's wage statements and personnel records. *Id.* The letter was not signed by Harper, but contained a purported "authorization for release of employment records," that was allegedly executed using "DocuSign." *Id.* In response, counsel for Charter advised Soderstrom that Harper had already initiated the litigation process against Charter, and, as a result, Charter was not obligated to produce Harper's personnel documents pursuant to Labor Code § 1198.5(n). *Id.* Charter's counsel also explained that because section 226(b) does not contemplate production of wage statements to a representative of an employee, Charter was requesting that Harper make the request for these records himself. *Id.* After further meeting and conferring about Harper's identity and Soderstrom's alleged representation, on July 18, 2018, Charter agreed to produce the requested documents. *Id.* However, on July 23, 2018, Charter received an email directly from Harper, in which he stated, "***I do not currently have representation***…." *Id.* (emphasis added). Charter's counsel then contacted Soderstrom stating, "Charter received an email from Mr. Harper yesterday indicating he is not currently represented. We would like to get some clarification from you regarding whether or not you are representing Mr. Harper." *Id.* However, Soderstrom refused to provide even a simple note from his alleged client indicating he was represented by Soderstrom. *Id.* Finally, on August 29, 2018, Harper emailed Charter's counsel directly and stated

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

9

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  Soderstrom now represented him regarding his employment-related claims against Charter. *Id*.

2  Six days (four business days) later, Charter produced copies of Harper's wage statements and

3  personnel file. *Id*.

4       On October 2, 2019, Sinclair requested copies of his personnel file and wage statements.

5  Dkt. 45, ¶ 63. Fifteen days later, on October 17, 2019, Charter timely produced copies of

6  Sinclair's personnel file and wage statements. UFs 28-29.

7      **K.**     **On September 14, 2018, Harper Filed A PAGA Letter With The LWDA.**

8       On September 14, 2018, Harper filed a Private Attorneys General Act ("PAGA") letter

9  with the Labor and Workforce Development Agency ("LWDA"). UF 34. The letter was only filed

10  on behalf of Harper – not Sinclair. *Id*. Sinclair is not asserting a PAGA claim in this case. Dkt. 45.

11      **L.**     **On November 19, 2018, Harper Sought A Ruling From JAMS That His**
12              **Claims Were *Not* Arbitrable.**

13       On November 19, 2018, Harper filed what he referred to as a "demand for arbitration"

14  with JAMS. UF 35. Harper voluntarily filed his "demand for arbitration" without a Court order

15  compelling arbitration and without a tolling agreement in place. *Id*. But Harper did not actually

16  pursue arbitration of any of his claims. *Id*. Rather, in his initial filing, he argued his claims were

17  *not* arbitrable. *Id*. ("[n]o part of the disputes between the Parties is arbitrable."). He maintained,

18  "the arbitration agreement is null and void" "for lack of jurisdiction" and demanded to pursue all

19  of his claims, including his PAGA claim, "in court" *rather than* in arbitration. *Id*.

20      **M.**     **On May 3, 2019, Harper Filed This Lawsuit Against Charter. On December**
21              **13, 2019, Sinclair Joined The Lawsuit Via The First Amended Complaint.**

22       On May 3, 2019, Harper filed this action against Charter Communications, LLC and

23  Charter Communications, Inc. UF 36. On December 13, 2019, Harper and Sinclair filed a First

24  Amended Complaint ("FAC"), adding Sinclair as a plaintiff, and dismissing Charter

25  Communications, Inc. UF 37. The operative FAC alleges the following ten causes of action

26  against Charter: (1) Failure to Pay Minimum Wages for All Hours Worked, (2) Failure to Pay

27  Overtime Wages for All Overtime Hours Worked, (3) Failure to Provide Meal Periods or Pay

28  Premium Wages In Lieu Thereof, (4) Failure to Provide Rest Breaks or Pay Premium Wages in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

10

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  Lieu Thereof, (5) Unlawful Calculation, Deduction, and Payment of Commission Wages, (6)

2  Failure to Provide Accurate Wage Statements, (7) Failure to Pay All Wages Owed Upon

3  Termination, (8) Failure to Provide Timely and Complete Copies of Employment Records, (9)

4  Violation of California's Unfair Competition Law, and (10) PAGA Civil Penalties. *Id.*

5  ### III.  <u>LEGAL ARGUMENT</u>

6  ### A.  <u>Summary Judgment Or Adjudication Of Plaintiffs' Claims Is Appropriate.</u>

7  Under Federal Rules of Civil Procedure, Rule 56(a), "[t]he court shall grant summary

8  judgment if the movant shows that there is no genuine dispute as to any material fact and the

9  movant is entitled to judgment as a matter of law." The moving party's showing "must be

10  sufficient for the court to hold that no reasonable trier of fact could find other than for the moving

11  party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). A defendant seeking

12  summary judgment on a matter for which it has the burden of persuasion at trial must demonstrate

13  there is no triable issue as to the matters alleged in its own pleadings. *Id.* Where the moving party

14  does not have the ultimate burden of persuasion at trial, summary judgment can be obtained by

15  either: (1) affirmatively negating an essential element of the opposing party's claim(s); or (2) by

16  showing the opposing party does not have sufficient evidence to allow a jury to find in its favor

17  on an essential element of its claim(s). *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-160

18  (1970); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). For the reasons set forth

19  below, this Court should grant summary judgment in Charter's favor.

20  ### B.  <u>Charter Properly Classified Plaintiffs As Exempt Outside Salespersons – Plaintiffs' First (Minimum Wage), Second (Overtime), Third (Meal Periods), And Fourth (Rest Periods) Causes Of Action, As Well As All Derivative Causes Of Action, Fail As A Matter Of Law.</u>

21

22

23  ### 1.  <u>The Outside Salesperson Exemption.</u>

24  Outside salespersons are exempt from California's minimum wage, overtime, and meal

25  and rest period requirements. *Barnick v. Wyeth*, 522 F.Supp.2d 1257, 1261 (C.D. Cal. 2007); Cal.

26  Lab. Code § 1171; Wage Order No. 4–2001 (1)(C). California defines an outside salesperson as

27  any person "who customarily and regularly works more than half the working time away from the

28  employer's place of business selling tangible or intangible items or obtaining orders or contracts

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

11

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
DB2/ 39221617.6      FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   for products, services, or use of facilities." Cal. Code Regs. tit. 8, §§ 11040(1)(C), (2)(M); Wage

2   Order No. 4–2001 (2)(M). The outside salesperson exemption exists because, "it's very difficult

3   to control their hours and working conditions. They set their own time, and they're on the road,

4   they call on their customers…. [R]arely do you know what they're doing on an hour-to-hour

5   basis." *Barnick*, 522 F.Supp.2d at 1261, *citing*, California Department of Labor Standards

6   Enforcement ("DLSE") Op. Letter, Sept. 8, 1998.[2] Courts have long recognized:

> The reasons for excluding an outside salesman are fairly apparent. Such salesmen, to a great extent, works individually, There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates, [sic] In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

12   *Barnick*, 522 F.Supp.2d at 1262, *citing*, *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–208 (10th

13   Cir. 1941). Unlike the white-collar exemptions (executive, administrative, professional), the

14   outside salesperson exemption does not have a minimum salary basis requirement. Cal. Code

15   Regs. tit. 8, §§ 11040(1)(C), (2)(M); Wage Order No. 4–2001 (2)(M).

16   California "[c]ourts must take a holistic view of the 'realistic' requirements of a job's

17   duties in determining whether an employee qualifies as an outside salesperson." *Karl v. Zimmer*

18   *Biomet Holdings, Inc.*, 2019 WL 5677543, at *5 (N.D. Cal. Oct. 31, 2019); *Ramirez*, 20 Cal.4th at

19   802. Courts also examine, "how the employee actually spends his or her time." *Ramirez*, 20

20   Cal.4th at 802. The court then must determine, "whether the employee's practice diverges from

21   the employer's realistic expectations, whether there was any concrete expression of employer

22   displeasure over an employee's substandard performance, and whether these expressions were

