1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11

12  LIONEL HARPER and DANIEL          No. 2:19-cv-00902 WBS DMC
    SINCLAIR, individually and on
13  behalf of all others similarly
    situated and all aggrieved
14  employees,                        ORDER RE: DEFENDANT'S MOTION
                                      FOR SUMMARY JUDGMENT OR, IN
15              Plaintiffs,           THE ALTERNATIVE, SUMMARY
                                      ADJUDICATION
16      v.

17  CHARTER COMMUNICATIONS, LLC,

18              Defendant.

19

20

21                        ----oo0oo----

22          Plaintiffs Lionel Harper ("Harper") and Daniel Sinclair

23  ("Sinclair") brought this putative class action against defendant

24  Charter Communications, LLC ("Charter") alleging various

25  violations of the California Labor and Business and Professions

26  Code.  (See First Am. Compl. ("FAC") (Docket No. 45).)  Charter

27  now moves for summary judgment on all claims or, in the

28
                              1

1  alternative, summary adjudication.  (See Def.'s Mot. for Summ. J.

2  ("Mot. for Summ. J.") (Docket No. 93-1).)

3  I.   Factual and Procedural Background

4         Plaintiffs were employed by Charter as small/medium

5  sized business Account Executives ("AEs") at Charter's Redding,

6  California location.  (Def.'s Statement of Undisputed Facts

7  ("Def.'s SUF") Nos. 1-2 (Docket No. 93-2).)  Harper worked for

8  Charter from September 18, 2017 to March 12, 2018, and Sinclair

9  worked for Charter from January 5, 2015 to April 4, 2017.  (Id.

10 Nos. 1,2, 31, 33.)

11        Charter is a broadband connectivity company and cable

12 operator serving business and residential customers under the

13 Spectrum brand, among others.  (Decl. of Andrea Benner ("Benner

14 Decl.") ¶ 3 (Docket No. 94).)  Charter utilizes AEs to sell its

15 phone, internet, and television services directly to small- and

16 medium-sized businesses in an assigned geographic area.  (Def.'s

17 SUF No. 4.)  Charter classifies its AEs as "exempt" employees.

18 (Pls.' Statement of Disputed Facts ("Pls.' SDF") No. 1 (Docket

19 No. 98-2).)  On a typical day when plaintiffs were employed by

20 Charter, Charter expected AEs to participate in a daily sales

21 call with their regional sales manager, prepare sales proposals,

22 cold-call potential customers, set up appointments with

23 prospective customers and meet them in person, monitor existing

24 sales, go "door-to-door knocking," and enter data related to

25 completed sales into one of several online portals, among other

26 tasks.  (Benner Decl. ¶¶ 12-13, Ex. A; Def.'s SUF Nos. 4-6;

27 Declaration of Zachary Shine ("Shine Decl."), Ex. B, Sinclair

28 Deposition ("Sinclair Dep.") 142:14-19 (Docket No. 95-3); Ex. A,

1   Harper Deposition ("Harper Dep.") 126:5-127:5 (Docket No. 95-1).)

2   AEs were also expected to interface with other departments,

3   including departments that were responsible for installing

4   equipment at the customer's business or for performing

5   construction on the customer's property (e.g., to install phone

6   lines or cables if the property did not already have them), and

7   to be customers' first point of contact for the services sold up

8   until installation had been completed. (See Shine Decl., Ex. C,

9   Benner Deposition ("Benner Dep.") 85:21-87:2; 97:14-98:19.)

10          As salespersons, Charter AEs were eligible to earn

11  commissions based on how many sales they made each month.

12  (Def.'s SUF No. 16.)  The parties dispute whether Charter ever

13  provided plaintiffs with a copy of Charter's commission plan or

14  conveyed its terms to the plaintiffs. (See Pls.' Response to

15  Def.'s SUF ("Pls." RSUF") Nos. 12-16.)

16          During his employment with Charter, Sinclair had two

17  managers: Wade Smith and Andrea Benner. (Sinclair Dep. 47:24-

18  51:6.)  Benner was Harper's manager throughout his entire

19  employment. (Harper Dep. 79:18-80:23.)  Since Benner was located

20  in Medford, Oregon, she did not directly supervise either

21  Sinclair or Harper's day-to-day activities. (Id.; Sinclair Dep.

22  47:24-51:6.)  Throughout Sinclair and Harper's employment,

23  Charter required all AEs to meet or exceed certain monthly sales

24  goals. (Def.'s SUF No. 9.)  Both Sinclair and Harper received

25  "corrective action reports" indicating that they were failing to

26  meet Charter's expectations related to the AE position during

27  their employment. (Def.'s SUF Nos. 9-10.)  Beginning on August

28  4, 2016, Sinclair took a leave of absence. (Benner Decl. ¶ 31.)

3

1    Charter terminated Sinclair on April 4, 2017.  (Id.)  On

2    approximately February 3, 2018, Harper took medical leave.  (Id.

3    at ¶ 34.)  He remained on leave through his termination on March

4    12, 2018.  (Id.)

5            On September 14, 2018, Harper filed a written notice

6    with the California Labor and Workforce Development Agency

7    ("LWDA"), alleging that Charter had committed violations of the

8    California Labor Code.  (See Decl. of Jamin Soderstrom

9    ("Soderstrom Decl.") ¶ 22 (Docket No. 98-5).)  Believing he was

10   subject to an arbitration agreement with Charter, Harper then

11   filed a demand for arbitration with JAMS on November 19, 2018.

12   (Id. at ¶ 23.)  The arbitrator subsequently issued a final award

13   determining that none of Harper's claims were arbitrable.  (See

14   id. ¶ 24.)  Harper then filed a complaint alleging the same

15   violations of the California Labor Code against Charter in Shasta

16   County Superior Court, on behalf of himself and all similarly

17   situated individuals.  (See Docket No. 1-1.)  Charter removed the

18   case to this court on May 17, 2019.  (See Docket No. 1.)  On

19   December 13, 2019, Harper amended his complaint, adding Sinclair

20   as a named plaintiff pursuant to Rule 15(c).  (See FAC.)

21           Plaintiffs allege that Charter erroneously categorized

22   them as exempt employees because Charter mistakenly categorized

23   them as "outside salespersons."  (FAC ¶ 9.)  Plaintiffs claim

24   that, as a result of this misclassification, Charter failed to

25   pay them minimum wage in violation of California Labor Code §§

26   1182.12, 1194, 1197, and 1194.4 (First Claim), failed to pay

27   overtime wages in violation of California Labor Code §§ 510 and

28   1197 (Second Claim), failed to provide meal periods or provide

4

premium wages in lieu thereof in violation of California Labor Code §§ 512 and 226.7 (Third Claim), and failed to provide rest breaks or pay premium wages in lieu thereof in violation of California Labor Code § 226.7 (Fourth Claim).  (See generally FAC.)  Plaintiffs further claim that Charter unlawfully calculated, deducted, and failed to pay commission wages under California Labor Code §§ 204, 221, 223, 224, and 2751 (Fifth Claim), failed to provide accurate wage statements in violation of California Labor Code § 226 (Sixth Claim), failed to pay all wages owed upon termination in violation of California Labor Code § 203 (Seventh Claim), failed to provide timely and complete copies of employment records in violation of California Labor Code §§ 226, 432, and 1198.5 (Eighth Claim), violated California's Unfair Competition Law ("UCL") under California Business and Professions Code § 17200 (Ninth Claim), and violated the California Private Attorney General Act ("PAGA"), Cal. Labor Code § 2698, et seq. (Tenth Claim).

II.  Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that

5

1  negates an essential element of the non-moving party's case.

2  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

3  Alternatively, the movant can demonstrate that the non-moving

4  party cannot provide evidence to support an essential element

5  upon which it will bear the burden of proof at trial.  Id.  Where

6  "the case turns on a mixed question of fact and law and the only

7  disputes relate to the legal significance of undisputed facts,

8  the controversy collapses into a question of law suitable to

9  disposition on summary judgment."  Thrifty Oil Co. v. Bank of Am.

10  Nat'l Tr. & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003).

11  "Where the record taken as a whole could not lead a rational

12  trier of fact to find for the non-moving party, there is no

13  genuine issue for trial."  Matsuhita Elec. Indus. Co. v. Zenith

14  Radio Corp., 475 U.S. 574, 587 (1986).  Any inferences drawn from

15  the underlying facts must, however, be viewed in the light most

16  favorable to the party opposing the motion.[1]  See id.

---

17  [1]    Charter makes several evidentiary objections to the
18  Declaration of Jamin S. Soderstrom and its attachments, the
   declaration of Lionel Harper, and the declaration of Daniel
19  Sinclair on the grounds that the statements by Mr. Soderstrom,
   Harper, and Sinclair, as well as their attached exhibits, lack
20  foundation, are hearsay, are speculative, or are irrelevant.
   (See Docket No. 103-1.)  Plaintiffs similarly object to portions
21  of the Declaration of Andrea Benner and its attachments.  (See
   Docket No. 98-27.)  The Ninth Circuit has long held that "to
22  survive summary judgment, a party does not necessarily have to
   produce evidence in a form that would be admissible at trial, as
23  long as the party satisfies the requirements of Federal Rule of
   Civil Procedure 56."  Fraser v. Goodale, 342 F.3d 1032, 1036-37
24  (9th Cir. 2003.)  Moreover, "[a]s a practical matter, the court
   finds this entire exercise of considering evidentiary objections
25  on a motion for summary judgment to be futile and
   counterproductive."  Burch v. Regents of University of
26  California, 433 F.Supp.2d 1110, 1122 (E.D. Cal. 2006) (Shubb,
27  J.).  Accordingly, if Charter or plaintiffs wish to raise these
28  evidentiary objections, they may do so at trial.

1 III. Discussion

2      A.   Claims for Failure to Pay Minimum Wage, Failure to Pay
            Overtime, Failure to Provide Meal Periods, and Failure
3           to Provide Rest Periods

4           Charter first argues that plaintiffs' First (Minimum

5 Wage), Second (Overtime), Third (Meal Periods), and Fourth (Rest

6 Periods) claims fail as a matter of law because California's wage

7 and hour laws, including minimum wage and overtime pay

8 requirements, as well as meal and rest period requirements, do

9 not apply to "outside salespersons."  (See Mot. for Summ. J. at

10 11-18.)  Charter also argues that Sinclair's First through Fourth

11 claims are time-barred because he last worked for Charter more

12 than three years before he filed suit.  The court will address

13 Charter's statute-of-limitations argument before turning to the

14 merits of its argument that Harper and Sinclair were properly

15 classified as "outside salespersons."

16           1.   Statute of Limitations

17           The applicable limitations period for claims for

18 damages under the California Labor Code is three years.  See Cal.

19 Code Civ. P. § 338.  Charter argues that Sinclair's claims are

20 time-barred because the last day Sinclair actually performed work

21 for Charter was July 16, 2016, but Sinclair did not file suit

22 until December 13, 2019.  (See Mot. for Summ. J. at 21.)