23   themselves realistic given the actual overall requirements of the job." *Id.* "[A]n employee who is

24   supposed to be engaged in sales activities during most of his working hours and falls below the 50

25   percent mark due to his own substandard performance should not thereby be able to evade a valid

26   _____

27   [2] "Courts defer to the agency charged with enforcing a regulation when interpreting a regulation because the agency possesses expertise in the subject area." *Maddock v. KB Homes, Inc.*, 2007

28   WL 2221030, at *9–10 (CD. Cal. 2007), *quoting*, *Cicairos v. Summit Logistics, Inc.*, 133 Cal.App.4th 949, 958 (2005)); *See also, Barnick*, 522 F.Supp.2d at 1262.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

12

Case No. 2:19-cv-00902-WBS-DMC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   exemption." *Id.*

2       **2.     Charter Realistically Expected Plaintiffs To Customarily And
          Regularly Spend More Than 50% Of Their Time Outside The Office –
3         Plaintiffs' Substandard Performance Cannot Save Them.**

4            Charter's realistic expectation was that Harper and Sinclair, as AEs, would customarily

5    and regularly spend more than 50% of their work day outside of the office selling Charter's

6    services. UF 4. Charter's sales training specifically instructed AEs to spend at least five out of

7    nine hours a day (55.6%) outside the office making sales. Benner Decl., ¶ 12, Ex. A. Moreover,

8    Plaintiffs' manager, Andrea Benner, instructed Plaintiffs to spend at least six out of nine hours a

9    day (66.7%) outside of the office selling. Benner Decl., ¶¶ 12-13; Benner Depo. 88:14-91:15

10   ("We are a field-based sales organization … the purpose of [an account executive's] job is to be

11   in the field, knocking that door and meeting that customer face-to-face."), 73:2-8 ("the behaviors

12   of a successful account executive" are "spending time in the field and door-knocking."), 103:1-11

13   ("Account executives should spend most of their time in the field … It's the job."). Harper

14   understood Charter expected him to work outside the office, visiting potential customers, during

15   at least the target "window" or "peak hours" discussed during his training (*i.e.* 10:00 a.m. – 3:00

16   p.m.). Harper Depo., 146:1-25, 145:14-25; 151:16-152:21 ("I definitely would strive to hit the

17   things that I was taught all salespeople should do while I was in training which was to try to make

18   those windows … I tried to stick with the company plan and what I learned in training which was,

19   you know, get out there at that time."). Moreover, both Plaintiffs admit that when they applied for

20   the AE position, they expected they would be spending their time outside the office, going door to

21   door, selling Spectrum services. Sinclair Depo. 47:24-51:6, 52:3-20; Harper Depo. 65:11-15,

22   69:6-15, 146:1-25, 151:25-152:21.

23           The California Supreme Court made clear, "an employee who is supposed to be engaged

24   in sales activities during most of his working hours and falls below the 50 percent mark due to his

25   own substandard performance should not thereby be able to evade a valid exemption." *Ramirez*,

26   20 Cal.4th at 802. Throughout Plaintiffs' employment, Charter provided concrete, realistic

27   expressions of displeasure about Plaintiffs' substandard performance. Both Harper and Sinclair

28   received corrective action and were placed on performance improvement plans for failing to meet

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

13

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION
DB2/ 39221617.6

1   Charter's expectations for the AE position *because they did not spend enough time outside the*

2   *office selling*. Benner Decl, ¶¶ 17-19, 27-30, 32-33, Exs. D-F, H-N. Only three months into

3   Harper's employment, Benner issued Harper a corrective action, in which she wrote, it "all starts

4   with *increasing your daily activity*. Your (sic) had 5 door swings yesterday, no appointments and

5   no sales. *You need to increase your activity to the minimum of 30-40 doors* which will give you

6   the opportunity to fill your funnel with viable opportunities." Benner Decl., ¶ 33, Ex. N.

7   Similarly, Benner issued several corrective actions to Sinclair in which she told Sinclair that in

8   order to reach his sales goals he "must focus [his] efforts on reaching new customers to sign."

9   Benner Decl., ¶¶ 28-30, Exs. I-K. She also explained, "you are not adding enough new business

10  contacts to your funnel. The only way you are going [to] meet the requirements to [] meet quota is

11  to *increase your field activity*. Your goal each day need[s] to be to connect with a minimum of 30

12  leads per day to ensure you have enough contact[s] to follow up with." *Id*. (emphasis added).

13  When Benner instructed Sinclair to "create a strategy to increase your monthly signings," Sinclair

14  stubbornly refused, stating, even though he was falling below expectations, "my strategy was

15  solid." Sinclair Depo., 176:8-178:5. In a subsequent performance improvement plan, Benner

16  again informed Sinclair that he must spend more time outside the office visiting prospective

17  customers ("not enough leads are being worked"). *Id*. Sinclair agreed that by writing this, Benner

18  was telling him that he was "not doing enough." Sinclair Depo. 185:6-186:10. Because Plaintiffs'

19  practices diverged from Charter's realistic expectations for the AE position, Plaintiffs cannot rely

20  on their own substandard performance in order to evade the valid outside salesperson exemption.

### 3.   Plaintiffs Engaged Exclusively In Sales Activities.

22      "Sales" includes much more than just meeting with customers and signing a sales contract

23  – it also includes other "sales-related" activities. *Ramirez*, Cal.4th at 801-802 ("surely the most

24  reasonable interpretation of the wage order is to count [related activities] as time spent

25  'selling.'"). This includes "other related activities such as preparation, travel time, and

26  paperwork." *Id.*; *see also, Brody v. AstraZeneca Pharmaceuticals, LP*, 2008 WL 6953957, at *8

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

14

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
DB2/ 39221617.6      FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

(C.D. Cal. June 11, 2008) ("'[S]elling' need not involve the literal execution of contracts.");[3] *Muldrow v. Surrex Sols. Corp.*, 208 Cal.App.4th 1381, 1392 (2012) (sales-related activities necessarily include "activities the employees are engaged in prior to the actual point in time that the sale is made."). For purposes of the exemption, a person is "selling" where "the person is actually engaged in activities directed toward the consummation of his own sales…" *Moore*, 2016 WL 3556610, at *6; *Karl*, 2019 WL 5677543, at *3 ("sales" include, "[o]ther work that furthers the employee's sales efforts … including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences."). Sales-related activities may even extend to activities that continue after the closing of the sale. *See*, *Cuvillier v. Alta Colleges, Inc.*, 2003 WL 25742943, at *2 (C.D.Cal. 2003) ("The 'selling' continues throughout the relationship.").

      Admissible evidence shows Plaintiffs' work day consisted entirely of sales or sales-related activities. This includes visiting businesses outside of the office in order to sell Spectrum services, preparing to make sales outside the office (including preparing sales proposals and dispositioning (or "scrubbing") their leads lists to identify viable customers), speaking with customers about sales, and participating in team calls regarding their sales activities. Benner Decl., 12, Ex. A; Sinclair Depo. 124:25-126:2; Harper Depo. 115:25-120:6, 148:15-152:21, 104:16-105:7 ("Obviously, [the purpose of scrubbing the leads list is] to give you a starting point to give you some traction to, you know, sell and make money, yes."). To the extent Plaintiffs were involved in any "installation" or "customer service" activities, their involvement was strictly limited to monitoring the installation of the services they sold to a particular customer or fielding questions prior to install that their customers had about the services Plaintiffs were selling them.

---

[3] "Federal law provides persuasive authority where, as here, California law is 'patterned on federal statutes,' and thus courts may 'look to analogous interpretations of federal law in making the determination of what constitutes 'selling' within the meaning of California law.' *Karl*, 2019 WL 5677543, at *5; *citing*, *Moore*, 2016 WL 3556610, at *5 (collecting cases). Under California law, unlike Federal law, sales-related activities do not include activities "*incidental*" to sales. However, Federal law is particularly relevant regarding what activities are considered "*sales-related*" (*i.e.* what it means to "sell"). See *Brody*, 2008 WL 6953957, at *6 ("Given the lack of California statutory or regulatory definitions, or judicial construction of what it means to 'sell' within the terms of the California exemption, reference to comparable federal law is especially sensible here.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

15

Case No. 2:19-cv-00902-WBS-DMC

DB2/ 39221617.6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  Sinclair Depo. 143:2-146:1; Harper Depo. 129:16-132:8.