23           Plaintiffs argue that, because Sinclair was among the

24 putative class members referenced in Harper's original complaint,

25 and Sinclair was added as a party plaintiff pursuant to Rule

26 15(c) when plaintiffs filed the First Amended Complaint on

27 December 13, 2019, Sinclair's claims relate back to Harper's

28 original pleading.  See In re Syntex Corp. Sec. Litig., 95 F.3d

1   922, 935-36 (9th Cir. 1996).

2          "An amendment adding a party plaintiff [under Rule

3   15(c)] relates back to the date of the original pleading only

4   when: (1) the original complaint gave the defendant adequate

5   notice of the claims of the newly proposed plaintiff; (2) the

6   relation back does not unfairly prejudice the defendant; and (3)

7   there is an identity of interests between the original and newly

8   proposed plaintiff."  Id.  "In deciding whether an amendment

9   relates back to the original claim, notice to the opposing party

10  of the existence and involvement of the new plaintiff is the

11  critical element."  Avila v. INS, 731 F.2d 616, 620 (9th Cir.

12  1984).  Whether the defendant had adequate notice of the newly

13  proposed plaintiff's claims often turns on "whether the original

14  complaint clearly stated that the plaintiff sought to represent

15  others."  Allen v. Similasan Corp., 96 F. Supp. 3d 1063, 1069

16  (S.D. Cal. 2015) (citations omitted).

17         The court finds that Harper's complaint gave defendant

18  adequate notice of Sinclair's claims because it sought to pursue

19  class claims.  While an individual complaint may not provide

20  adequate notice that the plaintiff seeks claims on behalf of a

21  class, see, e.g., Corns v. Laborers Int'l Union of N. Am., No.

22  09-cv-4403 YGR, 2014 WL 1319363, at *5 (N.D. Cal. Mar. 31, 2014),

23  courts have uniformly found that a class action complaint

24  provides defendants adequate notice of other class members'

25  claims, see, e.g., Lith v. Iheartmedia + Entm't, No. 1:16-cv-066

26  LJO SKO, 2016 WL 4000356, at *6 (E.D. Cal. July 25, 2016).  Here,

27  Harper's complaint unequivocally sought to bring a class action.

28  (See Docket No. 1-1 (commencing action with "Class and PAGA

1   Action Complaint").)  Defendant even acknowledged in its notice

2   of removal that the putative class included 1083 account

3   executives employed by defendant beginning in November 2014, of

4   which Sinclair was one.  (See Docket No. 1 at 11.)

5           The court also finds that an identity of interests

6   exists between Sinclair and Harper.  For there to be the required

7   identity of interests, Harper and Sinclair must be "similarly

8   situated."  Immigrant Assistance Project of L.A. Cty. Fed'n of

9   Labor (AFL-CIO) v. INS, 306 F.3d 842, 858 (9th Cir. 2002).

10  Plaintiffs are "similarly situated" when "[t]he circumstances

11  giving rise to the[ir] claims remain[ ] the same [under the

12  amended complaint] as under the original complaint.  Raynor Bros.

13  v. Am. Cyanimid Co., 695 F.2d 382, 384 (9th Cir. 1982).  Here,

14  Sinclair and Harper held the same position at Charter, had some

15  of the same supervisors and colleagues, and were subject to the

16  same allegedly unlawful policies and practices.  These policies

17  and procedures give rise to the same allegations of violations of

18  the California Labor Code, California's UCL, and PAGA in both the

19  original and operative complaints.  (Compare Compl. (Docket No.

20  1-1) with FAC (Docket No. 45).)  Because the court finds an

21  identity of interests between Harper and Sinclair, the relation

22  back of Sinclair's claims will not prejudice Charter.  Raynor

23  Bros. v. Am. Cyanimid Co., 695 F.2d 382, 384 (9th Cir. 1982)

24  (holding when new and former plaintiffs "have sufficient identity of

25  interests, relation back of the amendment is not prejudicial to the

26  defendant"); Besig v. Dolphin Boating & Swimming Club, 683 F.2d

27  1271, 1278 (9th Cir. 1982) (holding where the relief sought remains

28  the same "the defendant is not prejudiced because his response to

1   the action requires no revision"); <u>Immigrant Assistance</u>, 305 F.3d at

2   858 ("The addition of new plaintiffs who are similarly situated to

3   the original plaintiffs therefore did not cause the INS any

4   prejudice in the present case.").  Sinclair's claims as alleged in

5   the operative complaint therefore relate back to Harper's original

6   complaint, which was filed on May 3, 2019.

7          Plaintiffs further argue that the court should apply

8   principles of equitable tolling to suspend the running of any

9   applicable statutes of limitations after November 19, 2018.  (<u>See</u>

10  Pls.' Opp'n at 39-46.)  They base their argument on a series of

11  events that began over a year before Harper filed his original

12  complaint in Shasta County Superior Court.  On April 19, 2018,

13  approximately one month after Harper was terminated by Charter,

14  Harper contacted JAMS, the company listed in an arbitration

15  agreement Charter had signed with Harper, to request non-binding

16  mediation.  (Harper Decl. ¶ 22.)

17         Charter refused to participate in mediation with Harper

18  in May 2018.  (<u>Id.</u>)  On July 3, 2018, Charter's counsel sent

19  plaintiffs' counsel a letter attaching a copy of the arbitration

20  agreement Harper had signed, which required arbitration with JAMS.

21  (<u>See</u> Soderstrom Decl. ¶ 19, Ex. 19.)  Charter asked Harper to comply

22  with his contractual obligations to arbitrate, and stated that it

23  would move to compel arbitration is Harper elected to file a

24  complaint in court.  (<u>See id.</u>)  Harper subsequently filed a notice

25  of Charter's alleged violations of the California Labor Code with

26  the California LWDA, then filed an arbitration demand with JAMS on

27  November 19, 2018, in compliance with his arbitration agreement with

28  JAMS.  (<u>See id.</u> at ¶¶ 22-23.)  Because the arbitration agreement

10

1  included a mutual delegation option, Harper's arbitration demand

2  asked the arbitrator to address several threshold issues before

3  reaching the merits of the claim.  (See id.)  Harper's arbitration

4  demand stated that Harper intended to file the same claims on an

5  individual, class, and representative PAGA basis in court to the

6  extent the arbitrator determined some or all of the claims were not

7  arbitrable.  (See id.)

8        The arbitrator issued a final award on April 25, 2019,

9  dismissing the arbitration on the grounds that the entire

10 arbitration agreement was null and void and that none of Harper's

11 claims was arbitrable.  (See id. at ¶ 24.)  Harper filed his

12 complaint shortly thereafter, on May 3, 2019.  (See id.)

13       Plaintiffs argue that equitable tolling is automatic

14 "where exhaustion of an administrative remedy is mandatory prior to

15 filing suit."  McDonald v. Antelope Valley Cmty. Coll. Dist., 45

16 Cal. 4th 88, 101 (Cal. 2008).  The parties dispute whether Harper

17 was required to pursue arbitration before filing suit.  (See Mot.

18 for Summ. J. at 34; Pls.' Opp'n at 40.)  However, the court need not

19 address the question of whether Harper was required to arbitrate his

20 claims because equitable tolling may still apply "regardless of

21 whether the exhaustion of one remedy is a prerequisite to the

22 pursuit of another."  Elkins v. Derby, 12 Cal. 3d 410, 414 (Cal.

23 1974).  Equitable tolling applies in such situations when three

24 elements are present: (1) timely notice, (2) lack of prejudice to

25 the defendant, and (3) reasonable and good faith conduct by the

26 plaintiff.  See Saint Francis Mem'l Hosp. v. State Dep't of Pub.

27 Health, 9 Cal. 5th 710, 724 (2020); Elkins, 12 Cal. 3d at 414.

28       Here, Charter had notice of Harper's allegations and

11

1  claims, and of his intent to pursue them on behalf of other

2  employees in California and the Sate, as early as September 14,

3  2018, when Harper filed and mailed the PAGA notice, and certainly by

4  the time Harper filed his demand for arbitration, in which he

5  indicated his intent to pursue his claims in court should the

6  arbitrator determine that some or all of his claims were not

7  arbitrable.  (See Soderstrom Decl. ¶¶ 22-23.)

8         Under the second element, courts' "core focus" is

9  "whether application of equitable tolling would prevent the

10  defendant from defending a claim on the merits."  Saint Francis, 9

11  Cal. 5th at 728 (citing Addison v. California, 21 Cal. 3d 313, 318

12  (Cal. 1978)).  Given that Harper's claims in his demand for

13  arbitration were the same as his claims filed in court, and that

14  Harper indicated his intention to pursue his claims on behalf of a

15  class, the court does not "see how tolling [the] statute of

16  limitations would undermine the [defendant's] ability to defend the

17  propriety of the same penalty in superior court."  Id.  Indeed, by

18  May 17, 2019, just two weeks after Harper filed his claims in court,

19  Charter had already identified 1,083 putative class members and

20  aggrieved employees who had been employed by Charter in California

21  since November 19, 2014.  (See Docket No.1, at 11.)

22         Finally, the court finds here that Harper acted

23  reasonably and in good faith.  See Saint Francis, 9 Cal. 5th at 724.

24  Harper filed his PAGA notice on September 14, 2018, just ten days

25  after receiving his wage statements and some of his personnel

26  records from Charter.  (See Soderstrom Decl. ¶ 21.)  Harper filed

27  his arbitration demand two months later, and filed his suit in

28  Shasta Superior Court shortly after the arbitrator issued a final

1    award.  (See id. at ¶¶ 23-24.)  These actions were each "objectively

2    reasonable under the circumstances" and "subjectively in good faith"

3    as Harper believed himself to be bound to an arbitration agreement

4    with Charter that required arbitration with JAMS and did not

5    unreasonably delay.  See Saint Francis, 9 Cal. 5th at 724.

6         The court therefore finds that equitable tolling of the

7    statute of limitations applicable to the claims in Charter's

8    original complaint to November 19, 2018 (the date on which Harper

9    filed his arbitration demand with JAMS) is appropriate.  See id.

10   Because Sinclair's claims relate back to the claims contained in

11   Harper's original complaint, the applicable date for determining

12   whether Sinclair complied with the statute of limitations is

13   November 19, 2018.

14        Accordingly, because the applicable statute of

15   limitations for claims for damages under the Labor Code is three

16   years, and Sinclair was still working for Charter on November 19,

17   2015, the court will not grant summary judgment against Sinclair on

18   his First through Fourth claims for damages on the grounds that his

19   claims were not timely filed.  As Sinclair acknowledges, however,

20   he is time-barred from seeking penalties under his first four

21   claims, as the last day he worked for Charter was April 4, 2017, and

22   statutory penalties are subject to a one-year limitations period.

23   See Cal. Code Civ. P. § 340; (Pls.' Opp'n at 46).  The court will

24   therefore grant Charter's request for summary adjudication as to

25   Sinclair's First, Second, Third, and Fourth Claims for statutory

26   penalties.

27             2.   Outside Salesperson Exemption

28             Under California law, outside salespersons are exempt

                                   13

from overtime, minimum wage, meal period, and rest period requirements.  California Labor Code § 1171 sets forth that "the provisions of [the Labor Code's Chapter on Wages, Hours, and Working Conditions] shall apply to and include men, women and minors employed in any occupation, trade, or industry, whether compensation is measured by time, piece, or otherwise, but shall not include any individual employed as an outside salesman . . . ."  Cal. Lab. Code § 1171 (emphasis added).  Under California regulations, an "outside salesperson" is defined as "any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities."  Cal. Code Regs. tit. 8, § 11070.