2    Even the training Plaintiffs engaged in toward the beginning of their employment was

3  "primarily sales-related training" to help Plaintiffs gain "an understanding of Charter's sales

4  practices and the products and services [they were] selling." Harper Decl., Dkt. 64-3, ¶ 14.

5  Charter explained the point of Harper's training was to "introduce and review participants to the

6  world of Charter and Spectrum Business products and services through interactive exercises and

7  activities, covering our amazing suite of tools, products, strategies and best practices we require

8  of you, our AEs, so that you are well equipped to go out in the field and make the best sales

9  presentation possible." Benner Decl., ¶ 12, Ex. A. (emphasis added). Sinclair similarly stated,

10  "the goal [of the training] was to make us familiar with the products so we could sell them."

11  Sinclair Depo. 232:5-234:23. "The whole point of these activities [learning about Charter's sales

12  practices and the products and services they were selling] are the essential prerequisites necessary

13  to accomplishing the sale." *Muldrow*, 208 Cal.App.4th at 1392 (courts cannot view "the word

14  sales in a vacuum contrary to the job description of any salesman.").

15    Plaintiffs were exclusively engaged in sales and sales-related activities during their entire

16  employment with Charter.

17      **4.**  <u>**Training Provided To Plaintiffs Does Not Impact Their Exempt Status.**</u>

18        **a.**  **Plaintiffs' Several Days Of Sales-Related Training Supports**
19          **Their Classification As Exempt Outside Salespersons.**

20    The fact that Plaintiffs engaged in normal onboarding and orientation and took 4.5

21  (Sinclair) and 10 (Harper) days of sales-related training does not invalidate their exempt status.

22  As *Barnick* and others hold, "specialized sales training" is actually a factor *in favor* of the

23  exemption. *Barnick*, 522 F.Supp.2d at 1263 (finding plaintiff was properly classified as an

24  exempt outside salesperson, in part, *because* he received regular specialized training at sales

25  conferences); *Schmidt v. Eagle Waste Recycling, Inc.* 598 F.Supp.2d 928, 935 (W.D. Wisc. 2009),

26  *aff'd,* 599 F.3d 626 (7th Cir. 2010) (Courts must view "all the facts surrounding the employee's

27  job in determining how to properly classify the employee" including "whether the employee

28  receives specialized sales training."). In the seminal outside salesperson case, *Jewel Tea Co.*, the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

16

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
DB2/ 39221617.6   FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

court held employees who sold tea, coffee, baking soda and similar products fell within the

definition of the outside sales exemption notwithstanding the sales training they received upon

hire:

> When a salesman is employed, the Company places great emphasis on his selling ability and before giving him a route, carefully trains him over a period of one to three weeks in selling methods and techniques. Thereafter, he is started on a route with an assistant sales manager, who stays with him for two weeks. He is then permitted to go out on a route by himself. Two or three weeks later he is given another sales course by the assistant sales manager who goes with him on his route for another two weeks' period to find out how he is progressing. After that, he receives periodical training and one night every two weeks he is required to attend a meeting of the Next Door Neighbor Club, an organization sponsored by the Company for the instruction and welfare of its salesmen. In connection with its training program, the Company has developed a sound film which illustrates methods of sales.

*Jewel Tea Co.*, 118 F.2d at 204. In holding the employees were properly classified as exempt

outsides salespersons, the court specifically noted the fact that the employees "were given initial

training before they undertook their duties and were continuously trained during their

employment in the art of salesmanship" *supported* its finding. *Id.* at 208.

In *Lane v. Humana Marketpoint, Inc.*, the court held employees qualified as outside

salespersons during their entire employment even though "[u]pon their hire, Plaintiffs attended a

three-week training course on selling Defendant's products, including training on sales

techniques. In addition to this initial training, they attended several sales training meetings

throughout their employment." *Lane v. Humana Marketpoint, Inc.* 2011 WL 2181736 *1 (D.

Idaho 2011). Similarly, the Ninth Circuit in *Christopher v. SmithKline Beecham Corp.* found the

employees were properly classified as exempt outside salesperson even though they received in-

depth training. *Christopher v. SmithKline Beecham Corp.* 635 F.3d 383, 386 (9th Cir. 2011)

("When Glaxo hires new PSRs, it provides them with more than one month of training that

focuses on making presentations, learning about Glaxo products, and building interpersonal

skills."). In *Nielsen v. DeVry, Inc.* 302 F.Supp.2d 747 (W.D. Mich. 2003), relied on heavily by

*Barnick*, the court also specifically' identified specialized sales training as a factor *in favor of* the

exemption:

Specialized sales training is another factor indicative of whether an employee is

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

17

Case No. 2:19-cv-00902-WBS-DMC

DB2/ 39221617.6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   engaged in sales. See *Fields*, 261 F. Supp.2d at 975 (employees "received sales
2   training in products and techniques"); *Krispy Kreme*, 346 F.Supp. at 1106
    (employees underwent training program including reviewing the products to be
3   sold; production and quality standards and methods; handling of the product;
    servicing of established customers; and training in increasing sales to established
4   customers and gaining new business). Upon being hired by DeVry as field
    representatives, Plaintiffs spent the first month of their employment in training
5   where they learned about DeVry's educational programs and services, as well as
    techniques for meeting prospective students, persuading them to submit an
6   application, and the "stitching-in" method of following up on applicants to ensure
    they would start school at DeVry. In addition to this initial training, DeVry issued
7   audio tapes and workbooks that instructed field representatives on methods for
    overcoming objections, territory management, booking the difficult high school, and
8   finalization techniques. These facts reflect DeVry's efforts to train its field
    representatives in the art of sales.

9   *Nielsen*, 302 F.Supp.2d at 757.

10      In most of these cases, the training was far more extensive than the 4.5 (Sinclair) and 10

11   (Harper) days of training provided to Plaintiffs. Rather than negate Plaintiffs' exempt status, this

12   sales-related training supports Charter's position that Plaintiffs were properly classified as exempt

13   outside salespersons throughout their employment.

14          **b.      Plaintiffs Cannot Selectively Carve Out Certain Days Or Weeks
                     As A Basis For Their Misclassification Allegations.**
15

16      In California, there is <u>no</u> requirement that an employee spend *every day* or *every week*

17   performing over 50% outside sales in order to qualify for the outside salesperson exemption.

18   Rather, a salesperson must only "*customarily and regularly*" work more than half his working

19   time away from the employer's place of business selling. Cal.Code Regs. tit. 8, §§ 11040(1)(C),

20   (2)(M); Wage Order No. 4–2001 (2)(M). California law does not define the phrase "customarily

21   and regularly" and Charter has not found any cases interpreting the term under California law.

22   *Guilfoyle v. Dollar Tree Stores, Inc.*, 2014 WL 66740, at *4 (E.D. Cal. 2014). However,

23   "[b]ecause the California wage and hour laws are modeled to some extent on federal laws, federal

24   cases may provide persuasive guidance" on the meaning of the phrase. *Id.*; *see also*, *Nordquist v.*

25   *McGraw-Hill Broadcasting Co.*, 32 Cal.App.4th 555, 562 (1995); *Monzon v. Schaefer Ambulance*

26   *Service, Inc.*, 224 Cal.App.3d 16, 31 (1990).