Whether someone is an outside salesperson under the California labor laws is a mixed question of law and fact, although it often "turns on a detailed, fact-specific determination."  Ramirez v. Yosemite Water Co., 20 Cal. 4th 785, 790 (Cal. 1999).  "[T]he assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption."  Id. (citations omitted).

According to the California Supreme Court, the determination of whether an employee is an "outside salesperson" entails a "quantitative approach, looking to the actual hours spent on sales activity to determine if an employee is primarily a salesperson."  Id. at 801.  This determination is guided by practical inquiries into the actual nature of the requirements of

14

1  the employee's job.  See id.  Courts may not rely solely on

2  either "the number of hours that the employer, according to its

3  job description or its estimate, claims the employee should be

4  working in sales," or "the actual average hours the employee

5  spent on sales activity."  Id. at 802 (emphasis added).  As the

6  California Supreme Court has explained:

7           On the one hand, if hours worked on sales
            were determined through an employer's job
8           description, then the employer could make an
            employee exempt from overtime laws solely by
9           fashioning an idealized job description that
            had little basis in reality. On the other
10          hand, an employee who is supposed to be
            engaged in sales activities during most of
11          his working hours and falls below the 50
            percent mark due to his own substandard
12          performance should not thereby be able to
            evade a valid exemption. A trial court, in
13          determining whether the employee is an
            outside salesperson, must steer clear of
14          these two pitfalls by inquiring into the
            realistic requirements of the job. In so
15          doing, the court should consider, first and
            foremost, how the employee actually spends
16          his or her time. But the trial court should
            also consider whether the employee's
17          practice diverges from the employer's
            realistic expectations, whether there was
18          any concrete expression of employer
            displeasure over an employee's substandard
19          performance, and whether these expressions
            were themselves realistic given the actual
20          overall requirements of the job.

21  Id.

22          "[O]nly time 'away from the employer's place of

23  business' that is spent on sales activity, i.e., 'selling

24  tangible or intangible items or obtaining orders or contracts for

25  products, services or use of facilities,' counts towards the 50%

26  mark needed to establish the [outside salesperson] exemption."

27  Spallino v. Charter Comms. Inc., No. ED CV 17-0982-DOC (SPx),

28  2018 WL 6011541, at *8 (C.D. Cal. June 5, 2018) (quoting 8 Cal.

1  Code Regs. § 11070).  Activities performed inside the office do

2  not count toward the exemption even if they are direct sales or

3  sales-related activities.  See Duran v. United States Bank Nat'l

4  Assn., 59 Cal. 4th 1, 26 (Cal. 2014) ("Unlike the corresponding

5  federal provision, California's wage order definition 'takes a

6  purely quantitative approach' and focuses exclusively on whether

7  the employee spends more than half of the workday engaged in

8  sales activities outside the office." (emphasis added) (quoting

9  Ramirez, 20 Cal. 4th at 797)).  California law also does not

10  treat activities that are "incidental" to sales activities as

11  exempt, even if they are performed outside the office.  Ramirez,

12  20 Cal. 4th at 796-801.

13          Here, no party appears to contend that Harper or

14  Sinclair actually spent more than 50% of their time away from the

15  employer's place of business engaged in sales activities.  (See

16  Def.'s SUF Nos. 10-11; Pls.' SDF Nos. SDF Nos. 19-22.)  Rather,

17  Charter argues that plaintiffs were appropriately classified as

18  outside salespersons because, during their employment, Charter

19  expected AEs to "customarily and regularly" spend at least 50% of

20  their time in the field conducting sales activities.  (Mot. for

21  Summ. J. at 3; Def.'s SUF No. 4.)  If plaintiffs were spending

22  less than 50% of their time outside the office participating in

23  sales activities, Charter contends, they were not meeting the

24  realistic requirements of their jobs.  Ramirez, 20 Cal. 4th at

25  802.

26          Charter points to several "corrective action reports"

27  that were issued to plaintiffs as evidence that they were not

28  living up to Charter's expectations for how much time AEs should

1    be spending outside the office.  (See Benner Decl., Ex. I-N.)

2    However, these corrective action reports were issued based on

3    plaintiffs' failure to meet rolling average sales targets,

4    without regard to the amount of time plaintiffs' spent outside

5    the office.  (See id.)  While some of the directives contained in

6    these reports instructed plaintiffs to focus on activities that

7    would result in their spending more time outside the office, such

8    as following more leads or knocking on more doors, other

9    directives instructed plaintiffs to focus on activities that had

10   to be done in the office, such as sending their manager their

11   daily call form.  (See id.)  None of the corrective action

12   reports expressly state that plaintiffs were failing to live up

13   to expectations because they were spending too much time in the

14   office.  (See id.)

15          Charter also emphasizes that it advertises the AE

16   position as one that will "keep you on the go" and "working door-

17   to-door."  (Benner Decl. ¶ 5.)  According to training materials

18   provided to new AEs in December 2016, on a "typical day," Charter

19   expects AEs to be outside the office from 10:00 a.m. to 3:00

20   p.m., or five hours out of the day.  (See Benner Decl., Ex. A,

21   ("December 2016 AE Training Materials") at 41.)  Plaintiffs'

22   former manager similarly testified that "account executives

23   should spend most of their time in the field."  (Benner Dep.

24   92:1-8, 103:1-11.)

25          But the training materials Charter cites do not

26   actually specify that Charter expects AEs to be out of the office

27   more than half the day; while the schedule on a "typical day"

28   will have AEs out of the office between 10:00 a.m. and 3 p.m.,

1   the schedule does not specify how long a AE's typical day will

2   last besides saying it will go from "approximately 8:00 a.m." to

3   "around 5 p.m."  (See December 2016 AE Training Materials at 41.)

4   In fact, both Sinclair and Harper testified that they regularly

5   were required to work past 5 p.m. and that, contrary to the

6   training materials emphasized by Charter, they were advised that

7   the best sales results would be achieved if they were out in the

8   field selling from 11:00 a.m. to 2:00 or 3:00 p.m., which would

9   only result in 3-4 hours being spent out of the office selling.

10  (See Harper Dep. 146:1-25, 163:1-164:11; Sinclair Dep.  97:5-15,

11  100:25-101:19.)  Other training materials produced by Charter

12  reinforce plaintiffs' testimony, providing testimonials from "the

13  best" AEs and samples schedules that suggest AEs need not spend

14  more than 50% of their time outside the office.  (See Soderstrom

15  Decl., Exs. 10, 11.)

16       By contrast, another job description produced by

17  Charter for "Direct Sales Reps" reveals that Charter expressly

18  stated that it expected those employees to spend 80% of their

19  time outside the office.  (See Soderstrom Decl., Ex. 21.)

20  Neither of Charter's "Standards of Performance" for the AE

21  position in December 2015 or August 2017 indicated that Charter

22  expected AEs to spend any particular amount of time outside the

23  office--rather, the expectation simply appears to have been that

24  AEs would complete a certain number of sales each month.  (See

25  Benner Decl., Ex. H; Benner Dep. 37:1-18; Soderstrom Decl., Ex.

26  8.)  Plaintiffs have also submitted declarations in which they

27  explain that, contrary to the testimony of their former manager,

28  Benner, no person at Charter, or any document they ever saw at

1    Charter, expected or required them to spend more than 50% of

2    their work hours outside the office selling Charter's services.

3    (See Harper Decl. ¶¶ 6, 10; Sinclair Decl. ¶¶ 6, 10.)

4            Viewing the evidence in the light most favorable to the

5    non-moving parties, the court finds that genuine issues of

6    material fact exist as to whether Charter actually expected its

7    AEs to spend more than 50% of their time outside the office,

8    engaged in sales or sales-related activities, at the time of

9    plaintiffs' employment.  See Celotex, 477 U.S. at 322–23.

10           Furthermore, even if Charter did have such an

11   expectation, a genuine issue of fact would exist as to whether

12   such an expectation was reasonable in light of the duties

13   plaintiffs were expected to complete as part of their roles as

14   AEs.  See Ramirez, 20 Cal. 4th at 802 (directing that while

15   courts should "consider, first and foremost, how the employee

16   actually spends his or her time," they "should also consider

17   whether the employee's practice diverges from the employer's

18   realistic expectations, whether there was any concrete expression

19   of employer displeasure over an employee's substandard

20   performance, and whether these expressions were themselves

21   realistic given the actual overall requirements of the job"

22   (emphasis added)).  The evidence shows that many of the tasks

23   inherent to plaintiffs' job required them to be in the office.

24   AEs were required to attend a daily sales call at the start of

25   each day that prevented them from going out into the field.

26   (Harper Dep. 149:9-17; Sinclair Dep. 98:25-99:14; Benner Dep.

27   106:20-110:11.)  This call typically lasted between 15 minutes

28   and an hour, depending on how long the manager let the meeting

1   run.   (See id.)

2          AEs were also required to spend significant amounts of

3   time "scrubbing" a list of businesses provided to them by Charter

4   to target each month (known as the "leads list").  (Harper Dep.

5   102:5-104:15; Sinclair Dep. 277:20-278:15.)  The scrubbing

6   process required AEs to go through the leads list and determine

7   which businesses were not viable targets, because they had

8   closed, already had Charter service, or were listed at an address

9   that was actually just a vacant lot or building.  (See id.)

10  Sinclair and Harper both testified that this process required

11  them to work at their desk, because much of it involved

12  researching businesses online, searching Google Maps, looking

13  through Charter databases, or conferring with other AEs.   (Id.)

14         Once AEs had verified that a business listed on the

15  leads list was a valid lead, they had to research the business to

16  determine how many clients it serviced, as well as what phone,

17  internet, or telephone service the business already had, to

18  create a sales proposal tailored to the specific business' needs.

19  (Harper Dep. 117:14-119:16; Sinclair Dep. 133:2-134:9.)  Harper

20  and Sinclair testified that this process also largely required

21  them to be at their desk, and estimated that it could take

22  anywhere from 30 minutes to 3 hours, depending on how complex of

23  a proposal needed to be prepared.  (See id.)

24         After closing a deal with a client, AEs would have to

25  return to the office to input the order into an online portal.

26  (Harper Dep. 126:5-127:5; Sinclair Dep. 142:14-19.)  Harper

27  estimated that the input process would take 30 minutes to an

28  hour.  (See id.)  The evidence shows that AEs were then expected

1  to be involved with an account up until service had been

2  completely installed at the client's business.  (Harper Dep.

3  127:16-131:13; Sinclair Dep. 275:5-7; Benner Dep. 91:11-100:13.)

4  While other departments were in charge of the actual installation

5  and any construction that had to occur at the customer's business

6  and/or property (e.g., installing cable or phone lines), AEs were

7  expected to be the first point of contact would have to consult

8  with these other departments to troubleshoot issues  and would be

9  expected to field calls from customers who viewed them as a point

10  of contact for Charter.  (Id.)