27      The phrase "customarily and regularly" "is defined under analogous federal regulations to

28   mean 'a frequency that must be greater than occasional but which, of course, may be less than

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

18

Case No. 2:19-cv-00902-WBS-DMC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

DB2/ 39221617.6

constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." *Guilfoyle*, 2014 WL 66740 at *4; 29 C.F.R. § 541.701; *Morales v. Compass Group, PLC*, 2014 WL 5304913, at *7 (C.D. Cal. 2014) ("Customarily and regularly" is defined as occurring "more than occasionally" or "normally and recurrently ... in the day-to-day performance" of job duties). Thus, the definition of an "outside salesperson" in California is really:

> One who, on greater than an occasional basis, but less than constantly (*i.e.* "customarily and regularly"), works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

"Courts have declined to set bright-line rules regarding what constitutes 'customarily and regularly.'" *McKinney v. United Stor–All Ctrs. LLC*, 656 F.Supp.2d 114, 131 (D.D.C. 2009), *citing*, *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 (11th Cir. 2008); *see also*, *Perez v. RadioShack Corp.*, 2005 WL 2897378 at *8 (N.D. Ill. 2005) (holding that an 80% standard is appropriate in evaluating the "regularly and customarily" standard); *Kastor v. Sam's Wholesale Club*, 131 F.Supp.2d 862, 869 (N.D. Tex. 2001) (70-75% of the time met the "regularly and customarily" standard); *Murray v. Stuckey's, Inc.*, 50 F.3d 564, 568 (8th Cir. 1995) (meeting the definition of the exemption 98.2% of the time was "'customarily and regularly' by any definition."). "The term 'customarily and regularly' requires a case-by-case determination, based on all the facts and circumstances, over a time period of sufficient duration to exclude anomalies." 69 Fed. Reg. 22122, 22187 (Apr. 23, 2004). "Nothing … requires that, to meet the definition of 'customarily and regularly,' a task be performed more than once a week or that a task be performed each and every workweek." *Id.*; *see also*, *Dixon v. Zabka*, 2014 WL 6084351, at *17–18 (D. Conn. Nov 13, 2014) (Finding employees who spent time training during their first week of work were properly classified as outside salespersons, reasoning "the Court must view the [employees'] positions as a whole" and the "first week of training is merely a small portion of the position as a whole…").

By including the "customarily and regularly" language, the IWC avoided an absurd reading of the outside salesperson exemption that would require exempt outside salespersons to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

19

Case No. 2:19-cv-00902-WBS-DMC

DB2/ 39221617.6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

spend every single day or week engaged in majority exempt duties or risk misclassification. The addition of the "customarily and regularly" language allows outside salespersons to occasionally attend conferences, engage in trainings, travel to meetings, mentor other employees, etc. without requiring that the employer change the employee's exempt status every time the salesperson engages in some temporary activity in which he is not technically spending more than half his time engaged in outside sales. For example, if, five years into her employment, an outside salesperson attends a sales conference in San Diego for five days, it would be absurd to reclassify that person as a non-exempt employee during those five days, and then reclassify her as an exempt employee the following Monday when she returned to regular duties. What if the conference was only three days, and the salesperson worked her normal duties the other two? What if a salesperson underwent orientation and training on new products for three days, and then engaged in his normal duties the other two? What if a salesperson traveled to another office to give a presentation for two days, spent half the third day traveling back to the office, attended an employee birthday lunch for the rest of the third day, and worked his normal duties the remaining two days? Would the employer be required to temporarily reclassify those salespersons as non-exempt, fundamentally change all policies and practices regarding timekeeping, compensation, meal and rest periods, etc., and then promptly reclassify those salespersons days later? Of course not. This is precisely why the "customarily and regularly" language exists. If employers were required to reclassify exempt outside salespersons on a daily or weekly basis, it would require highly precise timekeeping, documentation and examination of every single activity the salesperson engaged in throughout every single day. This runs counter to the very reason California classifies outside salespersons as exempt in the first place. *See*, *Barnick*, 522 F.Supp.2d at 1261, DLSE Op. Letter, Sept. 8, 1998 (classifying outside salesperson as exempt because, "it's very difficult to control their hours and working conditions. They set their own time, and they're on the road, they call on their customers. . . . [R]arely do you know what they're doing on an hour-to-hour basis."); *Jewel Tea Co.*, 118 F.2d at 207–208 ( "To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman"). Requiring that outside salespersons spend the majority of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

20

DB2/ 39221617.6

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   every single day or week performing greater than 50% outside sales duties would render the

2   "customarily and regularly" language superfluous. The Supreme Court has "long held that 'a

3   statute ought, upon the whole, to be so construed that, if it can be prevented, no clause' is

4   rendered 'superfluous, void, or insignificant.'" *Young v. United Parcel Service, Inc.*, 135 S.Ct.

5   1338, 1352 (2015); *citing*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

6          Here, Plaintiffs demand that this Court selectively carve out 4.5 (Sinclair) and 10 (Harper)

7   days in which Plaintiffs engaged in sales-related training and ignore the rest of their employment.

8   That is not how the outside salesperson exemption works. A court cannot analyze one without the

9   other. Charter employed Harper for approximately 175 days and Sinclair for approximately 820

10  days. Benner Decl., ¶¶ 31, 35, Exs. L and P; Sinclair Depo. 268:17-19; Harper Depo. 78:16-79:1,

11  62:19-63:9. Even if Plaintiffs did not engage in outside sales activities for over 50% of their time

12  during their "training days," the undisputed evidence shows they were still expected to

13  *customarily and regularly* engage in outside sales activities for the majority of their work time

14  during the rest of their employment – for Sinclair, 815 days (or 99.4%) and for Harper, 165 days

15  (or 94.3%). Because 99.4% and 94.3% undoubtedly amount to "customarily and regularly" (*i.e.* at

16  a frequency greater than occasionally but less than constantly) for purposes of the outside

17  salesperson exemption, Plaintiffs were properly classified as exempt outside salespersons during

18  their entire employment. Plaintiffs' claims related to their alleged misclassification fail as a

19  matter of law.

20          **C.**     **Sinclair's Claims Are Time-Barred.**

21          The statutes of limitations for Plaintiffs' claims range from one to three years from the

22  date of the alleged violation. Cal. Cod Civ. Proc. §§ 338, 340(a). Charter hired Sinclair in January

23  2015. Dkt. 45, ¶ 9; Sinclair Depo. 268:17-19. On August 4, 2016, Sinclair took a leave of absence

24  that lasted through his termination on April 4, 2017. Benner Decl., ¶¶ 31, 36, Exs. L and R. The

25  last day Sinclair actually performed work for Charter was in July 2016. *Id*. However, Sinclair did

26  not file suit until December 13, 2019 – nearly three years and five months after he stopped

27  performing work for Charter. Dkt. 45. Because Sinclair's wage and hour claims violations (*e.g.*,

28  minimum wage, overtime, meal and rest periods, commissions, wage statements, etc.) did not

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

21

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   occur during the statute of limitations period, Sinclair's claims are time-barred.[4]

2   **D.      Plaintiffs' Fifth Cause Of Action Regarding Commissions Fails.**

3   Plaintiffs' "Count Five" alleges "unlawful calculation, deduction, and payment of

4   commission wages" in violation of California Labor Code §§ 2751, 204, 221, 223 and 224.

5   Plaintiffs' Fifth Cause of Action fails for a number of reasons.

6   **1.      There Is No Private Right Of Action Under Labor Code § 2751.**

7   California Labor Code § 2751(b) states that where an employee is paid commissions, "the

8   employer shall give a signed copy of the [commission plan] to every employee who is a party

9   thereto and shall obtain a signed receipt for the contract from each employee." However, there is

10   no private right of action for a violation of Labor Code § 2751(b). *Swafford v. Int'l Bus. Machines*

11   *Corp.*, 383 F.Supp.3d 916, 934 (N.D. Cal. Apr. 7, 2019); *Beard v. International Business*

12   *Machines Corporation*, 2019 WL 1516592, at *6 (N.D. Cal. 2019). In *Swafford*, the court

13   explained, "[p]rior to January 2012, California Labor Code § 2752 provided that '[a]ny employer

14   who does not employ an employee pursuant to a written contract as required by Section 2751

15   shall be liable to the employee in a civil action for triple damages.'" *Swafford*, 383 F.Supp.3d at

16   934; *see also*, *Beard*, 2019 WL 1516592 at *6. But "[w]hen the California Legislature amended

17   Section 2751 in 2011, it repealed Section 2752." *Id.*, *citing*, Stats. 2011, ch. 556, § 3. Therefore,

18

---

19   [4] Plaintiffs will likely argue their Ninth Cause of Action for Violation of California's Unfair
     Competition Law ("UCL") "extends" the UCL's four-year statute of limitations to their Labor

20   Code claims. This is wrong. As this Court correctly explained in *Rojas-Cifuentes v. ACX Pacific
     Northwest Inc.*, 2016 WL 6217060, at *3 (E.D. Cal. Oct. 15, 2016):

21   "The Court finds that the *Cortez* holding does not extend as far as Plaintiff claims. Under *Cortez*,

22   a four-year statute of limitations will apply to a UCL claim predicated on a Labor Code violation
     with a shorter statute of limitations. *Id.* *Cortez* does not hold that once a violation serves as

23   predicate to a UCL claim the statute of limitations for the independent Labor Code violation also
     extends to four years. As Judge Levi in this District explained, when a plaintiff borrows the

24   violation of another law in order to make a UCL claim, 'the two causes of action do not become
     one.' *Pac. Gas & Elec. Co. v. Jesse M. Lange Distrib., Inc.*, 2005 WL 3507968, at *6 (E.D. Cal.