11       According to Harper, AEs would frequently have to work

12  out logistical issues with customers regarding work that other

13  departments were tasked with doing, like scheduling installs or

14  required construction, all of which would be done from the

15  office.  (Id.; Benner Dep. 91:11-100:13 (explaining that AEs were

16  expected to be the "main point of contact" with post-sale

17  customers during the installation process and "remain available

18  to the customer throughout the installation process").)

19  Sinclair also testified that up until the day after an install

20  was completed, AEs were expected to field calls from clients

21  experiencing issues and investigate what their issue was so that

22  the AE could refer the issue to the proper Charter department.

23  (Sinclair Dep. 144:1-145:6.)  Based on these tasks, Sinclair and

24  Harper testified that they spent 70% and approximately 60-65% of

25  their time at their desks, respectively.  (Sinclair Dep. 47:10-

26  16; Harper Dep. 235:19-254:12.)

27       Ultimately, the determination of whether Harper and

28  Sinclair can appropriately be classified as "outside

1  salespersons" who are exempt from California wage and hour laws

2  is a fact-intensive question.  See Ramirez, 20 Cal. 4th at 790.

3  Given the conflicting testimonial and documentary evidence as to

4  Charter's expectations regarding how many hours plaintiffs should

5  have spent outside the office, plaintiffs' testimony regarding

6  the demands of their job and why they spent a majority of their

7  time at the office, and viewing the facts in the light most

8  favorable to plaintiffs as the non-moving parties, a reasonable

9  juror could find that plaintiffs did not qualify as "outside

10 salespersons."  See Spallino, 2018 WL 6011541, at *9 (denying

11 summary judgment as to plaintiff's wage and hour claims because

12 there was a disputed issue of fact as to whether Time Warner

13 Cable Account Executive was an "outside salesperson"); T.W. Elec.

14 Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631

15 (9th Cir. 1987) ("If the nonmoving party produces direct evidence

16 of a material fact, the court may not assess the credibility of

17 this evidence nor weigh against it any conflicting evidence

18 presented by the moving party.").

19       Accordingly, there is a disputed issue of material fact

20 underlying whether plaintiffs were protected by California's

21 minimum wage, overtime pay, meal period, and rest period

22 requirements.  The court will therefore deny Charter's motion for

23 summary judgment as to plaintiffs' First through Fourth Claims

24 (except for Sinclair's First through Fourth Claims for penalties,

25 as discussed above).[2]

26 _____

27       [2]   Plaintiffs present an alternative argument that, even
if the court were to find that Charter had properly classified
   AEs as outside salespersons after they had completed their
28 initial training, the court should consider AEs' training weeks

1        B.    Commission-Based Claims

2            Plaintiffs' Fifth Claim alleges that Charter unlawfully

3    calculated, deducted, and paid commission wages in violation of

4    California Labor Code §§ 2751(b), 204, 221, 223, and 224.  (See

5    FAC ¶¶ 42-48.)  As a threshold matter, Charter again argues that

6    Sinclair's commission-based claims are time-barred based on the

7    Labor Code's three-year statute of limitations.  (See Mot. for

8    Summ. J. at 25.)  For the reasons discussed above, the court

9    finds this argument to be without merit.

10           Charter also raises several substantive arguments as to

11   why summary adjudication is appropriate as to each alleged

12   statutory violation in the operative complaint. The court will

13   address each of Charter's arguments in turn:

14                1.    California Labor Code § 2751(b)

15           California Labor Code § 2751(b) states that, where an

16   employee is paid commissions, "the employer shall give a signed

17   copy of the [commission plan] to every employee who is a party

18   thereto and shall obtain a signed receipt for the contract from

19   each employee."  Cal. Labor Code § 2751(b).  Charter argues that

20   plaintiffs' claim fails as a matter of law because § 2751(b) no

21   longer provides a private right of action.  (See Mot. for Summ.

22   J. at 22.)  "Prior to January 2012, California Labor Code § 2752

23   provided that '[a]ny employer who does not employ an employee

24   _____

25   separately and find that, at the least, Charter had misclassified
     plaintiffs during training.  (See Pls.' Opp'n at 12-15.)  Because
26   the court finds that genuine issues of material fact exist as to
     whether AEs were properly classified as outside salespersons
27   throughout their entire employment, it need not consider
     plaintiffs' training weeks separately from their non-training
28   weeks.

1    pursuant to a written contract as required by Section 2751 shall
2    be liable to the employee in a civil action for triple damages.'"
3    Swafford v. Int'l Bus. Machines Corp., 383 F. Supp. 3d 916, 934
4    (N.D. Cal. 2019).  But "[w]hen the California Legislature amended
5    Section 2751 in 2011, it repealed Section 2752."  Beard v. Int'l
6    Bus. Machines Corp., No. C 18-06783 WHA, 2019 WL 1516692 (N.D.
7    Cal. Apr. 7, 2019) (citing Stats. 2011, ch. 556, § 3).  Other
8    district courts interpreting § 2751(b) have concluded that the
9    California's repeal of § 2752 removed any private right of action
10   under the statute.  See id.; Swafford, 383 F. Supp. 3d at 934.
11   This court agrees with those courts, and finds that plaintiffs
12   have no private right of action under § 2751.  The court will
13   therefore grant Charter's motion for summary adjudication as to
14   plaintiffs' claim that Charter violated Labor Code § 2751(b).

15          However, while § 2751 does not provide plaintiffs with
16   a private right of action, the court will still assess whether a
17   genuine dispute of material fact exists, as a violation of
18   § 2751(b) may still form the basis of Harper's PAGA claim and
19   serve as a predicate violation for plaintiffs' claims under the
20   UCL, as discussed below.  See Beard v. Int'l Bus. Machines Corp.,
21   No. C 18-06783 WHA, 2020 WL 1812171, at *9-10 (N.D. Cal. Apr. 9,
22   2020) (denying employer summary judgment on UCL claim predicated
23   on violation of Section 2751); Keenan v. Cox Commc'ns Cal., LLC,
24   No. 18-cv-129-MMA (LL), 2019 WL 3288939, at *9 (S.D. Cal. July
25   22, 2019) (stating that monetary relief for violations of § 2751
26   is only available in the form of civil penalties under PAGA)
27   (overruled on other grounds).

28          Charter argues that it complied with § 2751(b) by

24

1   providing plaintiffs with their commission plans through an

2   online portal known as "Synygy" and by requiring them to check a

3   box acknowledging receipt shortly after they were hired.  (See

4   Mot. for Summ. J. at 23.)  In support of its argument, Charter

5   presents documents related to a Synygy training course that it

6   asserts plaintiffs took upon being hired by Charter, as well as

7   statements contained in Benner's declaration.  (See Benner Decl.

8   ¶¶ 17, 20-23, Ex. G.)  Both Benner's declaration and the Synygy

9   training documents state that, in the course of the training, new

10  AEs were required to review their commission plan and check a box

11  acknowledging that they had read and understood it, and that they

12  agreed to comply with its terms.  (See id.)  According to Benner,

13  the only way new AEs could "clear" the acknowledgment page and

14  gain access to compensation information in the Synygy portal was

15  to click the acknowledge button.  (See id.)  Benner also states

16  that another Charter employee has searched Synygy's

17  acknowledgement data and found that Harper electronically

18  acknowledged receipt of his commission plan on September 29,

19  2017, at 2:36 p.m.  (See id.)

20          Plaintiffs dispute that they ever completed the Synygy

21  training described in the training documents and by Benner.  (See

22  Harper Decl. ¶ 19; Sinclair Decl. ¶ 17; Soderstrom Decl., Ex.

23  15.)  Neither plaintiff recognized the Synygy training guide when

24  it was presented to them, and a transcript of the training titles

25  Harper completed during his training does not mention any

26  training related to the Synygy portal.  (See id.)  Neither

27  plaintiff recognized the commission plans Charter asserts they

28  reviewed and signed, either.  (Sinclair Dep. 75:9-76:17; Harper

1    Dep. 84:9-86:16.)  Both Harper and Sinclair testified that they

2    were never presented with copies of the commission plans;

3    instead, the only knowledge they had of Charter's commission

4    plans came from conversations they had with others in the office

5    or, in Sinclair's case, from a one-page summary provided to him

6    by a Charter employee.  (Sinclair Dep. 77:9-78:5; Harper Dep.

7    86:21-87:22.)

8              The only evidence that either plaintiff signed or

9    acknowledged receipt of their commission plans comes from

10   Benner's statement that AEs had to acknowledge receipt

11   electronically before they could access the Synygy portal to view

12   their compensation information, and her statement that Charter is

13   in possession of data showing Harper electronically acknowledged

14   receipt of his commission plan.  (See Benner Decl. ¶¶ 17, 20-23.)

15   However, both plaintiffs state in their declarations that there

16   were multiple ways AEs could view and keep track of their

17   commissions besides logging into Synygy, including other online

18   portals, via email from their managers, phone discussions, sales

19   meetings, and on their wage statements.  (See Pls.' SDF 28;

20   Harper Decl. ¶ 15; Sinclair Decl. ¶ 13.)  And Charter has not

21   produced the data showing electronic acknowledgement to which

22   Benner refers, or any commission plans signed by either

23   plaintiff.  (See (See Pls.' SDF 30-34; Soderstrom Decl. ¶ 4;

24   Benner Decl., Ex. F.)  In other words, there is no documentary

25   evidence the court can rely on that conclusively shows that

26   plaintiffs knowingly agreed to Charter's commission plan,

27   acknowledged receipt of the plan, or were provided with a signed

28   copy of the plan, and the testimony and declarations of the

1    parties are in direct conflict.  The court therefore finds that a

2    genuine issue of material fact exists as to whether Charter

3    failed to provide plaintiffs with signed copies of their

4    commission plans or failed to obtain a signed receipt from each

5    plaintiff in violation of § 2751.  See Celotex, 477 U.S. at 322–

6    23.

7              3.   California Labor Code § 204

8              Plaintiffs claim that Charter violated California Labor

9    Code § 204 by adopting an unlawful monthly commission pay period

10   and paying earned commissions late.  (See FAC ¶¶ 46; Pls.' Opp'n

11   at 25.)  Section 204 states in pertinent part:

12             All wages . . . earned by any person in any
               employment are due and payable twice during
13             each calendar month, on days designated in
               advance by the employer as the regular
14             paydays.  Labor performed between the 1st
               and 15th days, inclusive, of any calendar
15             month shall be paid for between the 16th and
               the 26th day of the month during which the
16             labor was performed, and labor performed
               between the 16th and the last day,
17             inclusive, of any calendar month, shall be
               paid for between the 1st and 10th day of the
18             following month.

19   Cal. Labor Code § 204(a).  "In other words, all earned wages,

20   including commissions, must be paid no less frequently than

21   semimonthly."  Peabody v. Time Warner Cable, Inc., 59 Cal. 4th

22   662, 668 (Cal. 2014) (emphasis in original).