25   Dec. 21, 2005). 'The UCL claim must remain a separate cause of action because the UCL
     provides its own procedural guidelines and limited remedies[;]...[m]erely bringing a UCL claim

26   does not allow a plaintiff to circumvent the statute of limitations already developed by the
     California legislature for different remedies under a different statute.' *Id*; *see also Singer v.*

27   *Becton, Dickenson & Co.*, 2008 WL 2899825 (S.D. Cal. 2008) (dismissing a labor code violation
     as time barred but allowing the violation to serve as a predicate for the UCL claim). Insofar as

28   Plaintiff asserts the meal period violations as a cause of action separate from his UCL claim, the
     three-year statute of limitations applies."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

22

Case No. 2:19-cv-00902-WBS-DMC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

DB2/ 39221617.6

1  "the Labor Code no longer affords a private right of action for violations of Section 2751." *Beard*,

2  2019 WL 1516592 at *6. Thus, Plaintiffs' claim for violation of Labor Code § 2751 must be

3  dismissed.

### 2.    Charter Provided Harper With A Signed Commission Plan And Harper Signed An Acknowledgment Of Receipt.

6       Although there is no private right of action under Labor Code § 2751, Harper will likely

7  argue a "violation" of § 2751 may still serve as the basis for PAGA penalties.[5] This claim fails

8  because admissible evidence shows, (1) Charter provided Harper with a signed copy of his

9  commission plan, and, (2) Harper acknowledged receipt. Specifically, during the time Charter

10 employed Plaintiffs, Charter directed newly hired AEs, including Harper, to log on to Synygy to

11 access compensation and commission information, including a copy of his commission plan.

12 Benner Decl. ¶¶ 17, 20-23, Ex. G. After reviewing the plan, AEs were required to click the

13 acknowledge box, which read, in part, "I acknowledge, by my acceptance below, that I have read,

14 understood, and agree to comply with the terms and conditions of the attached plan document."

15 *Id*. Only by reviewing the commission plan and affirmatively acknowledging review and receipt

16 by clicking the acknowledgment box, could AEs "clear" the acknowledgment page and gain

17 access to compensation information on the Synygy portal. *Id*. Charter's records show that at 2:36

18 p.m. on September 29, 2017, Harper accessed Synygy, reviewed an electronic copy of his

19 commission plan and electronically signed the acknowledgment of receipt.[6] *Id*. Summary

20 adjudication of this claim is proper.

---

[5] This allegation would *only* apply to Harper since Sinclair is not seeking PAGA penalties. But even if it did apply to Sinclair, the undisputed evidence also shows Sinclair accessed his compensation plan through Synygy as well. 73:20-74:16, 79:6-82:24.

[6] To the extent Harper argues clicking an acknowledgment and receipt is not a signature, that argument is easily defeated because California "recognizes the validity of electronic signatures." *Smith v. Rent-A-Center, Inc.*, 2019 WL 3004160, at *5 (E.D. Cal. July 10, 2019); Cal. Civ. Code § 1633.1 *et seq*. Specifically, "the use of a checkbox to show acknowledgment and agreement with a specific policy document also has been found sufficient ..." *Smith*, 2019 WL 3004160, at *5; *Tanis v. Southwest Airlines, Co., et al*, 2019 WL 1111240, at *5-7 (S.D. Cal. Mar. 11, 2019); *see also, Mikhak v. University of Phoenix*, 2016 WL 3401763, at *6 (N.D. Cal. June 21, 2016) ("Electronic signatures and clicking 'Accept' are valid means of expressing assent to a contract.").

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

DB2/ 39221617.6

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

### 3. Plaintiffs' Labor Code § 204 Claim Fails Because Charter's Commission Plans Comply With Labor Code § 204.

It seems Plaintiffs are claiming Charter violated Labor Code § 204 by allegedly failing "to pay commission wages for the pay period in which they were earned." Dkt. 45, ¶¶ 46-47. Section 204(a) provides, "[a]ll wages … earned by any person in any employment are due and payable twice during each calendar month..." Lab. Code § 204(a). "In other words, all earned wages, including commissions, must be paid no less frequently than semimonthly." *Peabody v. Time Warner Cable, Inc.*, 59 Cal.4th 662, 668 (2014). However, while "section 204 establishes semimonthly pay periods, […] there is no obligation to pay *unearned* commission wages in any pay period. Commissions are owed only when they have been *earned*, even if it is on a monthly, quarterly, or less frequent basis." *Id.* (emphasis added)

AEs earn commissions on a monthly basis. Benner Decl., ¶¶ 17, 19, Exs. D and F. All AEs must meet several criteria in order for a commission to be considered "earned." *Id.* Charter then pays commissions monthly once they are earned. *Id.* Numerous courts have found, "[s]uch agreements are permitted under California law and do not offend § 204." *Chavez v. Time Warner Cable, LLC*, 728 F. App'x 645, 648 (9th Cir. 2018); *Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313, 1335, 48 Cal.Rptr.3d 749 (2006), 59 Cal.4th at 668; DLSE Opn. Letter No. 2002.12.09–2 (2002) ("[c]ommission programs which calculate the amount owed once a month (or less often) are common."). Charter's practice of paying commissions monthly once the commissions are earned does not offend section 204. Thus, summary adjudication of this claim is proper.

### 4. Plaintiffs' Labor Code §§ 221, 223 and 224 Claims Fail Because Charter Never Deducted, Reduced, Clawed Back, Or Otherwise Reconciled Plaintiffs' Commissions.

Plaintiffs generally allege, "Charter violated Sections 221, 223, and 224 each time it failed to correctly and fairly calculate and pay earned commission and each time it deducted, reduced, clawed back, or otherwise reconciled Plaintiff's […] incentive compensation." Dkt. 45, ¶ 47. This claim fails because Charter correctly and fairly calculated and paid earned commissions, to the extent they were due, and never deducted, reduced, clawed back, or otherwise reconciled Plaintiffs' commissions. Plaintiffs have not, and cannot, point to any admissible evidence in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

24

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1    support of this meritless claim. Moreover, the commission plans do not provide for any

2    deductions, reductions, claw backs or reconciliations. Per the terms of the commission plans, an

3    AE does not "earn" a commission until a number of requirements are met including a new service

4    contract signed by the customer, installation of the service, the sale is accurately entered into the

5    CRM system, and the salesperson meets certain minimum performance thresholds for the month.

6    Benner Decl., ¶¶ 17, 19, Exs. D and F. Charter's plan does not provide for an "advance" or "loan"

7    that Charter could recoup in the case of, for example, a return, refund or chargeback. *Id*. In

8    practice and per the express terms of the commission plans, Charter did not deduct, reduce, claw

9    back, or otherwise reconcile Plaintiffs' commissions.

10
11    **5.     Harper's Commission-Related Claims Fail Because Harper Never Earned A Commission.**

12        Harper's commission-related claims depend on Charter owing Harper a commission

13    payment. However, Harper *never earned a commission* during his employment with Charter.