23             Charter argues that summary judgment is appropriate

24   because its commission plan complies with § 204.  (See Mot. for

25   Summ. J. at 24.)  According to Charter, AEs earn commissions on a

26   monthly basis, once they have met several criteria set out in

27   Charter's commission plan.  (See Benner Decl. ¶¶ 17, 19, Exs. D,

28

1  F.)  Charter contends that numerous courts and the California

2  Department of Labor Standards Enforcement ("DLSE")--the

3  California agency empowered to enforce California's labor laws,

4  including wage orders--have recognized that "[c]omission programs

5  which calculate the amount owed once a month (or less often) are

6  common."  DLSE Opn. Letter No 2202.12.09-2 (2002); see also

7  Chavez v. Time Warner Cable, LLC, 728 F. App'x 645, 648 (9th Cir.

8  2018) ("such agreements are permitted under California law and do

9  not offend § 204").

10      Plaintiff argues that Charter improperly conflates the

11  determination of when a commission is earned with the

12  determination of when an earned commission is required to be

13  paid.  "A commission is 'earned' when the employee has perfected

14  the right to payment; that is, when all of the legal conditions

15  precedent have been met. Such conditions precedent are a matter

16  of contract between the employer and employee, subject to various

17  limitations imposed by common law or statute."  Koehl v. Verio,

18  Inc., 142 Cal. App. 4th 1313, 1335, (1st Dist. 2006) (quoting

19  DLSE Opn. Letter No. 1999.01.09, p.2).  While the DLSE and

20  numerous courts interpreting § 204 have concluded that a

21  commission plan that determines how much an employee has earned

22  in commission once per month does not violate § 204, see Peabody,

23  59 Cal. 4th at 668, once the determination that an employee has

24  earned commissions has been made, that employee must be paid

25  during the next pay period.  See id.

26      Plaintiffs contend that, while they "earned" their

27  commissions at the conclusion of each "commission month," which

28  began on the 22nd of each month and ended on the 21st of the next

1  month, the evidence shows that Charter did not pay plaintiffs

2  until the second semimonthly pay period after the 22nd.  (See

3  Pls.' SDF 23-26; Benner Decl. ¶¶ 17, 19, Exs. D, F, Q, R; Benner

4  Dep. at 39:11-24.)

5          Charter argues that its payments were nonetheless

6  timely.  Although the commission month ended on the 21st of each

7  calendar month, Charter states that AEs did not "earn"

8  commissions until Charter had reviewed and verified any sales

9  pursuant to the terms of its commission plan.  (See Benner Decl.,

10  Ex. D at CHA/HAR 145, Ex. F at CHA/HAR 2468); Chavez v. Time

11  Warner Cable Co. LLC, No. CV 12-05291-RGK (RZx), 2013 WL

12  12080302, at *4 (C.D. Cal. Feb. 20, 2013) (holding that employer

13  had complied with § 204 by paying commissions on a monthly basis

14  after taking a reasonable period of time to verify sales

15  resulting in payment) (reversed on other grounds).

16          Charter does not provide any evidence in support of its

17  assertion that it conducted additional verification of

18  plaintiffs' sales after the 21st of each month, or that this

19  verification process lasted until the next calendar month such

20  that payment during the second semimonthly pay period would be

21  timely.  Moreover, because a genuine dispute of material fact

22  exists as to whether plaintiffs knowingly agreed to the terms of

23  Charter's commission plan, the court cannot conclude as a matter

24  of law that Sinclair and Harper only "earned" their commissions

25  upon the completion of the conditions laid out in the commission

26  plans provided by Charter.  See Koehl, 142 Cal. App. 4th at 1335

27  ("A commission is 'earned' when the employee has perfected the

28  right to payment; that is, when all of the legal conditions

precedent have been met. Such conditions precedent are a matter of contract between the employer and employee . . . .").

For similar reasons, the court cannot conclude, as Charter argues, that Harper's commission-based claims must fail because he never "earned" any commissions throughout the duration of his employment with Charter under the terms of his commission plan. Charter contends that Harper never completed the requisite number of monthly sales set out in the commission plan to "earn" any commissions. But undisputed evidence shows that Harper was paid $420 in commissions on January 19, 2018. (See Benner Decl., Ex. Q at CHA/HAR 57.)

The court will therefore deny Charter's motion for summary judgment as to plaintiffs' claim for violations of § 204.

### 4.   California Labor Code §§ 221, 223, 224

Plaintiffs claim that Charter violated California Labor Code §§ 221, 223, and 224 by "unlawfully deducting, reducing, clawing back, or otherwise reconciling commissions owed to plaintiffs." (FAC ¶ 47.)

#### a.   Sections 221 and 224

California Labor Code §§ 221 and 224 protect employees against unlawful deductions of their earned wages. Under § 221, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Section 224 authorizes certain deductions that an employee "expressly authorize[s] in writing," but forbids deductions that amount to a "rebate or deduction from the standard wage . . . pursuant to wage agreement or statute."

"[A]n employee's 'wages' or 'earnings' [under § 221]

are the amount the employer has offered or promised to pay, or has paid pursuant to such an offer or promise, as compensation for that employee's labor." Kemp v. Int'l Bus. Machs. Corp., No. 3:09-cv-03683, 2010 WL 4698490, at *5 (N.D. Cal. Nov. 4, 2010) (quoting Prachasaisoradej v. Ralphs Grocery Co., 42 Cal. 4th 217, 228 (Cal. 2007)).  Commissions can qualify as wages under California Labor Code § 221, but as the court noted in Kemp, "the right of a salesperson or any other person to a commission depends on the terms of the contract for compensation."  Id. (citations omitted); see also Swafford, 383 F. Supp. 3d at 934. Accordingly, a California Labor Code § 221 claim requires "some showing that [the plaintiff] is contractually entitled to the commissions he claims to have been denied."  Swafford, 383 F. Supp. 3d at 934.

Here, the parties dispute the number of earned commissions to which Harper was entitled in December 2017, and whether Charter fully paid him pursuant to the terms of his commission plan.  (See Pls.' Opp'n at 27; Def.'s Reply at 30.) Harper presents evidence of emails he sent to his manager in January 2018 indicating that Charter had not provided him with commissions for nine installs he completed in December.  (See Harper Decl., Ex. 2.)  Charter argues that Harper was not entitled to any commissions in December, because he failed to sell the threshold level of fifteen "Primary Service Units" ("PSUs") required under the terms of his commission plan to "earn" commissions.  (See Benner Decl., Ex. D.)  Further, Charter argues that, even if Harper had been entitled to commissions for December, he only completed seven PSUs, for which he was fully

31

1  paid in January 2018.  (See Benner Decl., Ex. Q at CHA-HAR 57

2  (showing Harper was paid $420 in commissions, at a rate of $60

3  per PSU x 7 PSUs.)

4           Because the court has found that a disputed issue of

5  material fact exists as to whether Harper knowingly agreed to the

6  terms of the commission plan to which Charter refers, the court

7  cannot rule as a matter of law that Harper failed to "earn" any

8  commissions in December 2017 because he did not sell fifteen

9  PSUs.  See Kemp, 2010 WL 4698490, at *5 ("the right of a

10 salesperson or any other person to a commission depends on the

11 terms of the contract for compensation").  While Harper contends

12 that he earned and was entitled to commissions for nine installs

13 he completed in December, Charter argues that it properly paid

14 him only for seven.  There is therefore a disputed issue of

15 material fact as to whether Charter unlawfully failed to pay

16 Harper commission wages it had promised to pay pursuant to the

17 agreement.  See id.

18          Sinclair argues that Charter failed to pay him a

19 commission for multiple sales he worked on that were ultimately

20 transferred to a national sales AE before they were finalized.

21 (See Sinclair Decl. ¶ 19; Sinclair Dep. 224:3-21.)  Charter

22 counters that, under the terms of Sinclair's commission plan, a

23 service had to be installed before a commission on that sale

24 could be "earned."  (See Def.'s Reply at 31; Benner Decl., Ex.

25 F.)  Since Sinclair did not perform every step of the sales

26 before they were completed, Charter contends that Sinclair did

27 not "earn" the commissions to which he believes he is entitled.

28 (See id.)

1    Again, a disputed issue of fact exists as to whether

2   Sinclair knowingly agreed to the terms of the commission plan to

3   which Charter refers.  The court therefore cannot rule as a

4   matter of law that Sinclair did not earn commissions for the

5   sales at issue based on the terms of the commission plan which

6   Charter argues applied at the time.  Because the parties disagree

7   as to whether Sinclair was entitled to commissions for sales in

8   which he performed some, but not all, of the requisite work, the

9   court concludes that a disputed issue of material fact exists as

10  to whether Sinclair "earned" commission wages for those sales,

11  and, therefore, whether Charter failed to pay Sinclair commission

12  wages it had promised him as part of the commission plan.  See

13  Kemp,, No. 2010 WL 4698490, at *5.  The court will therefore deny

14  Charter's motion for summary judgment as to plaintiffs' Fifth

15  Claim for violations of California Labor Code §§ 221 and 224.

16                    b.   Section 223

17       "Section 223 prohibits the secret payment of a lower

18  wage while purporting to pay the wage required by statute or

19  contract."  Johnson v. Hewlett-Packard Co., 809 F. Supp. 2d 1114,

20  1136 (N.D. Cal. 2011).

21       The text of section 223 does not support the existence

22  of a private right of action because it does not set forth an

23  entitlement to a wage or provide a penalty.  See id.; Calop

24  Business Systems, Inc. v. City of Los Angeles, 984 F. Supp. 981,

25  1015 (C.D. Cal. 2013).  The court will therefore grant summary

26  judgment in favor of Charter as to plaintiffs' Fifth Claim for

27  violation of California Labor Code § 223.

28       However, while § 223 does not provide plaintiffs with a

1   private right of action, the court will still assess whether a

2   genuine dispute of material fact exists, as a violation of § 223

3   (like a violation of § 2751(b)) may still form the basis of

4   Harper's PAGA claim and serve as a predicate violation for

5   plaintiffs' claims under the UCL discussed below.

6          As described above, both Harper and Sinclair have

7   provided evidence sufficient evidence to create a disputed issue

8   of material fact as to whether Charter paid them a lower

9   commission wage than that to which they were entitled as part of

10  their commission plans, while purporting to pay them the proper

11  wage.  See Johnson, 809 F. Supp. 2d at 1136.  A genuine of fact

12  therefore exists as to whether Charter violated the terms of

13  California Labor Code § 223.

14         C.   Plaintiffs' Wage Statement Claims

15         California Labor Code § 226 requires that employers

16  furnish their employees with accurate itemized statements in

17  writing, showing gross wages earned, total hours worked, all

18  deductions, net wages earned, all applicable hourly rates and the

19  corresponding number of hours worked at each hourly rate, and the

20  inclusive dates of all pay periods.  Cal. Labor Code § 226(a).

21  "An employee suffering injury as a result of a knowing and

22  intentional failure by an employer to comply with subdivision (a)

23  is entitled to recover the greater of all actual damages or

24  [statutory penalties] and is entitled to an award of costs and

25  reasonable attorney's fees."  Id. § 226(e)(1).  Plaintiffs allege

26  a number of violations of § 226 in their complaint, some of which

27  are derivative of their misclassification-based claims and their

28  commission-based claims, and some of which are independent.  (See

34

1  FAC ¶¶ 49-54.)

2          1.   Whether Plaintiffs' Derivative Wage Statement
               Claims Must Fail
3

4          Charter first argues that plaintiffs' derivative wage

5  statement claims must fail because the minimum wage, overtime,

6  and meal and rest period claims from which they derive also fail.