14    Benner Decl., ¶¶ 17-18, Exs. D-E. Under the terms of his commission plan, to earn *any*

15    commission, Harper was required to generate at least 15 connected PSUs (the "Minimum PSU

16    Threshold") in a given month. *Id*. Harper's commissions statements show he failed to generate at

17    least 15 connected PSUs in any month he worked for Charter. Benner Decl., ¶ 19, Ex. E. Since he

18    never earned a commission during his employment with Charter, Harper's commission-related

19    claims fail for this reason as well.

20    **6.     Sinclair's Commission-Related Claims Are Time-Barred.**

21        The statute of limitations for claims under Labor Code §§ 204, 221, 223 and 224 is three

22    years. Cal. C. Civ. P. § 338; *City of Oakland v. Hassey*, 163 Cal.App.4th 1477, 1499 (2008).

23    Sinclair last worked for Charter in July 2016. Benner Decl., ¶¶ 31, 36, Exs. L and R. He received

24    his final commission payment on October 21, 2016. Benner Decl., ¶ 36, Ex. R. However, Sinclair

25    did not file his lawsuit until December 13, 2019 – three years, one month and 22 days later. Dkt.

26    45. Because Sinclair did not bring these claims within three years of the alleged violation, even if

27    these claims had merit, which they do not, they are time-barred.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

25

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

E.      **Plaintiffs' Sixth Cause Of Action For Wage Statement Violations Fails.**

1.      **The Wage Statement Claim Is Derivative.**

Plaintiffs base their Sixth Cause of Action for wage statement violations on Charter's alleged failure to pay Plaintiffs minimum wages and overtime and to provide meal and rest periods. Dkt. 45, ¶¶ 49-54. Because Charter properly classified Plaintiffs as exempt outside salespersons, and Plaintiffs' minimum wage, overtime and meal and rest period claims fail, Plaintiffs' derivative Sixth Cause of Action also fails. *Dillon v. Cloughetry Packing, LLC*, 2018 WL 6333689 at *3 (C.D. Cal. Sep. 4, 2018).

2.      **The Wage Statement Claim Is Time-Barred And Plaintiffs Cannot Show Actual Damages.**

This claim is also time-barred. Claims for penalties under Labor Code § 226 for violations of the itemized wage statement requirements must be filed within one year. Cal. Code. Civ. Proc. § 340(a); *Murphy v. Kenneth Cole Prods.*, 40 Cal. 4th 1094, 1118. n.16 (2007) ("[I]temized wage statement violations" are "undisputedly governed by a one-year statute of limitations."); *Gomez v. J. Jacobo Farm Labor Contractor, Inc.*, 334 F.R.D. 234, 265 (E.D. Cal., 2019) ("California law imposes a one-year statute of limitations" for wage statement violations). Here, Harper last worked for Charter in January 2018 and Sinclair last worked for Charter in July 2016. Benner Decl., ¶¶ 31, 34-36, Exs. O-R. But Harper filed his Complaint on May 3, 2019 and Sinclair joined via the FAC on December 13, 2019. Dkts. 1-1, 45. Since Plaintiffs did not file their complaints within one year of an alleged violation, the Sixth Cause of Action is time-barred.

Plaintiffs may argue they are seeking actual damages in addition to penalties for alleged wage statement violations, and, thus, their claim is subject to a three-year statute of limitations. This changes nothing with regard to Sinclair. His claims are still time-barred as he filed his complaint over three years after last working for Charter. Moreover, to recover actual damages, Plaintiffs must produce facts showing they suffered a "cognizable injury" amounting to something more than not receiving a compliant itemized wage statement. *Angeles v. U.S. Airways, Inc.*, 2013 WL 622032, *10 (N.D. Cal. Feb. 19, 2013) ("A plaintiff must adequately plead an injury arising from an employer's failure to provide full and accurate wage statements,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

26

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   and the omission of the required information alone is not sufficient"); *Johnson v. Serenity*

2   *Transp., Inc.*, 141 F. Supp. 3d 974, 1004 (N.D. Cal. 2015) ("The mere fact that the information

3   was missing from the wage statement is not a cognizable injury"). "[T]he types of injuries on

4   which a Section 226 claim may be premised include 'the possibility of not being paid overtime,

5   employee confusion over whether they received all wages owed them, difficulty and expense

6   involved in reconstructing pay records, and forcing employees to make mathematical

7   computations to analyze whether the wages paid in fact compensated them for all hours worked."

8   *Ortega v. J.B. Hunt Trans., Inc.*, 258 F.R.D. 361, 374 (C.D. Cal. 2009). Here, Plaintiffs cannot

9   offer admissible evidence of actual damages. Thus, this claim fails for this additional reason.

10              **3.       The Wage Statements Were Compliant.**

11          Plaintiffs also claim that prior to 2018, their "wage statements did not include the

12   inclusive dates of the relevant pay period and only included the end date." Dkt. 45, ¶ 52. This is

13   demonstrably false. All of Harper's wage statements include both a beginning and end date.

14   Benner Decl., ¶ 36, Ex. Q. For Sinclair, only his wage statements from January 2015 through

15   December 2015 do not include a beginning date. Benner Decl., ¶ 36, Ex. R. Thereafter, all of

16   Sinclair's wage statements include both a beginning and end date. *Id.* As explained above, wage

17   statement claims are governed by a one-year statute of limitations. Cal. Code. Civ. Proc. § 340(a).

18   Thus, any claims based on alleged violations occurring in 2015, over four years before Sinclair

19   filed the FAC, are time-barred.

20          Plaintiffs also claim, "commission wages were included on a wage statement that was

21   separate from the regular wage statement." Dkt. 45, ¶ 52. Charter is not aware of any requirement

22   that commission payments be included on the same wage statement as Plaintiffs' biweekly wages.

23   As explained above, commissions were earned and paid on a monthly basis once earned in

24   compliance with California law.

25          Plaintiffs further allege that prior to 2017 Charter did not include the total hours worked

26   on their wage statements. Dkt., ¶ 52. First, Charter did not hire Harper until September 2017. Dkt.

27   45, ¶ 9; Harper Depo. 78:16-79:1, 62:19-63:9. Thus, this claim fails as to Harper. Second,

28   Sinclair's wage statements *do* include hours worked. Benner Decl., ¶ 36, Ex. Q. Third, Labor

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY
DB2/ 39221617.6

27

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   Code § 226(j) provides that employers are not required to show hours worked by exempt outside

2   salespersons on their wage statements. Cal. Lab. C. § 226(j). Plaintiffs seem to rely on one stray

3   case, *Garnett v. ADT LLC*, 139 F. Supp. 3d 1121, 1130 (E.D. Cal. 2015), that was expressly

4   *overruled* by the legislature when, effective January 1, 2017, it amended section 226 by adding

5   subsection (j), and clarified employers were not required to show hours worked for exempt

6   positions, including outside salespersons.[7] Dkt. 45, ¶ 52, n. 1. This claim also fails.

7

8   ### 4.   Meal And Rest Period Violations Cannot Form The Basis Of A Wage Statement Claim.

9          To the extent Plaintiffs' base their wage statement claim on alleged meal and rest period

10   violations, the claim must fail because, "section 226.7 actions do not entitle employees to pursue

11   the derivative penalties in sections 203 and 226." *Naranjo v. Spectrum Sec. Servs., Inc.*, 40

12   Cal.App.5th 444, 474 (2019). Section 226 only requires that employers accurately describe the

13   monies that are being paid "at the time of each payment of wages." Lab. Code §226(a). It does

14   not require that employees describe monies that are not being paid or meal and rest premium

15   payments that allegedly should have been paid. *Jones v. Spherion Staffing, Inc.*, 2012 WL

16   3264081, **8-9 (C.D. Cal. 2012) (dismissing wage statement claims based on alleged missing

17   meal break premiums, noting "the legislative history shows that the purpose of Section 226 was

18   for transparency, not for double recovery.").

19   ### F.   Plaintiffs' Seventh Cause Of Action For Waiting Time Penalties Fails.

20   ### 1.   Plaintiffs' Waiting Time Penalty Fails With Their Other Claims.