7  However, as discussed above, the court has found that genuine

8  disputes of material fact remain as to plaintiffs' minimum wage,

9  overtime, and meal and rest period claims.  Summary judgment in

10 favor of Charter is therefore not warranted solely on this

11 ground.

12         2.   Whether the Statute of Limitations Bars
               Plaintiffs' Claims
13

14         Charter further argues that plaintiffs' wage statement

15 claims are time-barred.  Section 226 "has two applicable statutes

16 of limitations--one year for penalties, and three years for

17 damages."  Sarkisov v. StoneMor Partners, L.P., No. C 13-04834

18 WHA, 2014 WL 1340762, at *2 (N.D. Cal. 2014).  Charter contends

19 that, because Harper last worked for Charter in January 2018 and

20 Sinclair last worked for Charter in July 2016, but Harper did not

21 file his complaint until May 3, 2019, and Sinclair did not join

22 the suit via the FAC until December 13, 2019, plaintiffs did not

23 successfully assert their claims within the one-year limitations

24 period for penalties, and to the extent that Sinclair has made

25 out a claim for damages under the statute, he did not timely file

26 within the three-year limitations period.  (See Mot. for Summ. J.

27 at 26; Docket Nos. 1, 45.)

28         As discussed above, in Section III.A.1., the relevant

35

1 date for determining whether plaintiffs timely filed their claims

2 is November 19, 2018.  Since that date is less than a year from

3 Harper's last day, and less than three years from Sinclair's last

4 day, Charter's argument that Harper's wage statement claim for

5 penalties or Sinclair's claim for damages is time-barred fails.

6 However, the court will grant summary judgment in favor of

7 Charter as to Sinclair's claim for penalties.

            3.   Whether Plaintiffs' Claims Fail to Establish an
8                 Actual Injury or a Knowing and Intentional
                  Violation
9

10      Next, Charter contends that plaintiffs' claim under

11 § 226 fails as a matter of law because plaintiffs "cannot offer

12 admissible evidence of actual damages."  (See Mot. for Summ. J.

13 at 27.)  Charter also argues in its reply that plaintiffs' claim

14 fails because plaintiffs cannot show that their injury occurred

15 as a result of a "knowing and intentional" violation of § 226(e),

16 as required under the statute, because Charter had a "good faith

17 belief" that their wage statements were in compliance given their

18 belief that plaintiffs were properly classified as outside

19 salespersons.  (See Def.'s Reply at 16.)

20      However, an employer's showing that it acted under a

21 good-faith belief that its employees were outside salespersons

22 when issuing their wage statements is not sufficient to require

23 that the employees' § 226(e) claim must fail as a matter of law.

24 See Novoa v. Charter Commc'ns, LLC, 100 F. Supp. 3d 1013, 1028

25 (E.D. Cal. 2015) (Ishii, J.) ("no court has granted summary

26 judgment to an employer, finding that it acted in good faith when

27 it violated Section 226(a); such a determination is generally a

28 question for the factfinder to resolve at trial" (collecting

1  cases) (internal quotation marks omitted)); Garnett v. ADT LLC,

2  139 F. Supp. 3d 1121, 1133 (E.D. Cal. 2015) (Shubb, J.) ("To the

3  extent that some district courts have found that an employer can

4  lack the necessary knowledge and intent if it had a good faith

5  belief that its employee was exempt from section 226, this court

6  disagrees."). An employee may establish § 226's "knowing and

7  intentional" requirement by showing that his employer knowingly

8  omitted information from his wage statements--he need not show

9  that the employer knew that it was violating § 226's statutory

10 requirements. See Novoa, 100 F. Supp. 3d at 1028. A disputed

11 issue of fact therefore remains as to whether Charter knowingly

12 omitted information from plaintiffs' wage statements in violation

13 of § 226.

14        Plaintiffs have also submitted sufficient evidence that

15 they suffered a cognizable "injury" sufficient to show actual

16 damages. Courts have recognized that lost wages are a form of

17 "all actual damages" recoverable under § 226(e)(1) because

18 "[f]ailure to provide complete and accurate itemized paystubs

19 could have made the alleged under-reporting of wages more

20 difficult to detect and confront." Sarkisov, 2014 WL 1340762, at

21 *2; Arredondo v. Delano Farms Co, 301 F.R.D. 493, 547 (E.D. Cal.

22 2014) (Seng, J.). Here, plaintiffs seek lost minimum, overtime,

23 premium, and commission wages, and assert that Charter's failure

24 to accurately itemize their total hours worked, their regular and

25 overtime hours worked, the premium wages they were owed for meal

26 periods and rest breaks not provided and the proper hourly rate

27 for such premium wages, the commission wages they were owed, and

28 the pay period for which they should have been paid made it more

1   difficult for plaintiffs to determine from their wage statements

2   the amount they should have been paid each pay period.  (See FAC

3   ¶ 54, Prayer for Relief ¶¶ C-D; Harper Decl. ¶ 16; Sinclair Decl.

4   ¶ 14.); Tennison v. Hub Grp. Trucking, Inc., No. LA CV20-05076

5   JAK (SPx), 2020 WL 7714702, at *11 (C.D. Cal. Dec. 28, 2020)

6   ("While there must be some injury in order to recover damages

7   [under Section 226(e)], a very modest showing will suffice."].  A

8   genuine dispute of material fact therefore exists as to whether

9   plaintiffs suffered a cognizable injury sufficient to recover

10  actual damages under § 226.

11           4.    Whether Charter's Wage Statements Complied with
                   § 226
12

13           Finally, Charter argues that summary judgment of

14  plaintiffs' wage statement claim is appropriate because Charter's

15  wage statements complied with the requirements of § 226.  In the

16  FAC, plaintiffs allege that Charter's wage statements were

17  deficient in the following ways:

18           (a) prior to 2018, wage statements did not
             include the inclusive dates of the relevant
19           pay period and only included the end date;
             (b) prior to 2018, commission wages were
20           included on a wage statement that was
             separate from the regular wage statement and
21           the commission wages were not attributed to
             and paid for the pay periods in which they
22           were earned; (c) prior to 2017 Charter did
             not accurately keep track of and include on
23           wage statements the total hours worked by
             Outside Salesperson Class members; (d) wage
24           statements never reflected any premium wages
             being paid to Plaintiffs and Outside
25           Salesperson Class members for meal periods
             or rest breaks that were not provided or
26           that were late, shortened, missed, or on-
             duty, both during training weeks and after
27           training weeks; and (e) Plaintiffs' final
             several wage statements failed to accurately
28           record the time worked, wages due, and

                              38

1
2

inclusive dates of the applicable pay
periods, and failed to pay any waiting time
penalties.

3

(FAC ¶ 52.)

4

5          Charter contests each of these allegations.  Charter

6    first asserts that all of plaintiffs' wage statements--with the

7    exception of Sinclair's wage statements from 2015--included the

8    inclusive dates of the relevant pay period.  (See Mot. for Summ.

9    J. at 27.)  Charter argues that Sinclair's 2015 wage statements,

10   though admittedly violative, cannot form the basis of a valid

11   § 226 claim because wage statement claims are governed by a one-

12   year statute of limitations, and Sinclair did not file the FAC

     until December 2019.

13

14         However, plaintiffs have produced evidence showing that

15   the "Pay Begin Date" and "Pay End Date" on several of Harper's

16   wage statements were not accurate with respect to the applicable

17   22nd-to-21st "commission month" for earning commissions.  (See

18   Benner Decl., Ex. Q, at CHA/HAR 52 (listing begin date as

19   10/20/17 and end date as 11/02/17), CHA/HAR 54 (listing begin

20   date as November 17, 2017 and end date as 11/30/17), CHA/HAR 57

21   (listing begin date as 12/15/17 and end date as 12/21/17).)  As

22   for Sinclair's claim, the court finds that it is not barred as to

23   violations that occurred on or after November 19, 2015, given

24   that Sinclair is seeking actual damages and thus the three-year

25   statute of limitations applies, and plaintiffs have submitted

26   evidence showing that Sinclair's December 31, 2016 wage statement

27   is missing a "Period Beginning" date.  (See Benner Decl., Ex. R,

28   at CHA/HAR 404.)  The court therefore finds that genuine disputes

                                    39

1   of material fact exist as to plaintiffs' claim for wage statement

2   violations based on Charter's failure to provide inclusive dates

3   of the relevant pay period.

4          Charter next argues that it is "not aware of any

5   requirement that commission payments be included on the same wage

6   statement as Plaintiffs' biweekly wages."  (See Mot. for Summ. J.

7   at 27.)  Labor Code § 226(e) requires employers to furnish

8   employees with accurate and complete information required by the

9   statute so that employees may "promptly and easily determine from

10  the wage statement alone . . . [t]he amount of the gross wages or

11  net wages paid to the employee during the pay period."  Cal.

12  Labor Code §§ 226(e)(1), (e)(2)(b)(i).

13         Both plaintiffs state in their declarations that they

14  were not able to promptly and easily determine from their wage

15  statements the total gross and net wages they were paid for a pay

16  period that included payment of both salary and commission wages.

17  (See Harper Decl. ¶ 16; Sinclair Decl. ¶ 14.)  That is

18  understandable given that the beginning and end dates listed on

19  Charter's commission wage statements do not correspond with

20  Charter's 22nd-to-22st "commission month," and that the

21  commission statements list two different pay periods, one of

22  which does not correspond with the pay period listed on the

23  salary statement.  (See Benner Decl., Ex. Q, at CHA/HAR 51-52

24  (listing "Begin Dates" of 10/20/17 and 11/03/17, and "End Dates"

25  of 11/02/17 and 11/16/17), CHA/HAR 53-54 (listing "Begin Dates"

26  of 11/17/17 and 12/01/17, and "End Dates" of 11/30/17 and

27  12/14/17), CHA/HAR 56-57 (listing "Begin Dates" of 12/15/17,

28  12/29/17 and 1/10/18, and "End Dates" of 12/21/17, 1/10/18, and

1  1/11/18).)  There is therefore a genuine dispute of material fact

2  as to whether Charter's practice of splitting wages between two

3  wage statements that covered the same pay period violated § 226.

4        Finally, Charter argues that plaintiffs' claims fail to

5  the extent they are based on allegations that, prior to 2017,

6  Charter's wage statements did not include total hours worked.

7  (See Mot. for Summ. J. at 27-28.)  The court agrees that, because

8  Charter did not hire Harper until September 2017, this claim

9  fails as to Harper to the extent it is based on allegations

10  regarding wage statements prior to 2017.  (See Harper Dep. 62:19-

11  63:9, 78:16-79:1).  However, Harper has alleged other violations

12  of § 226 (see FAC ¶ 52) for which the court has found that

13  genuine disputes of material fact exist.  For instance, as

14  discussed above, Harper has presented evidence sufficient to

15  create an issue of material fact that Charter's wage statements

16  did not include accurate "Pay Begin" or "Pay End" dates, and that

17  Charter's practice of splitting his wage statements into separate

18  statements for salary and commission prevented him from promptly

19  and easily determining how much he had earned during a specific

20  pay period from the statement alone.  The court will therefore

21  not grant summary adjudication as to Harper's Sixth Claim for

22  violations of § 226.