21          Plaintiffs' claim for waiting time penalties is entirely derivative of their claims for alleged

22   meal and rest period violations and failure to timely and accurately pay commissions wages.

23   Because those claims fail, Plaintiffs' derivative claim for waiting time penalties also fails. *Dillon*,

24   2018 WL 6333689 at *3.

---

25   [7] Prior to 2017, there was no definitive and binding decision regarding this issue. At most, courts in this circuit were "divided regarding whether the outside salesperson exemption applies to an

26   accurate wage statement claim." *Moore*, 2016 WL 7638182, at *3; *citing, Dailey v. Just Energy Mktg. Corp.*, 2015 WL 4498430, at *5 (N.D. Cal. July 23, 2015) (dismissing class

27   representative's individual claims for accurate wage statements and waiting time penalties on the basis that she was an outside salesperson); vs. *Garnett*, 139 F. Supp. 3d at 1130 (finding the

28   outside salesperson exemption does not apply to accurate wage statement requirements).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

28

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

### 2. Plaintiffs Cannot Recover Waiting Time Penalties For Meal And Rest Period Violations.

Even if Plaintiffs' meal and rest period claims could proceed, which they cannot, summary judgment should still be granted in favor of Charter because Labor Code § 226.7 meal and rest break premiums do not constitute "wages earned" under Labor Code § 201 for purposes of waiting time penalties under Labor Code § 203. *Naranjo*, 40 Cal.App.5th at 474 ("section 226.7 actions do not entitle employees to pursue the derivative penalties in sections 203 and 226.").[8]

Labor Code § 201 provides, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." In *Kirby v. Immoos Fire Prot., Inc.*, 53 Cal. 4th 1244 (2012), the Supreme Court made clear, "a section 226.7 claim is not an action brought for nonpayment of wages; it is an action brought for non-provision of meal or rest breaks." *Kirby*, 53 Cal. 4th at 1248. The court explained, "Section 226.7 is not aimed at protecting or providing employees' wages. Instead, the statute is primarily concerned with ensuring the health and welfare of employees by requiring that employers provide meal and rest periods as mandated by the IWC." *Id.* The *Kirby* court found that because "the legal violation [triggering a Section 226.7 claim] is non-provision of meal or rest breaks," rather than nonpayment of wages, the wrong at issue is *not* the nonpayment of wages. *Id.* Following *Kirby*, numerous district courts, including this one, as well as California Appellate Courts, have held Section 203 waiting time penalties are *not recoverable* based on a failure to make Section 226.7 premium payments at termination. In fact, as recent as April 30, 2020, the California Court of Appeal, Second District ruled, "a plaintiff is not entitled to recover penalties for waiting time […] violations based on claims of nonprovision of rest or meal periods." *Betancourt v. OS Rest. Servs., LLC*, 2020 WL 2570839, at *4 (Cal. App. 2d Apr. 30 2020). The court explained:

> *Kirby* tells us […] an action for nonprovision of meal or rest breaks is not an action brought for nonpayment of wages. The remedy for nonprovision of meal or rest breaks is an additional hour of pay (often described in the case law as "premium wages"), but that does not turn a lawsuit for violation of meal or rest breaks into a

---

[8] Similarly, because Plaintiffs are not entitled to section 226 derivative penalties, they are "not entitled to section 226, subdivision (e) attorney fees." *Naranjo*, 40 Cal.App.5th at 474.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

1    lawsuit for nonpayment of wages.

2        *Id.* Numerous other District Courts and California Appellate Courts are in accord. *See*,

3    *Culley v. Lincare Inc.*, 236 F. Supp. 3d 1184, 1195 (E.D. Cal. 2017) (dismissing the plaintiff's

4    claim for waiting time penalties under Section 203, finding, "failure to pay § 226.7 meal time

5    penalties cannot support a claim for nonpayment of wages"); *Guerrero v. Halliburton Energy*

6    *Servs., Inc.*, 231 F. Supp. 3d 797 (E.D. Cal. 2017) (dismissing Section 203 claim finding 226.7

7    premiums cannot support a claim for waiting time penalties); *Jones v. Spherion Staffing LLC*,

8    2012 WL 3264081, at *8-9 (C.D. Cal. Aug. 7, 2012) (finding plaintiff could not advance a

9    Section 203 claim on alleged violations of Section 226.7); *Singletary v. Teavana Corp.*, 2014 WL

10   1760884, *4 (N.D. Cal. Apr. 2, 2014) (203 does not provide penalties for failure to pay meal and

11   rest break premiums); *Ling v. P.F. Chang's China Bistro, Inc.*, 245 Cal. App. 4th 1242 (2016),

12   (finding "a section 226.7 action is brought for the non-provision of meal and rest periods, not for

13   the 'nonpayment of wages'"); *Ramos v. Garcia*, 248 Cal. App. 4th 778, 790, (2016) ("the

14   gravamen of a section 226.7 action is the non-provision of meal or rest periods, not the

15   nonpayment of wages")

16   **G.    Plaintiffs' Eighth Cause Of Action For Violation of Labor Code §§ 226 and**
         **1198.5[9] Fails Because Charter Timely Provided Copies Of Plaintiffs'**
17       **Personnel Records And Wage Statements.**

18       **1.    Charter Timely Provided Harper Copies Of His Employment Records.**

19       Labor Code § 1198.5 provides a current and former employee, "the right to inspect and

20   receive a copy of the personnel records that the employer maintains relating to the employee's

21   performance or to any grievance concerning the employee." However, before producing the

22   personnel file, "[t]he employer may take reasonable steps to verify the identity of a current or

23   former employee or his or her authorized representative." Cal. Lab. C. § 1198.5(e); *Liu v. Win*

24   *Woo Trading, LLC*, 2016 WL 3231518, at *7 (N.D. Cal. June 13, 2016). Additionally, "[i]f an

25   ――――――――――

26   [9] Plaintiffs also assert a claim under Labor Code § 432. Dkt. 45. However, a claim under section
     432 must fail because section 432 does not apply to requests made by *former* employees. *Harris*
27   *v. Best Buy Stores, L.P.*, 2016 WL 4073327, at *10 (N.D. Cal. 2016). Here, it is undisputed
     Plaintiffs requested their records *after* they were terminated by Charter. There is also no private
28   right of action under Labor Code § 432. *Vicko Ins. Serv. Inc. v. Ohio Indem. Co.*, 70 Cal. App. 4th
     55, 62-63 (1999); *Noe v. Superior Court*, 237 Cal. App. 4th 316, 335-37 (2015).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

30

Case No. 2:19-cv-00902-WBS-DMC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   employee or former employee files a lawsuit that relates to a personnel matter against his or her

2   employer or former employer, the right of the employee, former employee, or his or her

3   representative to inspect or copy personnel records under this section ceases during the pendency

4   of the lawsuit in the court with original jurisdiction." Cal. Lab. C. § 1198.5(n). A "lawsuit" is not

5   defined for purposes of section 1198.5. *Id*. Labor Code § 226(c) gives a current or former

6   employee, but not an employee's representative, a right to inspect or receive a copy of his own

7   wage statements. Like Labor Code § 1198.5, "[t]he employer may take reasonable steps to ensure

8   the identity of a current or former employee." Cal. Lab. C. § 226(b).

9        On April 19, 2018, Harper initiated the litigation process by asserting employment-related

10  claims with JAMS. Shine Decl., ¶ 5, Ex. D. Harper was not represented at the time. *Id*. On June 5,

11  2018, Harper's current counsel, Soderstrom, sent a letter to Charter requesting Harper's wage

12  statements and personnel records. Shine Decl., ¶ 6, Ex. E. Although the letter contained a

13  purported "authorization for release of employment records," the authorization was not physically

14  signed by Harper. *Id*. Rather, it was allegedly executed electronically using "DocuSign." *Id*.