23        The court disagrees with Charter's argument that this

24  claim also fails as to Sinclair.  Charter contends that,

25  effective January 1, 2017, the California Legislature clarified

26  that employers were not required to show hours worked for exempt

27  positions, including outside salespersons, when it amended § 226

28  by adding subjection (j).  Notwithstanding the fact that Charter

41

1   fails to provide any authority indicating the California

2   Legislature intended subsection (j) to apply retroactively, the

3   text of subsection (j) indicates that it only applies when the

4   employee is exempt from the payment of minimum wage and overtime

5   under the "exemption for outside salesperson provided in any

6   applicable order of the Industrial Welfare Commission."  Cal.

7   Labor Code § 226(j)(2)(B).  Because a genuine dispute of material

8   fact exists as to whether Sinclair was properly classified as an

9   outside salesperson, the court finds that a genuine dispute of

10  material fact exists as to whether Charter's wage statements

11  violated § 226 by failing to include total hours worked prior to

12  2017.

13          The court will therefore deny summary judgment as to

14  Harper's Sixth Claim, and grant summary judgment in favor of

15  Charter as to Sinclair's Sixth Claim for penalties.

16          D.    Plaintiffs' Waiting Time Penalty Claims

17          Plaintiffs' seventh claim alleges that they are

18  entitled to waiting time penalties under California Labor Code

19  § 203.  (FAC ¶¶ 55-58.)  Under Labor Code § 203, if "an employer

20  willfully fails to pay, without abatement or reduction, in

21  accordance with Section[] 201 . . . any wages of an employee who

22  is discharged or who quits, the wages of the employee shall

23  continue as a penalty from the due date thereof at the same rate

24  until paid or until an action therefor is commenced," up to 30

25  days.  Cal. Labor Code § 203(a).  Plaintiffs allege that they

26  were owed premium wages pursuant to Labor Code § 226.7 because

27  Charter failed to provide them with compliant meal and rest

28  breaks, and that they were owed commission wages because Charter

42

1   failed to correctly pay all commission wages that were earned and

2   payable.  (FAC ¶ 57.)  Because Charter did not pay these wages to

3   plaintiffs upon their termination, plaintiffs argue they are

4   entitled to waiting time penalties under Labor Code § 203.  (See

5   id.)

6          The parties agree that plaintiffs' waiting time

7   penalties claim is entirely derivative of their

8   misclassification-based and commission-based wage claims.  (See

9   Mot. for Summ. J. at 28; Pls.' Opp'n at 31.)  Because the court

10  has found that genuine issues of material fact exist as to

11  plaintiffs' underlying misclassification-based and commission-

12  based wage claims, the court will not grant summary judgment in

13  favor of Charter solely on this ground.  (See Mot. for Summ. J.

14  at 28.)

15         Charter further argues that meal and rest period claims

16  cannot form the basis of a waiting time penalties claim because

17  Labor Code § 226.7 meal and rest break premiums do not constitute

18  "wages earned" for the purposes of Labor Code § 203.  (See Mot.

19  for Summ. J. at 28.)  Under California law, an employer that

20  fails to provide an employee with a legally compliant meal or

21  rest period is required to pay the employee "one additional hour

22  of pay at the employee's regular rate of compensation for each

23  workday that the meal or rest...period is not provided."  Cal.

24  Labor Code § 226.7(c).  The question of whether these ordered

25  payments constitute wages or penalties for the purposes of a

26  waiting time penalties claim has divided district courts in

27  California.  See Finder v. Leprino Foods Co., No. 1:13-cv-2059

28  AWI BAM, 2015 WL 1137151, at *5 (E.D. Cal. Mar. 12, 2015)

1  (acknowledging "[t]here is no clear answer" from conflicting

2  decisions of the district courts of California).

3         This division among courts stems from two seemingly

4  contradictory decisions by the California Supreme Court: _Murphy_

5  _v. Kenneth Cole Productions_, 40 Cal. 4th 1094 (Cal. 2007), and

6  _Kirby v. Immoos Fire Protection, Inc._, 53 Cal. 4th 1244, 1257

7  (Cal. 2012).  In _Murphy_, the court considered the nature of

8  § 226.7 payments for purposes of determining the applicable

9  limitations period for a claim under the statute.  _Murphy_, 40

10  Cal. 4th at 1110.  After examining the language, legislative

11  history, and purpose of § 226.7, _Murphy_ concluded that "the

12  'additional hour of pay' is a premium wage intended to compensate

13  employees, not a penalty."  _Id._ at 1114.  _Kirby_, by contrast,

14  held that, for purposes of awarding attorneys' fees for the

15  nonpayment of wages, "a section 226.7 claim is not an action

16  brought for nonpayment of wages; it is an action brought for non-

17  provision of meal or rest breaks."  _Kirby_, 53 Cal. 4th at 1257.

18         The _Kirby_ court explained that its decision was "not at

19  odds with our decision in _Murphy_."  _See id._  Instead, the court

20  explained, _Murphy_ determined that the remedy for a § 226.7

21  violation is a wage, while _Kirby_ determined that the legal

22  violation triggering that remedy is the failure to provide a meal

23  or rest period, not the nonpayment of wages.  _See id._  Because

24  _Kirby_ was concerned with characterizing the nature of the § 226.7

25  claim itself, whereas _Murphy_ focused on the nature and

26  characterization of the relief for that claim, the court held in

27  _Finder_ that that _Murphy_ was the more directly relevant precedent

28  and, therefore, that failure to pay premium wages under § 226.7

1   may form the basis for a waiting time penalties claim.  See

2   Finder, 2015 WL 1137151, at *8.

3         Charter contends that a recent California Court of

4   Appeals decision, Naranjo v. Spectrum Security Servs., Inc., 40

5   Cal. App. 5th 444, 474 (2d Dist. 2019), should take precedence

6   over the interpretation of § 226.7 offered in Finder.  (See Mot.

7   for Summ. J. at 29; Def.'s Reply ("Reply") at 20 (Docket No.

8   103).)  There, the court expressly held that premiums under

9   § 226.7 are not wages for the employee's labor, work, or service,

10  but rather a penalty for the employer's recalcitrance.  See

11  Naranjo, 40 Cal. App. 5th at 473.  "Read this way, an employer's

12  failure, however willful, to pay section 226.7 statutory remedies

13  does not trigger section 203's derivative penalty provisions for

14  untimely wage payments."  Id. at 473–74.

15        However, as Judge Ishii recently pointed out in Bates

16  v. Leprino Foods Co., No. 2:20-cv-00700 AWI BAM, 2020 WL 6392562

17  (E.D. Cal. Nov. 2, 2020), the California Supreme Court is

18  currently reviewing Naranjo and, thus, Naranjo "has no binding or

19  precedential effect, and may be cited for potentially persuasive

20  value only."  Bates, 2020 WL 6392562, at *5 (quoting Cal. R. Ct.

21  8.1115(e)(1)).  In light of Naranjo's non-precedential effect,

22  the court in Bates found no reason to deviate from Finder and

23  held that § 226.7 premiums are wages for the purposes of a

24  waiting time penalties claim under § 203.

25        This court agrees with Judge Ishii's analyses in Finder

26  and Bates that, under California Supreme Court precedent, § 226.7

27  premiums are wages for purposes of §203 waiting time penalties

28  claims.  Because the only contrary California precedent, Naranjo,

                                    45

1    lacks precedential value, the court will deny summary judgment as

2    to plaintiffs' Seventh Claim for waiting time penalties based on

3    Charter's failure to pay § 226.7 premiums.

4         E.    Plaintiffs' Untimely Production of Employment Records
              Claims
5

6         Plaintiffs' Eighth Claim alleges that Charter failed to

7    timely produce copies of their "personnel file[s], including all

8    wage statements, instruments [they] signed or acknowledged

9    concerning [their] employment, and other records concerning

10   [their] obtaining and holding of employment . . . ."  (FAC ¶¶ 61,

11   63.)  Plaintiffs rely on three California Labor Code provisions.

12   First, § 226(b) gives current and former employees a right to

13   inspect or copy their employment records, and permits an employer

14   to take "reasonable steps" to ensure the identity of a current or

15   former employee.  Cal. Labor Code §§ 226(b).  Section 226(c)

16   requires that the employer comply with a § 226(b) request as soon

17   as practicable, but no later than 21 calendar days from the date

18   of the request.  Id. at § 226(c).

19        Second, § 1198.5 provides that "[e]very current and

20   former employee . . . has the right to inspect and receive a copy

21   of the personnel records that the employer maintains relating to

22   the employee's performance or to any grievance concerning the

23   employee."  Cal. Labor Code § 1198.5.  The employer must make the

24   contents of the personnel records available for inspection at a

25   reasonable time, but no later than 30 days from the request.  Id.

26   Section 1198.5 also permits an employer to take "reasonable

27   steps" to verify the identity of a current or former employee or

28   his or her authorized representative.  Id. at § 1198.5(e).

1   Finally, under § 432, "[i]f an employee ... signs any instrument
2   relating to the obtaining or holding of employment, he shall be
3   given a copy of the instrument upon request."  See Cal. Labor
4   Code § 432.

5        On June 5, 2018, plaintiffs' counsel prepared and sent
6   a letter via email to Charter's in-house counsel requesting
7   Harper's wage statements, personnel file records, and other
8   employment records.  (See Soderstrom Decl. ¶ 19.)  Plaintiffs'
9   counsel attached an authorization for the release of employment
10  records signed by Harper using "DocuSign."  (See id.; Harper
11  Decl. ¶ 23.)  On July 3, 2018, counsel for Charter sent an email
12  and letter to plaintiffs' counsel advising him that it was
13  Charter's position that his request for Harper's wage statements
14  under § 226(b) was not valid, and that Harper would have to make
15  the request himself before Charter would produce the records.
16  (See Shine Decl. ¶ 7, Ex. F.)  After further discussion between
17  plaintiffs' and Charter's counsel, on July 18, 2018, Charter's
18  counsel agreed to produce the documents requested by plaintiffs'
19  counsel within a week.  (See id. at ¶ 8.)

20       However, on July 23, 2018, Charter's in-house counsel
21  received an email directly from Harper, who stated that he did
22  not currently have representation.  (See id. at ¶ 9.)  The next
23  day, counsel for Charter reached out to plaintiffs' counsel to
24  confirm that he was indeed representing Harper.  (See id.)
25  Plaintiffs' counsel sent Charter's counsel a redacted version of
26  his attorney-client agreement with Harper two weeks later, on
27  August 13, 2018, and Harper emailed Charter's counsel directly on
28  August 29, 2018 to confirm representation. (See id. at ¶ 10-11.)

1    Six days later, on September 4, 2018, Charter provided

2    plaintiffs' counsel with copies of his wage statements and

3    documents from his personnel file.  (See id. at ¶ 11; Soderstrom

4    Decl. ¶ 21.)  Plaintiffs' counsel asserts that this production

5    was deficient under § 1198.5 because it omitted certain documents

6    related to Harper's employment, including corrective action

7    reports.  (See Soderstrom Decl. ¶ 21.)