15  Charter is not aware of any California law requiring an entity to accept a digital or electronic

16  signature and Charter did agree to accept an electronic signature in this case. As a result, counsel

17  for Charter took reasonable steps to verify the identity of Harper and his supposedly authorized

18  representative, Soderstrom. First, counsel for Charter timely responded to Soderstrom's letter, and

19  advised Soderstrom that Harper had already initiated the litigation process against Charter. Shine

20  Decl., ¶ 7, Ex. F. Charter's counsel also stated that because, unlike Labor Code § 1198.5, section

21  226(b) does not contemplate production of wage statements to a representative of an employee,

22  Charter was requesting that Harper make the request for these records himself. *Id*. Shortly

23  thereafter, while the parties were still meeting and conferring about the document requests,

24  Harper personally emailed Charter stating, "*I do not currently have representation*." Shine Decl.,

25  8-11, Ex. G. (emphasis added). Charter's counsel then contacted Soderstrom in an effort to verify

26  the status of Soderstrom's supposed representation. *Id*. But Soderstrom refused to provide any

27  evidence of his alleged representation. Finally, several weeks later, Harper emailed Charter's

28  counsel directly and stated Soderstrom *now* represented him regarding his employment-related

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

31

Case No. 2:19-cv-00902-WBS-DMC

DB2/ 39221617.6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   claims against Charter. *Id*. Six days (four business days) later, Charter produced copies of

2   Harper's wage statements and personnel file. Shine Decl., ¶ 11. Because Charter provided Harper

3   his personnel file and wage statements within six days (four business days) of him confirming he

4   was represented by Soderstrom, Charter timely complied with Labor Code §§ 1198.5 and 226.

5          **2.**     **Charter Provided Sinclair With Timely And Complete Copies Of His Employment Records.**

7       Plaintiffs do not dispute that Charter timely provided Sinclair with his requested

8   employment records. Dkt. 45, ¶ 63 (admitting Charter provided the requested records within 15

9   days of his request). Rather, Plaintiffs seem to argue Charter did not provide "complete" records.

10   This claim fails because Charter provided Sinclair all documents required under the law.

11       Labor Code § 1198.5 provides a current and former employee, or his or her representative,

12   "the right to inspect and receive a copy of the personnel records that the employer maintains

13   relating to the employee's performance or to any grievance concerning the employee." "Personnel

14   records" are not defined in section 1198.5 or case law. Labor Code § 226 requires employers to

15   provide copies of the employee's wage statements. Within 15 days of Sinclair's request, Charter

16   provided Sinclair with his personnel file and all of his wage statements. Dkt. 45, ¶ 63.

17       **H.**     **Plaintiffs' Ninth Cause Of Action For Alleged UCL Violations Fails.**

18       Plaintiffs' claim under Business and Professions Code § 17200 (California Unfair

19   Competition Law ("UCL")) is wholly derivative of their Labor Code claims. Where, as here, a

20   UCL claim depends on the allegation that a practice is "unlawful" under some other law, a defeat

21   of the underlying claim extinguishes the UCL claim. *Ingels v. Westwood One Broadcasting Svcs.,*

22   *Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("If the [underlying] claim is dismissed, then there is

23   no 'unlawful' act upon which to base []the derivative Unfair Competition claim"); *Krantz v. BT*

24   *Visual Images*, 89 Cal. App. 4th 164, 178 (2001) (viability of UCL claim "stands or falls" with

25   the underlying claim). As a result, this claim fails.

26       **I.**     **Harper's PAGA Claim Fails.**

27          **1.**     **Harper Cannot Establish Any Predicate Violations.**

28       To establish entitlement to PAGA penalties, Harper must show Charter violated

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

32

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  substantive provisions of the Labor Code. *Yadira v. Fernandez*, 2011 WL 4101266 at *3 (N.D.

2  Cal. Sep. 8, 2011). Because Charter did not commit any Labor Code violations, Harper's PAGA

3  claim fails.

4  ## 2.   Harper's PAGA Claim Is Time-Barred.

5  A plaintiff must file a PAGA action within one year of the alleged violation. Cal. Code.

6  Civ. P § 340(a); *Esparza v. Safeway, Inc.*, 36 Cal.App.5th 42, 59 (2019) (PAGA claim was

7  untimely where LWDA notice was filed more than one year after meal period violations). The

8  statute of limitations for the filing of the PAGA lawsuit is tolled for the sixty-five day notice

9  period. Thus, as a practical matter, the statute of limitations for the filing of the LWDA letter is

10  one year, and the statute of limitations for the filing of the PAGA lawsuit is one year and sixty-

11  five days (or 430 days). *Bush v. Vaco Tech. Servs.*, LLC, 2018 WL 2047807 at *13 (N.D. Cal.

12  May 2, 2018). The statute of limitations begins to run when a cause of action accrues, meaning

13  when the cause of action is complete with all of its elements. *Esparza*, 36 Cal.App.5th at 59.

14  Here, Harper failed to file his PAGA complaint within 430 days of the alleged Labor Code

15  violations. Thus, his PAGA claim is time-barred.

16  Harper last performed work for Charter on January 30, 2018. Benner Decl., ¶¶ 34-36, Exs.

17  O-Q. Beginning February 3, 2018 and continuing through the end of his employment, Harper was

18  on an unpaid leave of absence. *Id.* As such, the last possible date on which an alleged minimum

19  wage, overtime, meal period, rest period, or wage statement violation could have occurred was

20  January 30, 2018. In order to file a timely PAGA action within 430 days of an alleged violation,

21  Harper was required to file his complaint no later than April 5, 2019. However, Harper waited

22  until May 3, 2019 to file his complaint. Dkt. 1-1. This was 458 days after January 30, 2018.[10] As

23  a result, the Court should dismiss Harper's PAGA claim.

24  Harper may argue the statute of limitations for his PAGA claim was tolled because he

25  voluntarily filed what he referred to as a "demand for arbitration" on November 19, 2018. Shine

26  Decl., ¶ 12, Ex. H. However, the equitable tolling doctrine only applies "[w]hen an injured person

27
28

[10] To the extent any of Harper's PAGA claims are based on his "training days" in September 2017, those alleged violations are also clearly time-barred as they occurred at least 574 days before he filed his Complaint.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DB2/ 39221617.6

33

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   has several legal remedies and, reasonably and in good faith, pursues one." *McDonald v. Antelope*

2   *Valley Cmty. Coll. Dist.*, 45 Cal.4th 88, 100 (2008)). Here, Harper did not *pursue arbitration* (*i.e.*

3   he did not "pursue an alternative legal remedy") of his PAGA claims. Rather, he vociferously

4   argued his claims were *not* arbitrable and demanded to pursue his PAGA claim "in court" *rather*

5   *than* in arbitration. Shine Decl., ¶ 12, Ex. H.

6         Moreover, even if he did pursue arbitration of his claims, which he did not, *voluntary*

7   election to arbitrate does not toll the statute of limitations. *Johnson v. Santos*, 148 Cal. App. 3d

8   566, 573–74 (1983) (plaintiff's voluntary election to arbitrate did not toll statute of limitations);

9   *Chen v. Lee*, 2005 WL 3445523, at *10-11 (Cal. Ct. App. 2005) ("we are not aware of any cases

10   recognizing [voluntary arbitration] as a tolling event."). Harper *voluntarily* filed his "demand for

11   arbitration" without a Court order and without a tolling agreement in place. Shine Decl., ¶ 12, Ex.

12   H. No court compelled Harper to arbitration. *Id.* Harper's voluntary decision to ask the arbitrator

13   *not* to exercise jurisdiction to arbitrate his claims did not toll the statute of limitations.

14   **IV.   CONCLUSION**

15         For the reasons set forth above, this Court should grant summary judgment or, in the

16   alternative, summary adjudication, in Charter's favor.

17

18     Dated: December 18, 2020          MORGAN, LEWIS & BOCKIUS LLP

19                         By   */s/ Zachary W. Shine*

20                             Kathryn T. McGuigan
                          Zachary Shine

21                             Nicole L. Antonopoulos

22                           **Attorneys for Defendant CHARTER
                        COMMUNICATIONS, LLC**

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SILICON VALLEY

34

Case No. 2:19-cv-00902-WBS-DMC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHARTER COMMUNICATIONS, LLC'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

DB2/ 39221617.6