8         Plaintiffs' counsel prepared and sent a similar letter

9    requesting that Charter produce Sinclair's wage statements,

10   personnel file records, and other employment records on October

11   2, 2019.  (See Soderstrom Decl. ¶ 25.)  Charter produced copies

12   of Sinclair's wage statements and personnel file records on

13   October 17, 2019.  (See id. at ¶ 26.)  Plaintiffs' counsel also

14   asserts that Charter's production as to Sinclair was deficient

15   under § 1198.5 because it omitted numerous wage statements and

16   corrective action reports.  (See id.)

17        To begin with, the court agrees with Charter that

18   summary adjudication as to § 432 is appropriate.  "While

19   §§ 226(c) and 1198.5 expressly include 'former employees,' the

20   plain language of § 432 limits applicability to 'employees or

21   applicant[s],' omitting any reference to former employees."

22   Harris v. Best Buy Stores, L.P., No. 15-cv-00657-HSG, 2016 WL

23   4073327, at *10 (N.D. Cal. Aug. 1, 2016) (quoting Cal. Labor

24   Codes §§ 226(c), 432, 1198.5); see also Arizona Elec. Power Co-

25   op., Inc. v. United States, 816 F.2d 1366, 1375 (9th Cir. 1987)

26   ("When Congress includes a specific term in one section of a

27   statute but omits it in another section of the same Act, it

28   should not be implied where it is excluded."); Briggs v. Eden

1  Council for Hope & Opportunity, 19 Cal. 4th 1106, 1117 (1999)

2  ("Where different words or phrases are used in the same

3  connection in different parts of a statute, it is presumed the

4  Legislature intended a different meaning.").  Because plaintiffs

5  do not dispute that their requests for records were made after

6  they were no longer employees, § 432 cannot apply here.

7          With respect to § 1198.5, the court declines to

8  interpret the term "personnel records" in the narrow fashion

9  urged by Charter.  Plaintiffs argue that, in response to their

10  requests, Charter failed to include corrective action reports,

11  letters related to their termination, and commission plan

12  documents and receipts in its production.  Without citing to any

13  authority, Charter argues that "personnel records" are "not so

14  expansively defined in § 1198.5 or case law."  To the contrary,

15  the case law indicates that § 1198.5 "intends a broad definition

16  of 'personnel file' to preclude employers from assigning

17  documents to files having some other name, and then refusing

18  access to the documents on the ground that they are not contained

19  in the 'personnel file.'"  Wellpoint Health Networks, Inc. v.

20  Superior Court, 59 Cal. App. 4th 110, 124 (2d Dist. 1997).

21  Common sense also dictates that at least some of the documents

22  omitted by Charter, such as corrective action reports, fall

23  within the plain text of the statute, as they are "personnel

24  records . . . relating to the employee's performance or to any

25  grievance concerning the employee."  Cal. Labor Code § 1198.5.

26  The court will therefore deny Charter's motion for summary

27  adjudication of plaintiffs' claim under § 1198.5.

28          Finally, as to § 226(b), the court again declines to

1   adopt the narrow interpretation of the statute put forward by

2   Charter.   Charter argues that § 226(b) only authorizes current or

3   former employees--and not their representatives--to inspect or

4   receive a copy of their own wage statements.   Because plaintiffs'

5   counsel sent Charter a request for plaintiffs' wage statements

6   under § 226 (not plaintiffs themselves), Charter argues that

7   plaintiffs' claim under § 226 fails as a matter of law.

8          Charter points out that, in contrast to § 1198.5, § 226

9   does not explicitly state that an employee's representative may

10  submit a request to inspect records.   Compare Cal. Labor Code

11  § 1198.5 ("Upon a written request from a current or former

12  employee, or his or her representative, the employer shall also

13  provide a copy of the personnel records.") with Cal. Labor Code

14  § 226(b) ("An employer . . . shall afford current and former

15  employees the right to inspect or receive a copy of records

16  pertaining to their employment, upon reasonable request to the

17  employer.").   However, Charter does not cite to a single case

18  where a court has held that a request made by a current or former

19  employee's representative is insufficient as a matter of law

20  under § 226(b).   Section 226(b)'s only requirement pertaining to

21  the employee's request is that it be "reasonable."   The court

22  finds that, here, a genuine issue of material fact exists as to

23  whether plaintiffs' requests to inspect and receive copies of

24  their wage statements pursuant to § 226(b) were reasonable, given

25  that they were signed by counsel and accompanied by an executed

26  authorization signed by plaintiffs electronically.   (See Shine

27  Decl., Ex. E.)

28          The court also finds that genuine issue of material

fact exists as to whether the timing of Charter's production of
Harper's wage statements fully satisfied § 226(b).  The evidence
shows that Charter did not produce Harper's wage statements for
91 days after receiving Harper's request.  (See Soderstrom Decl.
¶¶ 18-21, Ex. 18.)  While Charter contends that this delay
occurred as a result of "reasonable steps" taken by Charter to
verify Harper's identity and whether he was represented by
counsel, Charter did not initiate any efforts to verify Harper's
identity or that of his counsel until after the 21-day deadline
set out in § 226 had already passed.  (See id.); Cal. Labor Code
§ 226(c).  A reasonable jury could therefore find that Charter's
response was not timely and that the steps that it took to verify
Harper's identity and whether he was represented by counsel were
not reasonable under the statute.

        As to Sinclair's claim under § 226, plaintiffs have
submitted evidence showing Charter's production of Sinclair's
wage statements was incomplete and omitted at least 17 wage
statements.  (See Soderstrom Decl. ¶¶ 25-26; Benner Decl., Ex.
R.)  There is therefore a genuine dispute of material fact as to
whether Charter fully satisfied its obligations to Sinclair under
§ 226(a).  See Harris, 2016 WL 4073327, at *11 (denying summary
judgment because there was a factual dispute over whether
employer had "fully satisfied" its § 226 obligations).

        The court will therefore deny Charter's motion for
summary judgment as to plaintiffs' Eighth Claim for violations of
California Labor Code §§ 226 and 1198.5.  The court will,
however, grant summary adjudication in favor of Charter as to
plaintiffs' claim for violation of California Labor Code § 432.

1        F.   Plaintiffs' Claims under the UCL

2             Plaintiffs' Ninth Claim alleges that Charter has

3   committed acts of unfair competition, as defined by the

4   California Business and Professions Code § 17200, by violating

5   various provisions of the California Labor Code.  (FAC ¶¶ 65-73.)

6   Charter's only argument in support of summary judgment is that

7   plaintiffs' UCL claim is derivative of their First through Fifth

8   Claims.  (See Mot. for Summ. J. at 32; Pls.' Opp'n at 37.)

9   Because the court has found that a genuine dispute of material

10  fact exists as to plaintiff's underlying California Labor Code

11  claims, the court will not grant Charter's motion for summary

12  adjudication as to plaintiffs' UCL claim.  See Cortez v.

13  Purolator Air Filtration Prods., 23 Cal. 4th 163, 178-79 (Cal.

14  2000) (holding unpaid wages are recoverable as restitution under

15  the UCL).

16       G.   Harper's PAGA Claim

17            PAGA authorizes employees to recover civil penalties

18  for violations of the California Labor Code "as the proxy or

19  agent of the state's labor law enforcement agencies."  Kim v.

20  Reins Int'l Cal., Inc., 9 Cal. 5th 73, 82 (Cal. 2020) (emphasis

21  and citations omitted).  Only an "aggrieved employee," or a

22  person "who was employed by the alleged violator and against whom

23  one or more of the alleged violations was committed" may serve as

24  the state's representative in a PAGA action.  Id. (quoting Cal.

25  Labor Code § 2699(c)).

26            Only Harper has brought claims under PAGA.  (See FAC

27  ¶¶ 74-75.)  Charter first argues that summary judgment as to

28  Harper's PAGA claim is appropriate because Harper cannot show

1    that Charter committed violations of any underlying substantive

2    provisions of the California Labor Code.  However, because the

3    court has found that disputed issues of material fact exist as to

4    Harper's claims under other substantive provisions of the

5    California Labor Code, as discussed above, a disputed issue of

6    material fact also exists as to whether Harper is an aggrieved

7    employee under PAGA.

8         Charter next argues that Harper's PAGA claim is time-

9    barred.  A plaintiff must file a PAGA action within one year of

10   the alleged underlying Labor Code violation.  Cal. Code Civ. P.

11   § 340(a); Esparza v. Safeway, Inc., 36 Cal. App. 5th 42, 59 (2d

12   Dist. 2019).  The statute of limitations for the filing of the

13   PAGA lawsuit is tolled for the sixty-five day notice period.

14   Thus, as a practical matter, the statute of limitations for the

15   filing of the LWDA letter is one year, and the statute of

16   limitations for the filing of the PAGA lawsuit is one year and

17   sixty five days (or 430 days total).  Bush v. Vaco Tech. Servs.,

18   LLC, 2018 WL 2047807 at *13 (N.D. Cal. May 2, 2018).  The statute

19   of limitations begins to run when a cause of action accrues,

20   meaning when the cause of action is complete with all of its

21   elements.  Esparza, 36 Cal. App. 5th at 59.

22        Charter contends that, because Harper was on an unpaid

23   leave of absence from February 3, 2018 through the end of his

24   employment, Harper last performed work for Charter on January 30,

25   2018.  (See Benner Decl. ¶¶ 34-36, Exs. O-Q.)  Thus, in order to

26   file a timely PAGA action based on an alleged minimum wage,

27   overtime, meal period, rest period, or wage statement violation,

28   Harper would have had to file his complaint no later than April

1  5, 2019 (430 days after January 30, 2018). (See Mot. for Summ.

2  J. at 33.)  Because Harper filed his complaint on May 3, 2019,

3  Charter argues that Harper failed to timely file his PAGA claim

4  within the applicable statute of limitations and, as a result,

5  the court should dismiss his PAGA claim. (See id.)

6       However, as discussed above, in Section III.A.1, the

7  statute of limitations governing the claims in Harper's original

8  complaint--including his PAGA claim--may be equitably tolled to

9  November 19, 2018.  Charter's argument that Harper failed to

10 comply with the statute of limitations is therefore without

11 merit.

12      Accordingly, the court will deny Charter's motion for

13 summary judgment as to Harper's PAGA claim.

14      IT IS THEREFORE ORDERED that defendant's motion for

15 summary judgment or, in the alternative, summary adjudication

16 (Docket No. 93-1) be, and the same thereby is, DENIED as to

17 Sinclair's First, Second, Third,, Fourth, and Sixth Claims for

18 damages, Harper's First, Second, Third, Fourth, Sixth, and Tenth

19 Claims, as well as Plaintiffs' Fifth Claim for violations of Cal.

20 Labor Code § 204, 221, and 224, Seventh Claim, and Eighth Claim

21 for violations of §§ 1198.5 and 226.

22      IT IS FURTHER ORDERED that defendant's motion for

23 summary judgment or, in the alternative, summary adjudication

24 (Docket No. 93-1) be, and the same hereby is, GRANTED as to

25 Sinclair's First, Second, Third, Fourth, and Sixth Claims for

26 statutory penalties, as well as Plaintiffs' Fifth Claim for

27 violations of Cal. Labor Code §§ 2751(b) and 223, and Eighth

28 Claim for violations of Cal. Labor Code § 432.

1   Dated:   February 12, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28