Jamin S. Soderstrom, Bar No. 261054
jamin@soderstromlawfirm.com
SODERSTROM LAW PC
1 Park Plaza, Suite 600
Irvine, California 92614
Tel: (949) 667-4700
Fax: (949) 424-8091

*Counsel for Plaintiffs, Putative Class Members,
and Aggrieved Employees*

Joseph W. Ozmer II (SBN 316203)
jozmer@kcozlaw.com
Nathan D. Chapman (SBN 338735)
nchapman@kcozlaw.com
J. Scott Carr (SBN 136706)
scarr@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
333 S. Grand Avenue, Suite 2225
Los Angeles, California 90071
Tel: (213) 493-3980
Fax: (404) 400-7333

*Counsel for Defendant Charter Communications, LLC*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LIONEL HARPER, DANIEL SINCLAIR, HASSAN TURNER, LUIS VAZQUEZ, and PEDRO ABASCAL, individually and on behalf of all others similarly situated and all aggrieved employees, <br><br>    Plaintiffs, <br><br> v. <br><br> CHARTER COMMUNICATIONS, LLC, <br><br>    Defendant. | Case No.   2:19-cv-00902-WBS-DMC <br><br> **ORDER GRANTING JOINT MOTION, CONFIRMING FINAL AWARD OF ARBITRATOR, AND ENTERING JUDGMENT (TURNER ARBITRATION)** |

Plaintiff Hassan Turner and Defendant Charter Communications, LLC jointly submitted Notice of Final Award of Arbitrator and Joint Stipulation and Motion to Confirm Final Award and Enter Judgment (Turner Arbitration), which provides as follows:

WHEREAS, on October 13, 2021, the Court granted Charter's motion to compel individual arbitration of Turner's claims under the Mutual Arbitration Agreement (also known as the Solution Channel Agreement), and stayed his individual claims pending the completion of arbitration proceedings. Dkt. 202.

WHEREAS, on June 16, 2023, Arbitrator Ruth V. Glick, who was appointed by the American Arbitration Association (AAA) and presided over the arbitration between Turner and Charter, issued an Interim Award. **Exhibit 1** (Interim Award).

WHEREAS, on July 20, 2023, the Arbitrator issued a Final Award that incorporated the Interim Award and concluded the arbitration. **Exhibit 2** (Final Award).

NOW, THEREFORE, Turner and Charter stipulate and jointly move the Court to: (1) issue an order pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9 and 13, confirming the Final Award; (2) file such order with the clerk for the entry of judgment thereon; and (3) file the following papers with the clerk in accordance with 9 U.S.C. § 13:

a.   the Mutual Arbitration Agreement, attached as **Exhibit 3**;

b.   the AAA's appointment of the Arbitrator, attached as **Exhibit 4**;

c.   the Final Award, attached as **Exhibit 2**, and the Interim Award incorporated into the Final Award, attached as **Exhibit 1**; and

d.   the Court order dated October 13, 2021, attached as **Exhibit 5** (also in the Court's record as Docket 202).

Having reviewed the Interim Award and Final Award, and finding no basis to vacate, modify, or correct the Final Award pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9–11 (the parties having raised none), and pursuant to the parties' stipulation, the Court hereby **GRANTS** the joint motion and confirms the Final Award in full.

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9 and 13, the Court attaches the following papers and instructs the clerk to file them with this **ORDER**:

1      a.      the Mutual Arbitration Agreement, attached as **Exhibit 3**;

2      b.      the AAA's appointment of the Arbitrator, attached as **Exhibit 4**;

3      c.      the Final Award, attached as **Exhibit 2**, and the Interim Award incorporated into the

4      Final Award, attached as **Exhibit 1**; and

5      d.      the Court order dated October 13, 2021, attached as **Exhibit 5** (also in the Court's

6      record as Docket 202).

7      The Parties' joint motion is **GRANTED**, the Final Award is **CONFIRMED**, and

8 **JUDGMENT IS ENTERED**. The clerk shall docket this judgment pursuant to Federal Arbitration

9 Act, 9 U.S.C. § 13, and it shall have the same force and effect, in all respects, as, and be subject to all

10 the provisions of law relating to, a judgment in an action.

11      **IT IS SO ORDERED AND ADJUDGED. LET JUDGMENT BE FORTHWITH**

12 **ENTERED ACCORDINGLY.**

13 Dated: August 23, 2023

14 WILLIAM B. SHUBB

15 UNITED STATES DISTRICT JUDGE

# EXHIBIT 1

**INTERIM AWARD DATED JUNE 16, 2023**

**American Arbitration Association**
**Employment Arbitration Tribunal**

**In the Matter of the Arbitration between**

**Hassan Turner**

**and**

**Charter Communications, LLC**

**AAA Case # 01-22-0001-5254**

## <u>INTERIM AWARD</u>

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the personnel manual or employment agreement entered into by the above-named parties and dated May 23, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and Claimant, Hassan Turner, being represented by Jamin Soderstrom of Soderstrom Law PC, and Respondent, Charter Communications, LLC, being represented by Nathan Chapman of Kabat Chapman & Ozmer LLP, hereby issue this Interim Award, as follows:

### *Procedural History*

    Claimant, Hassan Turner ("Claimant" or "Turner") filed his misclassification and wage and hour claims against Charter Communications, LLC ("Charter") with the American Arbitration Association pursuant to the Mutual Arbitration Agreement of Charter Communications ("MAA"), which he electronically signed on May 23, 2018, and pursuant to an Order from the Honorable William B. Shubb, Judge of the U.S. District Court, Eastern District of California.  Turner's individual arbitration is part of a larger class and representative Private Attorneys General Act ("PAGA") action that has been pending against Charter Communications, LLC since May 3, 2019.  *Harper et al v Charter Communications, LLC,* Case No. 2:19-cv-00902 (E.D. Cal.)  Turner is a named plaintiff and proposed class representative in *Harper et al v Charter Communications, LLC,* and his court claims have been stayed since the court's October 13, 2021 order compelling arbitration. (JX 65).[1]  The arbitration claims arise from Turner's time working for Charter in 2018 as a Direct Sales Rep. ("DSR").

---

[1] Turner was added as a named plaintiff in the *Harper* action on April 16. 2021. He filed a demand for arbitration with Charter's Solution Channel on February 25, 2022. (JX74)

A pre-hearing scheduling conference for the arbitration was held on June 29, 2022 and Claimant's Specification of Claims, Contentions and Relief was filed on July 15, 2022. Charter filed a Counterclaim in this arbitration on June 10, 2022, alleging a breach of contract claim by Claimant for refusing to pay Respondent's attorney fees in an effort to resist arbitration of his claims pursuant to paragraph K of the MAA.  As the arbitrator in this matter, I concluded that I did not have arbitral jurisdiction to determine a claim for attorney's fees for an action that occurred in a federal judicial forum well before my appointment as arbitrator.  I dismissed the counterclaim on August 26, 2022 without prejudice so that the Respondent could file its attorney's fee request with the U.S. District Court for the Eastern District.

A series of requests for motions in advance of the arbitration were filed by both parties.  Claimant filed a Motion to Stay the proceedings and both parties requested leave to file a number of dispositive motions in advance of the arbitration.  I denied Claimant's Motion to Stay as well as both Claimant's and Respondent's request to file other dispositive motions on October 27, 2022.

The arbitration hearing in the matter of Hassan Turner and Charter Communications was held by Zoom on March 28, 2023.  An exhibit binder with joint exhibits JX1-74, Claimant's exhibits CX1-3 and Respondent's exhibits RX 1-2 was provided to the arbitrator.  Pre-hearing briefs from the parties were submitted on March 20, 2023 and Post-hearing briefs were submitted, after permission to postpone was granted, on May 5, 2023.  The record was closed on May 17, 2023.

## DISCUSSION

This case presents misclassification and wage and hour claims for two weeks of training that the Claimant, Hassan Turner, undertook prior to his employment as a Direct Sales Rep ("DSR") for Charter Communications, where he worked for three months from June 15, 2018 to October 15, 2018.  Turner, who had previously worked in sales, was hired by Charter as an exempt salaried and outside sales employee with a commission plan, based out of its Irwindale, CA office. (JX4)  Turner was classified as an exempt outside salesperson for his entire employment as a DSR.  He was paid a base salary, plus a sales commission allowance for the first five pay periods, commissions and other incentives. (JX 74).  The two-week training sessions included classroom training as well as "ride alongs" or "shadowing" an experienced DSR on their ordinary door-to door-sales activity in the field.

### Contentions

Claimant maintains he was not subject to the outside salesperson exception during these training sessions which included Week 1:  June 15-21, 2018 and Week 2: June 22-28, 2018, alleging that Charter failed to meet its affirmative burden to prove that Turner was plainly and unmistakably exempt during that period.  As a result, Claimant files the

following claims: failure to pay minimum wage and overtime demanding 20 hours[2] of overtime wages (Counts 1 and 2); failure to provide 11 meal periods and 11 rest periods (Counts 3 and 4), failure to provide a "training weeks" wage statement (Count 6); and waiting time penalties for failure to timely pay him all wages owed upon termination (Count 7).  In addition, Claimant asks for a combined $1,500 for statutory penalties, plus costs, expenses and attorney fees based on Charter's failure to timely provide him with copies of his wage statements and personnel records and files. (Count 8).[3]

Respondent maintains that the evidence shows Turner was properly classified as an outside salesperson, i.e., one who customarily and regularly spends more than half of their working time away from their employers' place of business engaging in sales related activities that exempt him from California's minimum wage, overtime and meal and rest period requirements.  Even if he were to be non-exempt, Respondent argues that Charter provided Turner the opportunity to take compliant meal and rest breaks.  Because Turner was an exempt employee during the two training weeks, Charter contends that the non-exempt and derivative claims fail.  Charter also denies that it failed to timely provide pay and employment records as alleged in Count 8.

After careful consideration of the evidence produced, the testimony given at the hearing and the case law, I have concluded that Charter met the burden of proof that Turner was an exempt employee during the first two training weeks, thereby denying Counts 1-4 and 6-7.  However, I have also concluded that Charter did not timely produce the wage statements according to California Labor code § 226(c) and personnel records according to California Labor Code § 1198.5(b) as alleged in Count 8.

### *Misclassification Based Claims*

Turner's claims 1-4 and 6-7 are based on Charter's alleged misclassification of him as an exempt outside salesperson during his first two weeks of employment, the "training weeks."  Turner demands include 10 hours of overtime work during each of the two weeks or 20 hours total.  Critical to the issue of whether Turner was exempt from the wage and hour claims of this two-week training period is whether or not he was misclassified as an "exempt" outside salesperson during that period.  Turner claims that Charter required him to participate and complete two weeks of non-exempt new hire orientation and training for the DSR position at the start of his employment.  Charter maintains Turner was properly classified as an outside salesperson, or one who customarily and regularly spends more

---

[2] In Claimant's post-hearing brief, he changed the over-time wage claim to 25 hours instead of 20 hours. I have used the original claim of 20 hours over-time in this analysis.

[3] Several claims were withdrawn prior to the arbitration.  These include (1) Claimant's non-monetary claims related to signed commission plans and receipts and other alleged unlawful commission practices as set forth under Count 5 of his Specification of Claims, (2) the "inclusive dates" violations related to wage statements as set forth under Count 6 of the Specification of Claims and (3) his requests for non-monetary injunctive relief under the UCL as set forth under Count 9 of his Specification of Claims.  (February 28, 2023 letter from Jamin Soderstrom, Counsel for Claimant, to Nathan D. Chapman, Counsel for Respondent.)  (JX72)

than half of their working time away from their employers' place of business engaging in sales-related activities, which occurred during the training weeks as well.

The determination of whether an employee is exempt or non-exempt is the subject of considerable reported and non-published federal and California case law.  The seminal California case defining the outside salesperson exemption is *Ramirez v Yosemite Water Company, Inc.,* 20 Cal 4th 785 (1999) in which the California Supreme Court examined the issue of classification when an employee performs a mixture of sales and non-sales duties. The Court concluded that an "outside salesperson" under the Industrial Welfare Commission ("IWC") wage orders incorporates a quantitative method, distinguishable from the standard applicable under the federal Fair Labor Standards Act ("FLSA").  As a result, the narrower application of California law must be relied upon to make the determination of whether or not an employee working in California falls under the outside salesperson exemption when looking at the facts of the case.

In *Ramirez v Yosemite*, an "outside salesperson" is one who meets the realistic requirements of the job in spending more than half of their time away from the employer's place of business selling or obtaining orders for products or services.  The Court refined the meaning of the quantitative nature by asking what are the realistic requirements of the job or how does the employee actually spend his or her time.  *Id* at 802.

The Court then provides some general guidance, first by following Wage Order No. 7-80 2(1) in defining "outside Salesperson' as any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders for contracts for products, services or use of facilities."[4] *Id* at 795.

In construing how the half time selling to customers is calculated, the Court states that

 "...a trial court, in determining whether the employee is an outside salesperson...by inquiring into the *realistic* requirements of the job.  In so doing, the court should consider, first and foremost, how the employee actually spends his or her time.  But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." *Id* at 802.

Claimant's counsel points to another decision by the California Supreme Court, *Duran v U.S. Bank National Assn.*, 59 Cal, 4th 1 (2014) asserting (incorrectly) that it concluded that outside salespersons are properly classified as non-exempt during the

---

[4] This has been codified in California IWC Wage Order No. 4-2001 § (2M) providing that an outside salesperson means any person, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders for contracts for products, services or use of facilities.

training weeks.[5]  However, the Court in *Duran* just refined the inquiry by stating that *Ramirez* did not say that the test boils down to whether a particular employee actually spends more than 50 percent of his or her working hours on outside sales.  Instead, the ultimate question is: what are the *realistic* requirements of the job?  *Duran* at 408-09 quoting *Ramirez,* 20 Cal 4th at 802.  *Duran* concludes that the primary consideration that informs this inquiry is "how the employee actually spends his or her time." *Ibid.*

Among other cases, Claimant cites *Heyen v Safeway, Inc*., 216 Cal. App 4th 795, 825-26 (2013) claiming that the exempt nature can change based on the purpose.  According to *Heyen,* in rejecting a standard of concurrent duties:

> "The test to determine whether defendants have met their burden to show that plaintiff spent more than 50% of her time engaged in exempt tasks is quantitative. The test requires that, first and foremost, you must look to the actual tasks performed by plaintiff. Merely because an employee has the duty of managing is not sufficient to establish exempt status."

> "If a party claims that an employee is engaged in concurrent performance of an exempt and non-exempt work, *you must consider that time to be either an exempt or a non-exempt activity depending on the primary purpose for which the employee undertook the activity at that time.* The nature of the activity can change from time to time." (Italics added.)"

In this case the court concluded that Heyen, a Safeway store manager, was not an exempt employee because she was spending more than 50% of her time checking, bagging, merchandising and bookkeeping, thereby providing non-exempt duties that did not diverge from Safeway's realistic expectations.[6]  This is in contrast to Turner who spent more than 50% of his time out in the field in the "ride alongs" for the express purpose to learn and make sales.

The conundrum in determining the meaning of the *Ramirez* opinion in distinguishing between exempt and non-exempt was described by Judge William Alsup in another case cited by Claimant, *Stickles v Atria*, 2021WL 6117702 (U.S. Dist. Ct. N. Cal) at 6.

> "Although the *Ramirez* opinion states how courts must determine the number of hours employees spend on outside sales activities, the opinion does not give clear guidance on what constitutes a sale. *D'Este v. Bayer Corp.*, 565 F.3d 1119, 1123 (9th Cir. 2009). Neither do the California wage orders, nor our court of appeals provide further definitions for what constitutes a sale. *Ibid.* In *Bayer Corp.*, a class action involving misclassification of employees, the plaintiff argued that employees must "consummate their own sales" to be considered outside salespersons. *Ibid.* By contrast, the defendant argued that employees who "engage in any part of the multiple-step process of selling or obtaining orders," regardless of whether they close sales or receive orders, are exempt outside salespersons. *Ibid.* Our court of appeals found that "the plain language

---

[5] Although the subject matter was wage and hour, the *Duran* case was primarily focused on the trial court's statistical sampling of the class.  The footnotes cited by Claimant only obliquely refer to outside salesperson trainees being nonexempt in reference to the trial court prohibiting the admission of timesheets in another class action matter having to do with the misclassification of some class members in training positions. *Id* at 21 and note 14, the cite provided by Claimant.

[6] In *Batze v Safeway*, 10 Cal. App. 5th 440,474 (2017), the court again, in determining whether the test for the exemption was met, looked at "...the work actually performed by the employee..." (which) "must be examined, and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realist requirements of the job shall be considered..."

of the [outside salesperson exemption] is susceptible to both interpretations." *Ibid*. Ultimately, our court of appeals declined to rule on the issue of what constitutes a sale and certified the issue to the California Supreme Court. *Id.* at 1124. The California Supreme Court declined to take up the question. *D'Este v. Bayer Corp.*, No. S172832 (June 10, 2009), docket available at https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0 & docid=1907570 & doc no=S172832 & request token=NiIwLSEmTkg9WzBRSCM9XEtIQFQ0UDxfJCI% 2BJzlTUCAgCg% 3D% 3D.

Claimant points to the 2021 *Stickles v Atria Senior Living, Inc.* case for the proposition that an employee cannot be selling if he needs another employee's participation to consummate the sale emphasizing that Turner's afternoon and evening "ride alongs" necessitated another employee's participation.  In the 2021 *Stickles* case dealing with class certification, the Court quoted another federal case, *Barnick v Wyeth*, 522 F. Supp 2d 1257 (C.D. Cal, October 25, 2007) opining that an employee should be classified as an exempt outside salesperson where he was hired based on his sales experience, received specialized sales training, solicited new business and his pay was based partially on sales he generated.  *Stickles*, 2021 WL 6117702 at 7.  Turner, who like Barnick, had prior sales experience, was being paid on commission with a special allocation for the two-week sales training period, while spending more than half his time accompanying an experienced Charter sales person on the "ride alongs" was, therefore, also engaging in exempt activity.

In a subsequent case, *Stickles v Atria Senior Living, Inc.* 2022-WL17178307, the same judge, determining it to be a borderline case, ruled that if a person's efforts are directed toward promoting his company, generally, rather than the consummation of his own specific sales, his activities were not exempt.  *Stickles 2022* at 6.  But the two *Stickles* cases concern promoting and marketing nursing homes and can be distinguished from this case since Turner's job required him to make door-to-door sales for Charter services.

The employer bears the burden of proving that the outside salesperson exemption applies. *Ramirez*, *supra* at 794-95.  Each of the many cases cited by the parties has its own special circumstances and facts specific to the time an employee spends on exempt and non-exempt duties.  The inquiry is how Turner actually spent his time during the two-week training period.  Reviewing the facts and testimony of the witnesses in this arbitration, I have come to the conclusion that Charter did meet the narrow threshold that the outside salesperson exemption applies to Turner's two weeks of training and that Turner was, therefore, exempt from the wage and hour regulations under state and federal law.

### How Claimant's Time was Actually Spent During the Training Session

To apply the *Ramirez* guidelines to an employee like Turner who was being trained for an exempt position, one must look at how he actually spent his time during the training weeks.  Ultimately, the question of whether one was appropriately classified as an "outside salesperson" and exempt from California wage and hour laws is a detailed fact intensive determination.  *Ramirez* at 790.  *Duran* re-emphasizes the *Ramirez* focus on the realistic requirements of the job and how the employee actually spends his or her time.  Ancillary questions include "whether the employee's practice diverges from the employer's realistic

expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job. *Duran* at 26.

The two-week training session had two components:  first classroom training conducted virtually, lasting about three to four hours during eight days of the first two weeks, and second, afternoon and early evening "ride alongs" or "shadowing" during which the trainee would learn and assist a more experienced DSR on how to conduct door-to-door sales in the field.

Turner began work on Friday, June 15, 2018, which was considered the first day of the Charter workweek.  He completed new-hire paperwork, ate a lunch hosted by the manager with the group and spent the afternoon in the field.  There was no classroom training during the following three workdays.  The initial days of the schedule were designed not to exceed 8 hours and included a lunch break and two duty-free uninterrupted breaks, half way in the morning and another two hours after returning from lunch.  Linda C. Arnold, Director of Training and Development, who is responsible for creating content for the training, testified that the actual training was designed to last for four hours maximum per day. (TR: 135:16-18, 137: 7-10) The new employees were hired on Friday and spent time to get to know their supervisor, their team, get uniforms, cell phones and tablets on Monday and Tuesday. (TR: 136:5-11)

The classroom portion of the training began on the fifth day of training (Wednesday) at 11:00 a.m. and lasted until about 3 p.m.  Approximately halfway through the instruction, trainers were told to provide a 10–15-minute break for the participants.  In addition, throughout the training, the trainees were free to go to a restroom or step away for any personal reason. (TR 137:13-138:16).  Breaktime was also accounted for in the Trainer Instructions. (JX 37: 0657 and Group Expectations. JX 50: 010945-46).  In addition, Raul Salcedo ("Salcedo"), Director of Residential Connectivity Specialists, testified that new hires were shown the break room on their very first day to see where the vending machines and quick meals were located. (TR 186:3-8)

After the classroom training ended, the DSR's were expected to take a meal break of at least 30 minutes, or as much time as they needed before traveling to the field to meet up with a more senior DSR to learn and assist in door-to-door sales for the rest of the day and evening.  Even if Turner was non-exempt, he did not show that he was deprived of any opportunity to take timely and compliant meal or rest breaks.  According to the California Supreme Court, employers are only obligated to relieve the employee of his duties and do not have to police the meal breaks in terms of insuring the employee actually takes one. *Brinker Rest. Corp. v Superior Court,* 53 Cal. 4th, 1004, 1040-41 (2012).

One of Turner's contentions is that he should be paid for time in which he showed up a half hour before the 11:00 a.m. training start because he was told to be there promptly at 11:00 a.m.  Turner testified repeatedly that he arrived at 10:30 a.m. for each training session in order to set up and be prepared for the 11:00 a.m. start.  But the trainings were

virtual, although live, which meant all he had to do was show up a few minutes early to connect his computer or tablet, hardly a task that takes a half hour.

According to Salcedo, who was responsible for hiring door-to-door sales associates in June 2018 in Irwindale, CA, a new hire was to show up at 11:00 a.m. on the first day and call his supervisor and wait to be picked up in the lobby.  It could not be earlier than 11:00 a.m. because that was the start time and they were not expected to do anything before they arrived. (TR195:11-14, 196:19-24).  Salcedo also testified that the employees always started their day at 11:00 a.m. for classroom training.  (TR 200:19-25).  Therefore, if Turner did show up at 10:30 a.m., he was reporting for work one half hour early and on his own time.

Salcedo said the company's expectations are that trainees should be in the office two to three hours, emphasizing, then we want the rest of the time in the field. (TR 197:11-16).  He confirmed that he personally sat in on some of the classes and stated they lasted no more than three to four hours. (TR 201:11-22).  Furthermore, he said the trainees were not required to complete any homework outside of the classroom. (TR 202:4-7).

Since the actual determination of how Turner's time was spent is critical in order to calculate whether he spent 50% or more of his time in the field, I tried to assess how he actually spent his time. But Turner made inconsistent estimates of how his time was spent during the two weeks of training.  According to his deposition testimony taken two years ago in 2021, Turner said his classroom training ended between 2 p.m. and 3p.m. every day, amounting to about three to four hours in class, as the training class was designed. (Turner Dep: 100:7-23).  At the arbitration hearing, he testified that the classroom training did not end until after 3:00 p.m. and sometimes as late as 4:30 p.m. (TR 41:10-13 (4:30 p.m.) 42:19-20 (4 p.m.) 47:20-21 (4 p.m.) 48:25-49:1(3:30 p.m.).  His testimony at the hearing adjusted the classroom hours to be significantly longer, and the field work considerably shorter, than his testimony in the earlier deposition.

Charter provided additional evidence of Turner's inconsistent testimony at his earlier deposition and at the arbitration hearing to augment his claim.

1.  In his deposition testimony, Turner said he spent a least four to five hours in the field. (Turner's Dep: 99:16-18.  At the hearing, Turner said he did not spend more than four hours in the field on some days of training (TR 96:3-7)
2.  In his deposition testimony, Turner said he arrived in the field around 4 p.m. each day after classroom training. (Turner Dep 99:7-14.  At the hearing, he said he did not arrive in the field until after 5 p.m. on several days. TR 30:118-21 (after 5:00p.m., 39:25-40:4 (between 4:30 and 5:00 p.m.), 57:6-11 (5:30 p.m.)
3.  In his deposition testimony, Turner said he remained in the field until 8:00 p.m. or 9:00 p.m. (Turner Dep 99:71-14).  At the hearing he said he was in the field shadowing until only 7:00 p.m. or 7:30 p.m. on some days.  (TR 40:11-14, (7:30 p.m.) 50:15-18 (7:00p.m. or 7:15 p.m.)

4.  In his deposition testimony, Turner said he got to the field at 4 p.m. on his first day of work. (Turner Dep. 184:2-8.  At the hearing, Turner testified that he got in the field at 5:30 p.m. (TR 99:24-100:7)

Charter demonstrated that Turner's testimony at the hearing was inconsistent and contradictory to his earlier testimony in a number of instances. (Resp.'s Exhibit C to Post Hearing Brief).  The discrepancy in Turner's deposition and hearing testimony shows that his later testimony at the hearing intended to diminish the number of the hours in the field in order to reduce outside sales work to less than 50%, and maximize the classroom work to over 50%.  But the evidence confirms that he actually spent less time in the classroom and more than 50% of time in the field learning to sell or selling.

Turner did testify that he went into the field everyday he worked during the training (TR 70:12-17); that he spent at least four hours in the field each day until around 9 p.m. other than the first Saturday. (TR 36:23-37:14 and Turner Dep 88:16-18).  At the end of the field training day, he spent 10-15 minutes calling his supervisor to tell him the sales he had lined up, or what sales he did not have, and what he had been doing all day (TR 25:16-20, 80:5-13).  The purpose of the call was to report on sales productivity but he later said the call was under two minutes. (TR 189:25-190:23).

The issue of whether these "ride alongs" were actually exempt sales activity was also dispelled by the testimony.  At the hearing Turner testified that his only purpose was to observe the senior DSR make sales. (TR 70:18-22).  But in his earlier deposition testimony, he had said that his purpose was to go door-to-door and make sales pitches and sell Charter's services to prospective customers, even if he did not technically get credit for the sale. (Turner Dep. 69:3-15).  Moreover, in his previous deposition testimony he said that he and his DSR sales partner would split up houses on a block and Turner would knock on his half and attempt to sell Charter's services to prospective customers. (Turner Dep. 70:3-71:5).  At the hearing, he adjusted that testimony to say that the only time Turner knocked on his own doors to sell services during training was the last couple days of training (TR 74:4-21) and that he "sometimes" split a block with his sales partner (TR 76:8-24).

Turner confirmed that his intention while working in the field was "to try and make a sale." (TR 78:8-13 and Turner Depo 194:5-10).  Before the end of the second week of training, Turner had received his own leads lists and began selling on his own.  (TR 52:20-23, 89: 2-4).  The travel time plus the four to five hours spent on shadowing experienced DSR's and attempting his own sales pitches qualify for exempt work that exceeded 50% of his time during the two training weeks.

The evidence from Turner's own testimony is that he spent more than 50% of his time during the two-week training period away from the office and out learning and participating in making sales.  Even if he spent 50 hours a week during the training weeks

as he claims, he spent more than 25 hours each week in sales related activities including one to one and a half hours each day to reach his assigned DSR.[7]

*Charter Realistically Expected Turner to Engage in Sales Related Activity*

Charter's realistic expectations were that Turner would spend the majority of his time in the field learning first hand sales related activities.  Raul Salcedo testified that Charter really wanted DSR's to spend 90% of the time in the field from 2:00p.m. to 9:00p.m. each weekday and 9:00 a.m. to 1:00pm on Saturdays and wanted new hires like Turner to spend most of their training in the field doing hands-on training with more experienced DSRs. (TR 183:3-9).  He also testified that in the field, new hires assist with the sales process, engage with customers and use the tablet assigned to them. "…  pretty much… they're learning the craft hands on. (TR 196:11-14).

Turner claimed at the hearing that he only started spending most of his time outside the office selling in his third week of employment after the training ended.  However, for this to be true, he could not have worked overtime as he only had three-to-four-hour classroom trainings eight out of the 14 days of the two-week training period. (181:3-9, JX12).  It is reasonable to infer that a company like Charter, whose profits depend on sales, would want to maximize the amount of time a DSR is in the field making sales and would emphasize that during the training period.

Charter's classroom training was designed to be less than 50% of his training week time.  During the first three weekdays, Turner was not expected to be in the office for more than two or three hours filling out new-hire paperwork, completing short self-guided orientation modules and completing minor onboarding tasks before going into the field. (TR 186:9-15, 200:2-8).  The virtual classroom training did not begin until the fifth day of his training on June 20, 2018.  The classroom training was designed not to exceed four hours so that the new hires could spend the majority of the day in the field.  In addition, there was no homework assigned, even if Turner claims he reviewed instructions outside of the classroom.  Turner did not complete any of the workbooks Charter provided to him during the classroom training and Charter did not reprimand him for failing to do so. (TR 208:15-214:3 and JX 30-47)

Charter did not express displeasure with Turner's performance because it anticipated that Turner, who had prior sales experience, was spending his time in the field perfecting a pitch for the company's products and services.  As a result, according to the *Ramirez* factors, the evidence has shown that Turner spent more than 50% of his time in the field learning and selling; the company's expectations for its specially designed training

---

[7] *Ramirez v Yosemite* states that sales related activities that fall within the scope of the exemption consist not only of the discrete act of making sales, but among other things the preparation, *travel time* and paperwork necessary to perform these functions. –*supra* at 801. (*Emphasis added*)

program was that he would be out in the field substantially more than in the office, and they expressed no displeasure in his efforts to prepare himself for his exempt sales position.  The ancillary guidelines of *Ramirez* and *Duran* have been satisfied.

For the reasons expressed above, I have concluded that the Claimant was an exempt employee during his two-week training sessions.  Therefore, the claims for failure to pay minimum wage and overtime demanding 20 hours of overtime wages (Counts 1 and 2); failure to provide 11 meal periods and 11 rest periods (Counts 3 and 4), and derivative claims of failure to provide a "training weeks" wage statement (Count 6); and waiting time penalties for failure to timely pay him all wages owed upon termination (Count 7) are, hereby, denied.

### Count 8- Wage Statements and Personnel Records and Files

Claimant is asking for statutory penalties for failing to give Turner a copy of his wage statements within 21 days of his request, and for failing to give him a complete copy of his personnel records and files within 30 days of his request, plus costs and attorney's fees pursuant to Labor Code §§ 226(b)-(c) and 1198.5 (a)-(b).  Claimant has shown that Charter did not meet either the 21-day or the 30-day requirement.

Charter argues that Turner has no proof that his request was ever delivered to his employer, as opposed to a law firm representing Charter in an unrelated matter.  However, Charter did receive the request because the Charter law firm's paralegal responded to the request on May 20, 2020, producing some of the records and a copy of the request.  (JX63.)  Turner correctly claims that his wage statements were produced 21 days after the statutory deadline and the personnel records/files, 12 days after the statutory deadline.  In addition, he maintains that the personnel records and files were incomplete because his commission plan documents (JX 51-55), training transcript (JX23), arbitration agreement (JX60-61) and several other policies that he was required to acknowledge (JX 48, 56, 58) relating to his performance were missing.  For these reasons, the Claimant prevails on Count 8.

Charter was required to give Turner a copy of his wage statements within 21 days of receiving a reasonable request and his personnel records and files within 30 days of receiving the request.  Labor Code §§ 226(b)-(c) and 1198.5 (a)-(c).  Turner, through his attorney, requested his wage statements and personnel records on April 8, 2020.  (JX 62).  The statutory deadline for the wage statements was April 29, 2020 and for the personnel records, May 8, 2020.  These records were belatedly provided on May 20, 2020. (JX63).  As a result, Turner's claim for $1,500 ($750 penalty for each infraction) in statutory penalties, plus costs and reasonable attorney fees is granted.

Therefore, Respondent shall pay Claimant $750 in penalties as provided for in Labor Code § 226 (f) and $750 in penalties as provided for in Labor Code § 1198.5(k).  Counsel shall meet and confer and Claimant shall provide Respondent with a detailed schedule of any costs and attorney fees, including fees and hours, for the infractions of these two codes

by **June 23, 2023**.  If there is any disagreement regarding the amount requested, the parties must inform the arbitrator by **June 30, 2023** with a letter brief in order for a final determination to be made.

### INTERIM AWARD

For the foregoing reasons, Counts 1-4, 6-7 are denied and Count 8 is granted. Charter is to pay Turner a total of $1,500 in statutory penalties, plus costs and reasonable attorney fees.

This Interim Award shall remain in full force and effect until such time as a Final Award is rendered.

I, Ruth V. Glick, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Interim Award.

Dated: June 16, 2023

Ruth V. Glick, Arbitrator

# EXHIBIT 2

**FINAL AWARD DATED JULY 20, 2023**

**American Arbitration Association**
**Employment Arbitration Tribunal**

**In the Matter of the Arbitration between**

**Hassan Turner**

**and**

**Charter Communications LLC**

**AAA Case # 01-22-0001-5254**

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the personnel manual or employment agreement entered into by the above-named parties and dated May 23, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and Claimant, Hassan Turner, being represented by Jamin Soderstrom of Soderstrom Law PC, and Respondent, Charter Communications, LLC, being represented by Nathan Chapman of Kabat Chapman & Ozmer LLP, hereby AWARD, as follows:

The Interim Award dated June 16, 2023 denying Counts 1-4, 6-7, and granting Count 8, awarding a total of $1,500 in statutory penalties under California Labor Code sections 226(f) and 1198.5 (k), is hereby incorporated (Attachment 1).  The parties have stipulated to Hassan Turner's claim for costs and reasonable attorney's fees incurred in connection with granting the Labor Code violations referred to above (Attachment 2).

Therefore, the following is hereby Awarded:

1. Counts 1-4 and 6-7 are DENIED.
2. Count 8 – Violation of Labor Code sections 226(f) and 1198.5(k) awarding a statutory penalty of $750 for each violation or a total of Fifteen Hundred Dollars ($1,500), which Charter shall pay Turner for statutory penalties, is GRANTED.
3. In accordance with the parties' Joint Stipulation, Charter shall pay a total amount of Ten Thousand Dollars ($10,000) to resolve Turner's claim for costs and reasonable attorney fees incurred by the Labor Code violations.

The administrative fees of the American Arbitration Association, totaling $2,950.00, and the compensation of the arbitrator, totaling $54,775.00, shall be borne by Charter.

This Final Award, which incorporates the Interim Award, dated June, 16, 2023, is in full and complete settlement and satisfaction of any and all issues submitted by the parties. Any claim not specifically addressed is herein deemed denied.

I, Ruth V. Glick, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, the Final Award.

Dated:  July 20, 2023                              Ruth V. Glick, Arbitrator

# EXHIBIT 3

**MUTUAL ARBITRATION AGREEMENT**



**NOTICE**

PLEASE READ THE FOLLOWING MUTUAL ARBITRATION AGREEMENT ("AGREEMENT") CAREFULLY.  IF YOU ACCEPT THE TERMS OF THE AGREEMENT (WHETHER YOU ARE AN APPLICANT, CURRENT EMPLOYEE, OR FORMER EMPLOYEE), YOU ARE AGREEING TO SUBMIT ANY COVERED EMPLOYMENT-RELATED DISPUTE BETWEEN YOU AND CHARTER COMMUNICATIONS (CHARTER) TO BINDING ARBITRATION. YOU ARE ALSO AGREEING TO WAIVE ANY RIGHT TO LITIGATE THE DISPUTE IN A COURT AND/OR HAVE THE DISPUTE DECIDED BY A JURY.

**MUTUAL ARBITRATION AGREEMENT**

A. **Arbitration Requirement.** You and Charter mutually agree that, as a condition of Charter considering your application for employment and/or your employment with Charter, any dispute arising out of or relating to your pre-employment application and/or employment with Charter or the termination of that relationship, except as specifically excluded below, must be resolved through binding arbitration by a private and neutral arbitrator, to be jointly chosen by you and Charter.

B. **Covered Claims.** You and Charter mutually agree that the following disputes, claims, and controversies (collectively referred to as "covered claims") will be submitted to arbitration in accordance with this Agreement:

1. all  disputes, claims, and controversies that could be asserted in court or before an administrative agency or for which you or Charter have an alleged cause of action related to pre-employment, employment, employment termination or post-employment-related claims, whether the claims are denominated as tort, contract, common law, or statutory claims (whether under local, state or federal law), including without limitation claims for: collection of overpaid wages and commissions, recovery of reimbursed tuition or relocation expense reimbursement, damage to or loss of Charter property, recovery of unauthorized charges on company credit card; claims for unlawful termination, unlawful failure to hire or failure to promote, wage and hour-based claims including claims for unpaid wages, commissions, or other compensation or penalties (including meal and rest break claims, claims for inaccurate wage statements, claims for reimbursement of expenses); unlawful discrimination or harassment (including such claims based upon race, color, national origin, sex, pregnancy, age, religion, sexual orientation, disability, and any other prohibited grounds), claims for unlawful retaliation, claims arising under the Family Medical Leave Act, Americans with Disabilities Act or similar state laws, including unlawful denial of or interference with a leave of absence, claims for unlawful denial of accommodation or failure to engage in the interactive process, whistleblower claims, claims for violations of the Sarbanes-Oxley Act, claims for violations of Occupational Safety and Health Administration or other safety or occupational health, whether arising before, during or after the termination of your employment, claims related to background and any and all other pre-employment and employment checks, including any claims brought under the Fair Credit Reporting Act and/or similar federal, state or local statutes or ordinances;

2. all disputes, claims, and controversies set forth in Section B.1 above, whether made against Charter, or any of its subsidiaries, parent, or affiliated entities, or its individual officers, directors, shareholders, agents, managers, or employees (in an official or personal capacity, if such claim against the employee arises from or in any way relates to your pre-employment or employment relationship with Charter); and

3. all disputes related to the arbitrability of any claim or controversy.



C. **Excluded Claims.** All other claims not covered under Section B above will not be submitted to arbitration under this Agreement. In addition, the following claims are specifically excluded from arbitration under this Agreement:

1. Claims for workers' compensation benefits (other than retaliation for pursuing such claims);

2. Claims for unemployment compensation benefits (other than retaliation for pursuing such claims);

3. Claims arising under the National Labor Relations Act;

4. Claims for violations of the Employee Retirement Income Security Act of 1974, or for breach of employee benefits or welfare plans that contain procedures for resolution of disputes under those plans, which shall be governed by those procedures;

5. Claims arising under the Health Insurance Portability and Accountability Act of 1996;

6. Claims for injunctive or other equitable relief related to unfair competition and the taking, use or unauthorized disclosure of trade secrets or confidential information;

7. Claims arising under separation or severance agreements or non-compete agreements (unless arbitration is provided for under the terms of the agreement);

8. Claims related to corrective action or other performance management that does not result in termination of employment;

9. Claims older than the statute of limitations applicable to such claims;

10. Claims of theft or embezzlement or any criminal conduct;

11. Claims over the validity of any party's intellectual property rights;

12. Any claims covered by a collective bargaining agreement, a severance agreement, or a written employment contract (although nothing in this Agreement shall limit the applicability of any arbitration or other dispute resolution provision contained in those agreements);

13. Any claims expressly non-arbitrable by statute, including 12 U.S.C. §5567(d)(2); 7 U.S.C. §26(n); or 18 U.S.C. §1514A(e)(2);

14. Any claims that have already been filed in federal or state court at the time you execute this Agreement, provided that such claims were not previously subject to any arbitration agreement.

Nothing in this Agreement shall prevent you from filing and pursuing the following: an administrative proceeding before the Equal Employment Opportunity Commission (EEOC) or an equivalent state or local agency (although if you choose to pursue the claim, any proceeding on the merits or for damages will be subject to arbitration); a proceeding before the National Labor Relations Board (NLRB); a claim for medical and/or disability benefits under applicable workers' compensation laws; or a claim for unemployment compensation benefits.

D. **Individual Claims Limitation and Representative, Collective, and Class Action Waiver.** You and Charter agree that both parties may only bring claims against the other party in their individual capacity and not as a plaintiff or class member in any purported class or representative proceeding, whether those claims are covered claims under Section B, or excluded claims under Section C. Additionally, the arbitrator shall not be permitted to order consolidation of claims or a representative, class, or collective, arbitration.



E. **Time Limits.** The aggrieved party must give written notice of the claim, in the manner required by this Agreement, within the time limit established by the applicable statute of limitations for each legal claim being asserted. To be timely, any claim that must be filed with an administrative agency or body as a precondition or prerequisite to filing the claim in court, must be filed with Solution Channel within the time period by which the charge, complaint or other similar document would have had to be filed with the agency or other administrative body. Whether a demand for arbitration is untimely is an affirmative defense, and will be decided by the arbitrator before any hearing on the merits of the aggrieved party's claim. If you file a charge or complaint with an administrative agency or body, any participation by Charter in the proceeding shall not be deemed a waiver of your obligation to arbitrate your claims pursuant to this Agreement. You agree not to assert, and agree to waive, any argument that Charter's participation in such a proceeding acts as a waiver or modification of the parties' agreement to arbitrate.

F. **Claim.** To pursue arbitration of a dispute under this Agreement, you must first submit a written claim at www.CharterSolutionChannel.com, a site hosted by a third party designated by Charter. In your claim, you must (1) describe the nature and basis of the claim or dispute, (2) set forth the specific relief sought, and (3) include a sworn verification that the dispute is covered by this Agreement and that the information submitted in the notice is accurate. In the event that Charter intends to seek arbitration of a dispute under this Agreement, it must send by certified mail to the individual's last known address, a written claim that meets the requirements of this Section F.

G. **Location.** Any arbitration hearing conducted under this Agreement will take place within 100 miles of the Charter office to which you last reported during your employment as of the date of the filing of the Notice, or the Charter office at which you sought employment, unless another location is mutually selected by the parties.

H. **Selection of Arbitrator.** The arbitration shall be held before one arbitrator who is a current member of the American Arbitration Association (AAA) and is listed on the Employment Dispute Resolution Roster. Within 45 days after submission of the claim, Charter will request from the AAA a list of at least five arbitrators willing to hear and decide the dispute. Within 20 days after receipt of the list from the AAA, the parties will select an arbitrator to hear and resolve the dispute and will notify the AAA of the selection of an arbitrator.

I. **Conduct of Arbitration.**

   1. *Rules.* Arbitration hearings will be conducted pursuant to the Solution Channel Program Guidelines and the arbitrator shall have the sole authority to determine whether a particular claim or controversy is arbitrable.

   2. *Authority of the Arbitrator.* The arbitrator will decide all discovery disputes related to the arbitration. Unless the parties agree to submit written arguments in lieu of a hearing on the merits of the claim[s], the arbitrator will schedule and conduct an evidentiary hearing, at which the arbitrator will hear testimony and receive evidence. The arbitrator shall apply the governing law applicable to any substantive claim asserted, including the applicable law necessary to determine when the claim arose and any damages.

   3. *Waiver of Hearing.* The parties may, at any time prior to a hearing, mutually agree to forego a hearing, and instead submit all evidence and argument to the arbitrator in writing.

   4. *Burden of Proof.* The arbitrator will apply the burdens of proof and law applicable to the claim, had the claim been adjudicated in court.

   5. *Decision.* The arbitrator will issue a decision within 30 days after the close of an arbitration hearing, or at a later time on which the parties agree. The decision will be signed and dated by the arbitrator, and will contain



express findings of fact and the legal reasons for the decision and any award, except as otherwise provided for under the Federal Arbitration Act.

J.  **Enforcement of the Decision.** Judgment on the arbitrator's decision may be entered in any court having jurisdiction over the matter, within 45 days following its issuance.

K.  **Arbitration Costs.** Charter will pay the AAA administrative fees and the arbitrator's fees and expenses.  All other costs, fees and expenses associated with the arbitration, including without limitation each party's attorneys' fees, will be borne by the party incurring the costs, fees and expenses.  The parties agree and acknowledge, however, that the failure or refusal of either party to submit to arbitration as required by this Agreement will constitute a material breach of this Agreement.  If any judicial action or proceeding is commenced in order to compel arbitration, and if arbitration is in fact compelled or the party resisting arbitration submits to arbitration following the commencement of the action or proceeding, the party that resisted arbitration will be required to pay to the other party all costs, fees and expenses that they incur in compelling arbitration, including, without limitation, reasonable attorneys' fees.

L.  **Jury Trial and Litigation Waiver.** You and Charter understand that, by agreeing to arbitration, both parties are waiving their right to demand a jury in any claim that is subject to arbitration under this Agreement.  In addition, in the event a dispute between you and Charter is not arbitrable under this Agreement for any reason and is pursued in court, you and Charter agree to waive any right to a jury trial that might otherwise exist.  Although this Agreement does not preclude either party from filing timely charges with any applicable administrative agency, neither party will ever seek or accept any damages, remedies, or other relief (any right to which is hereby waived) except through the binding arbitration process set forth in this Agreement.

M.  **Conflicts.** In the event of a conflict between this Agreement and the Solution Channel Program Guidelines, the terms of this Agreement will control.

N.  **No Retaliation.** Charter will not retaliate against you for seeking, in good faith, to resolve a dispute pursuant to this Agreement.

O.  **Employment-At-Will.** This Agreement in no way alters the at-will employment relationship between you and Charter.  You and Charter are free to terminate the employment relationship at any time for any lawful reason, and your employment is not for any specific duration.

P.  **Entire Agreement.** This Agreement sets for the complete agreement of the parties on the subject of resolution of the covered disputes, and supersedes any prior or contemporaneous oral or written understanding on this subject; provided, however, that this Agreement will not apply to the resolution of any charges, complaints, or lawsuits that have been filed with an administrative agency or court before the Effective Date of this Agreement.

Q.  **Severability.** The parties explicitly acknowledge and agree that the provisions of this Agreement are both reasonable and enforceable.  However, if any portion or provision of this Agreement (including, without implication of limitation, any portion or provision of any section of this Agreement) is determined to be illegal, invalid, or unenforceable by any court of competent jurisdiction and cannot be modified to be legal, valid, or enforceable, the remainder of this Agreement shall not be affected by such determination and shall be valid and enforceable to the fullest extent permitted by law, and said illegal, invalid, or unenforceable portion or provision shall be deemed not to be a part of this Agreement.  The only exception to this severability provision is, should the dispute involve a representative, collective or class action claim, and the representative, collective, and class action waiver (Section D) is found to be



invalid or unenforceable for any reason, then this Agreement (except for the parties' agreement to waive a jury trial) shall be null and void with respect to such representative, collective, and/or class claim only, and the dispute will not be arbitrable with respect to such claim(s).

R.  **Federal Arbitration Act.** This Agreement will be governed by the Federal Arbitration Act.

S.  **Consideration.** You agree that Charter has offered you sufficient consideration for this Agreement, including, without limitation, consideration of your application for employment with Charter, your employment with Charter, and/or Charter's mutual agreement to arbitrate disputes.

T.  **Termination.** This Agreement survives the termination of your employment with Charter (including if you are later re-employed by and/or if your employment with Charter terminates again).

U.  **Voluntary.** You acknowledge that you have carefully read this Agreement, fully understand what it means, and are entering into it voluntarily.

V.  **Effective Date.** This Agreement is effective and you are legally bound by the terms of Charter's Solution Channel and this Agreement, as of the date of your consent to participate in Solution Channel.

# EXHIBIT 4

**AAA APPOINTMENT OF ARBITRATOR**

AMERICAN
ARBITRATION
ASSOCIATION®   |   INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

Southeast Case Management Center
Charles Dorsey
Assistant Vice President
2200 Century Parkway
Suite 300
Atlanta, GA 30345
Telephone: (404)325-0101
Fax: (877)395-1388

June 8, 2022

Jamin S. Soderstrom, Esq.
Soderstrom Law PC
1 Park Plaza, Suite 600
Irvine, CA 92614
Via Email to: jamin@soderstromlawfirm.com

J. Scott Carr, Esq.
Kabat Chapman & Ozmer LLP
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Via Email to: scarr@kcozlaw.com

          Re:      Case Number: 01-22-0001-5254
                   Hassan Turner v. Charter Communications, LLC

Dear Parties:

Inasmuch as there were no objections to the appointment of Ruth V Glick, Esq., his appointment is hereby confirmed by the American Arbitration Association (the AAA).

Accordingly, a telephonic Arbitration Management Conference needs to be scheduled. Please confer with the other side and provide mutually agreeable dates and times from June 22 - 29, 2022.

The parties are requested to advise the undersigned of their availability on or before **June 15, 2022**.

We look forward to working with you and should there be any questions, please do not hesitate to contact the undersigned.

Sincerely,

/s/ Karen D. Smith, on behalf of

Erik Goss
Manager of ADR Services
Direct Dial: (678)686-6009
Main Dial: (404)320-5147
Email: ErikGoss@adr.org
Fax: (877)395-1388

Enclosure

cc:    Nathan D. Chapman, Esq.; Ruth V. Glick, Esq.

# EXHIBIT 5

**OCTOBER 13, 2021 ORDER COMPELLING ARBITRATION**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

LIONEL HARPER, DANIEL SINCLAIR, HASSAN TURNER, LUIS VAZQUEZ, and PEDRO ABASCAL, individually and on behalf of all others similarly situated and all aggrieved employees,

              Plaintiffs,

    v.

CHARTER COMMUNICATIONS, LLC,

              Defendant.

No. 2:19-cv-00902 WBS DMC

ORDER RE: DEFENDANT'S MOTIONS TO COMPEL ARBITRATION

----oo0oo----

        Plaintiffs Lionel Harper, Daniel Sinclair, Hassan Turner, Luis Vazquez, and Pedro Abascal ("plaintiffs") brought this putative class action against their former employer, Charter Communications, alleging various violations of the California Labor Code.  Among other things, plaintiffs allege that Charter misclassified them and other California employees as "outside salespersons," failed to pay them overtime wages, failed to

1

1  provide meal periods or rest breaks (or premium wages in lieu

2  thereof), and provided inaccurate wage statements.  (See

3  generally Second Amended Complaint ("SAC") (Docket No. 147).)

4  Charter now moves to (1) compel arbitration of plaintiff Harper's

5  claims and stay the action and (2) compel arbitration of

6  plaintiff Turner, Vazquez, and Abascal's claims and dismiss them

7  from the case.  (Mots. to Compel Arbitration (Docket Nos. 162,

8  165).)[1]

9  I.   Facts & Procedural History

10       Much of this case's factual background is set forth in

11  the court's accompanying Order Re: Plaintiffs' Motion to Modify

12  the Scheduling Order and for Leave to File a Third Amended

13  Complaint.  Accordingly, the court will not repeat it here except

14  where relevant to the instant motions.

15       A.   Plaintiff Harper

16       Plaintiff Harper worked for Charter from September 2017

17  to March 2018.  (SAC at ¶ 5 (Docket No. 147).)  Upon hire, Harper

18  signed an agreement to arbitrate "any and all claims, disputes,

19  and/or controversies between [Harper] and Charter arising from or

20  related to [Harper's] employment with Charter," designating JAMS

21

22       [1]   The parties have requested that the court take judicial
   notice of two filings in Harper's related FEHA case, other
23  documents filed in this litigation, the American Arbitration
   Association's rules and procedures, and two unpublished Los
24  Angeles Superior Court decisions addressing Charter's motions to
   compel arbitration in other cases.  (See Docket Nos. 171, 184,
25  185.)  Plaintiffs object to Charter's request as to the Los
   Angeles Superior Court decisions.  (See Docket No. 191.)  Because
26  the court does not find these materials relevant to this matter
   or helpful in deciding any of the issues currently before the
27  court, however, the court declines to take judicial notice of
   these materials.
28

2

1  as the arbitration provider and stating that JAMS rules,

2  procedures, and policies would govern arbitrations under that

3  agreement (the "JAMS Agreement").  (Order re Mot. to Compel Arb.

4  at 2 (Docket No. 24).)  The JAMS Agreement included a waiver of

5  representative, collective, and class actions (the "Waiver") and

6  a severance and so-called "poison pill" provision.  (Id. at 2.)

7  The severance provision stated that if any part of the agreement

8  was found to be void or unenforceable, that part would be severed

9  and the remainder enforced.  (Id. at 2-3.)  It went on to state

10  one exception (the "poison pill"): that if a dispute involved a

11  representative, collective, or class action claim, and the Waiver

12  were found to be invalid or unenforceable, "then th[e] entire

13  Agreement . . . shall be null and void and the dispute will not

14  be arbitrable."  (Id. at 3.)

15        In October 2017, while Harper was still employed by

16  Charter, Charter adopted a new arbitration agreement requiring

17  arbitration of claims via "Solution Channel," Charter's

18  employment-based legal dispute resolution program, which provided

19  for arbitration under the rules of the American Arbitration

20  Association (the "Solution Channel Agreement").  (Id. at 3.)

21  When announcing the change, Charter notified employees that they

22  would be bound by the Solution Channel Agreement unless they

23  opted out within thirty days.  (Id.)  Harper did not do so.

24  (Id.)

25        In November 2018, Harper filed a Demand for Arbitration

26  and Request for Rulings as to Inarbitrability with JAMS, seeking

27  a ruling on whether his employment-related grievances against

28  Charter could be arbitrated under the JAMS Agreement.  (Id. at 5-

3

1  6.)  Charter consented to and participated in the ensuing

2  arbitration process with JAMS, and in April 2019 an arbitrator

3  issued an award finding that Harper's wage-and-hour claims were

4  inarbitrable and dismissing the arbitration.  (Id. at 6; see Mot.

5  to Confirm Arb. Award, Ex. 16 ("Order of Dismissal"), at 157-66

6  (Docket No. 9-1).)

7       Specifically, the arbitrator determined that because

8  pre-dispute waivers of representative claims brought under PAGA

9  are unenforceable under California law, the JAMS Agreement Waiver

10  could not be enforced.  (Order of Dismissal at 159-61 (Docket No.

11  9-1) (citing Iskanian v. CLS Transp. L.A. LLC, 59 Cal. 4th 348,

12  384 (2014)).)  The arbitrator accordingly determined that this

13  activated the poison pill, nullifying the entire agreement.

14  (Id. at 163-65.)  The arbitrator rejected Charter's argument that

15  the poison pill be limited so as to nullify the agreement only as

16  to the representative, collective, or class action claim at issue

17  as contrary to the JAMS Agreement's plain text, which included no

18  such limitation.  (Id.)

19       In May 2019, after Harper had initiated this action in

20  state court, Charter sought to enforce the Solution Channel

21  Agreement against Harper, who refused.  (Order re Mot. to Compel

22  Arb. at 6-7 (Docket No. 24).)  In August 2019, this court

23  confirmed and entered judgment pursuant to the JAMS arbitration

24  award.  (Id. at 19.)  Further, the court found that there had

25  been a novation as a result of Charter's acquiescence to

26  arbitration under the JAMS Agreement rather than the Solution

27  Channel Agreement, held that any rights Charter had as against

28  Harper under the Solution Channel Agreement with respect to his

4

1  wage-and-hour claims were thus "dead and extinguished," and

2  denied a motion by Charter to compel arbitration under the

3  Solution Channel Agreement.  (Id. at 18-20.)[2]

4         In May 2021, Harper again sought employment with

5  Charter via an online application.  (Fries Decl. at ¶ 16, Ex. D

6  (Docket No. 162-1).)  When proceeding through Charter's online

7  application, applicants are presented with a webpage featuring

8  information about Charter's Solution Channel Agreement, with

9  links to the agreement itself and to Solution Channel Program

10 Guidelines, both of which applicants may save and print.  (Id. at

11 ¶¶ 7-10.)  To proceed with their application, applicants are

12 required to affirmatively agree to be bound by the Solution

13 Channel Agreement by clicking an "I Agree" button.  (Id. at

14 ¶ 11.)  They are informed that if they do not agree, they will be

15 removed from consideration for employment; their application is

16 not submitted, and they are given the option to begin the

17 application process again.  (Id. at ¶¶ 12-13.)  On May 23, 2021,

18 Harper consented to the Solution Channel Agreement and submitted

19 an online application to Charter.  (Id. at ¶ 16, Ex. D.)

20

21        [2]   In late 2019, the court also adjudicated a separate,
   related action between Harper and Charter brought under
22 California's Fair Employment and Housing Act ("FEHA").  See
   Harper v. Charter Comms., LLC, 2:19-cv-01749 WBS DMC, 2019 WL
23 6918280 (E.D. Cal. Dec. 18, 2019).  There, Harper had also sought
   to arbitrate his FEHA claims under the JAMS agreement, but this
24 time Charter did not participate.  Id. at *2.  The court held
   that because "Charter did not engage with [Harper's] FEHA claims"
25 in the manner it had with his wage-and-hour claims, there had
   been no novation of arbitration agreements with respect to the
26 FEHA claims.  Id. at *3.  After determining that the Solution
   Channel Agreement applied to Harper's FEHA claims and was valid,
27 the court granted a motion by Charter to compel arbitration of
   those claims under that agreement.  Id. at *3-6.
28

                                5

1      B. Plaintiffs Turner, Vazquez, and Abascal

2       In addition to consenting to the Solution Channel

3    Agreement in order to complete Charter's online application,

4    individuals who accept offers of employment from Charter are

5    again required to consent to the same agreement, or else they

6    cannot become a Charter employee.  (Fries Decl. re Turner at

7    ¶¶ 9-18 (Docket No. 165-2).)  Plaintiff Turner submitted an

8    online application on May 23, 2018, consenting to the Solution

9    Channel Agreement, and subsequently completed Charter's employee

10   onboarding process, consenting to the agreement again.  (Id. at

11   ¶¶ 8, 19, Exs. A & B.)  Plaintiff Vazquez did the same,

12   submitting his application on October 9, 2019.  (Fries Decl. re

13   Vazquez at ¶¶ 8, 19, Exs. A & B.)  Plaintiff Abascal did as well,

14   submitting his application on November 5, 2019.  (Fries Decl. re

15   Abascal at ¶¶ 8, 19, Exs. A & B.)

16     C. The Solution Channel Agreement

17      The Solution Channel Agreement contains several

18   provisions currently at issue.  It requires parties to the

19   agreement to resolve "all disputes, claims and controversies that

20   could be asserted in court or before an administrative agency for

21   which you or Charter have an alleged cause of action related to

22   pre-employment, employment, employment termination or post-

23   employment-related claims," including wage-and-hour-related

24   claims, through binding arbitration.  (Fries Aff., Ex. C

25   ("Solution Channel Agreement"), at §§ A, B(1) (Docket No. 165-

26   2).)

27      The agreement specifically excludes certain claims from

28   arbitration, including "[a]ny claims that have already been filed

1    in federal or state court at the time you execute this Agreement,

2    provided that such claims were not previously subject to any

3    arbitration agreement." (<u>Id.</u> at § C(14).) It also includes a

4    merger clause, providing that the Solution Channel Agreement

5    represents the complete agreement between parties on the

6    resolution of covered disputes, but noting that "this Agreement

7    will not apply to the resolution of any charges, complaints, or

8    lawsuits that have been filed with an administrative agency or

9    court before the Effective Date of this Agreement." (<u>Id.</u> at

10   § P.) Finally, like the JAMS Agreement, the Solution Channel

11   Agreement includes a waiver of representative, class, or

12   collective action claims. (<u>Id.</u> at § D.)

13   II.  <u>Analysis</u>

14          The Federal Arbitration Act ("FAA") provides that a

15   written provision in a "contract evidencing a transaction

16   involving commerce to settle by arbitration a controversy

17   thereafter arising out of such contract . . . shall be valid,

18   irrevocable, and enforceable, save upon such grounds as exist at

19   law or in equity for the revocation of any contract." 9 U.S.C.

20   § 2. Because arbitration is a matter of contract, "the central

21   . . . purpose of the FAA is to ensure that private agreements to

22   arbitrate are enforced according to their terms." <u>Stolt-Nielsen</u>

23   <u>S.A. v. AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 682 (2010)

24   (internal quotations omitted); <u>see also</u> <u>Perry v. Thomas</u>, 482 U.S.

25   483, 490 (1987) (under the FAA, arbitration agreements "must be

26   rigorously enforced") (internal quotations omitted, alterations

27   adopted).

28          The FAA "leaves no place for the exercise of discretion

1  by a district court, but instead mandates that district courts

2  shall direct the parties to proceed to arbitration on issues as

3  to which an arbitration agreement has been signed." Dean Witter

4  Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985).  Accordingly,

5  "the FAA limits courts' involvement to determining (1) whether a

6  valid agreement to arbitrate exists and, if it does, (2) whether

7  the agreement encompasses the dispute at issue." Cox v. Ocean

8  View Hotel Corp., 533 F.3d 1114, 1119 (9th Cir. 2008) (internal

9  quotations omitted).

10       "[A]s a matter of federal law, any doubts concerning

11  the scope of arbitrable issues should be resolved in favor of

12  arbitration, whether the problem at hand is a construction of the

13  contract language itself or an allegation of waiver, delay, or

14  like defense to arbitrability." Moses H. Cone Mem'l Hosp. v.

15  Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); see Poublon v.

16  C.H. Robinson Co., 846 F.3d 1251, 1259 (9th Cir. 2017) (same).

17  Upon a showing that a party has failed to comply with a valid

18  arbitration agreement, the district court must issue an order

19  compelling arbitration.  See Cohen v. Wedbush, Noble Cooke, Inc.,

20  841 F.2d 282, 285 (9th Cir. 1988).

21       The primary exception to courts' obligation to enforce

22  arbitration agreements under the FAA comes from the Act's "saving

23  clause," which "allows courts to refuse to enforce arbitration

24  agreements 'upon such grounds as exist at law or in equity for

25  the revocation of any contract.'" Epic Sys. Corp. v. Lewis, 138

26  S. Ct. 1612, 1622 (2018) (quoting 9 U.S.C. § 2).  Such "generally

27  applicable contract defenses" most frequently include "fraud,

28  duress, or unconscionability," but do not include "defenses that

8

apply only to arbitration." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal quotations omitted).

### A.  Applicability of the Solution Channel Agreement

Charter seeks to compel plaintiffs Harper, Turner, Vazquez, and Abascal to submit their California Labor Code and Unfair Competition Law ("UCL") claims to arbitration on an individual basis. (See Mot. to Compel Arb. re Harper at 1 (Docket No. 162); Mot. to Compel Arb. re Turner, Vazquez, & Abascal at 1 (Docket No. 165).) Plaintiffs contend that to do so, Charter must prove that (1) a valid agreement to arbitrate exists and (2) the agreement encompasses the claims Charter seeks to arbitrate. (See Opp. to Mot. to Compel Arb. at 16-17 (citing Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000)) (Docket No. 172); Opp. to Mot. to Compel Arb. at 14 (same) (Docket No. 173).)

Turner, Vazquez, and Abascal acknowledge that they each executed the Solution Channel Agreement both when applying for employment with Charter and when accepting their jobs, (see Opp. to Mot. to Compel Arb. at 9-11 (Docket No. 173)), and Harper acknowledges that he did when re-applying for employment with Charter in May 2021, (see Opp. to Mot. to Compel Arb. at 14 (Docket No. 172)). On this basis, plaintiffs concede that a valid agreement to arbitrate exists. (See id. at 17; Opp. to Mot. to Compel Arb. at 14 (Docket No. 173).) Accordingly, the question becomes whether the agreement applies to plaintiffs' Labor Code and UCL claims, of which Charter seeks to compel

1    arbitration.[3]

2           The Solution Channel Agreement provides that "[y]ou and

3    Charter mutually agree that . . . any dispute arising out of or

4    relating to your pre-employment application and/or employment

5    with Charter or the termination of that relationship, except as

6    specifically excluded below, must be resolved through binding

7    arbitration." (Solution Channel Agreement at § A (Docket No.

8    165-2).)  This is followed by a section titled "Covered Claims,"

9    (id. at § B), which specifies that such disputes include "wage

10   and hour-based claims including claims for unpaid wages,

11   commissions, or other compensations or penalties (including meal

12   and rest break claims, claims for inaccurate wage statements,

13   [and] claims for reimbursement of expenses)," (id. at § B(1)).

14   The parties do not dispute that the claims of which Charter seeks

15   to compel arbitration clearly fall into this category.

16           However, that section is followed by another, titled

17   "Excluded Claims," which lists a variety of claims to which the

18   "Covered Claims" section does not apply.  (See id. at § C.)

19   Notably for purposes of the instant motions, these include "[a]ny

20   claims that have already been filed in federal or state court at

21   the time you execute this Agreement, provided that such claims

22   were not previously subject to any arbitration agreement."  (Id.

23

24           [3]   Although at oral argument the parties briefly discussed
25   whether questions of arbitrability should themselves be submitted
     to an arbitrator, neither party raised this issue in their
26   briefing.  Accordingly, this court will decide whether
     plaintiffs' claims are arbitrable rather than submit the issue to
27   the arbitrator.  See also Momot v. Mastro, 652 F.3d 982, 987 (9th
     Cir. 2011) (gateway issues of arbitrability are presumptively
28   reserved for the court).

1   at § C(14).)   The aforementioned merger clause, which appears

2   later in the agreement, also provides that "this Agreement will

3   not apply to the resolution of any charges, complaints, or

4   lawsuits that have been filed with an administrative agency or

5   court before the Effective Date of this Agreement."   (Id. at

6   § P.)

7           Plaintiffs argue that these two provisions operate to

8   exclude plaintiffs Vazquez and Abascal's claims from mandatory

9   arbitration under the agreement.   Specifically, they argue that

10  because plaintiff Harper had already filed this action by the

11  time Vazquez and Abascal executed the agreement, their claims

12  qualify as having "already been filed in . . . court" and having

13  "been filed with a[ ] . . . court before the Effective Date of

14  th[e] Agreement" under these provisions.[4]   (See Opp. to Mot. to

15  Compel Arb. at 15-19 (Docket No. 173).)

16          They argue the same as to Harper, given that he

17  executed the operative agreement in May 2021, after bringing this

18  action, and contend that his claims "were not previously subject

19  to any agreement" pursuant to section C(14) because the

20  agreements he previously signed were no longer in effect by May

21  2021.   (See Opp. to Mot. to Compel Arb. at 16-22 (Docket No.

22  172).)   In light of the differing arguments put forward with

23  respect to Harper and to the other plaintiffs for whom Charter

24  seeks to compel arbitration, the court will address the two

25

26          [4]   Plaintiffs do not make this argument with respect to
    plaintiff Turner, as he had already executed the agreement when
27  this litigation began, and therefore they concede that sections
    C(14) and P do not apply to him.   (See Opp. to Mot. to Compel
28  Arb. at 17 n.6 (Docket No. 173).)

                                    11

1   groups separately.

2              1.   Plaintiffs Turner, Vazquez, and Abascal

3              Charter argues that Vazquez and Abascal improperly seek

4   to avoid arbitration by, in essence, piggybacking off of Harper's

5   already-filed claims, which they did not join until well after

6   executing the agreement.  (See Def.'s Reply at 5-10 (Docket No.

7   182).)  It contends that because section C creates exceptions to

8   section B's requirement that various claims be arbitrated, the

9   two sections must be read together, and that because section B by

10  its terms applies to "claims . . . for which you or Charter have

11  an alleged cause of action," the exclusion contained in section

12  C(14) is properly read to exclude only already-filed claims

13  between the signing party and Charter, rather than any already-

14  filed claims to which Charter is a party.  (Solution Channel

15  Agreement at § B(1) (emphasis added) (Docket No. 165-2); see id.

16  at 5-6.)  The court agrees.

17             Because, as a general matter, contract interpretation

18  is a matter of state law, the court looks to California law in

19  construing these provisions.  See DIRECTV, Inc. v. Imburgia, 577

20  U.S. 47, 54 (2015) (citing Volt Info. Scis., Inc. v. Bd. of Trs.

21  of Leland Stanford Junior Univ., 489 U.S. 468, 474 (1989)).

22  Three provisions of the California Civil Code, governing the

23  interpretation of contracts, are relevant here.  First, "[t]he

24  language of a contract is to govern its interpretation, if the

25  language is clear and explicit, and does not involve an

26  absurdity."  Cal. Civ. Code § 1638.  Second, "[a] contract must

27  be so interpreted as to give effect to the mutual intention of

28  the parties as it existed at the time of contracting, so far as

                              12

the same is ascertainable and lawful."  Id. at § 1636.  Third,

"[t]he whole of a contract is to be taken together, so as to give

effect to every part, if reasonably practicable, each clause

helping to interpret the other."  Id. at § 1641.

Under these provisions, it is clear that section C(14)

of the agreement cannot be read to prevent arbitration of Vazquez

and Abascal's claims by virtue of Harper's previously filed

claim.  Because section C specifically lists exclusions to

section B, the two must be read together.  See also id.  Per

section B's clear language, claims covered under that section —

and thus excluded under section C — are those between "You"

(i.e., the individual signatory) "and Charter."  This clearly

signifies an intention to require arbitration of claims — and

thus, under section C, exclude from arbitration — only claims

that might arise as between the signatory and Charter.  See id.

at §§ 1636, 1638.  To allow signatories to avoid arbitration of

otherwise-covered claims by joining suits filed by individuals

not party to the contract would plainly frustrate this intention.

For similar reasons, section P likewise does not

exclude Vazquez and Abascal's claims from arbitration.  As noted

above, the Solution Channel Agreement's core provisions specify

that it applies to disputes between "You and Charter."  Although

section P does not directly incorporate this language in the

manner that section C does, to apply it in plaintiffs' preferred

manner would run counter to the contract's central purpose, which

is to require arbitration of disputes.  See id. at § 1636.  And

to the extent that this omission creates a conflict between

sections P and C(14), "in a contract, when a general and

1  particular provision are inconsistent, the latter is paramount to

2  the former," meaning that "a particular intent will control a

3  general one that is inconsistent with it." Karpinski v. Smitty's

4  Bar, Inc., 246 Cal. App. 4th 456, 464 (1st Dist. 2016) (internal

5  quotation marks and citation omitted).

6         For these reasons, together with the FAA's mandate that

7  any doubts as to an arbitration agreement's applicability be

8  resolved in favor of arbitration, see Moses H. Cone Mem'l Hosp.,

9  460 U.S. at 24–25; Poublon, 846 F.3d at 1259, the court concludes

10  that the Solution Channel Agreement applies to compel arbitration

11  of Vazquez and Abascal's claims.  Plaintiffs do not contest that

12  the agreement applies to Turner's claims, and sections C(14) and

13  P clearly do not exclude them, as this action had not yet been

14  filed at the time he executed the agreement.  Accordingly, the

15  court concludes that the Solution Channel Agreement applies to

16  Turner's claims as well.

17         2.  Plaintiff Harper

18         Plaintiffs also contend that section P of the agreement

19  excludes Harper's claims from its coverage.  (See Opp. to Mot. to

20  Compel Arb. at 18-19 (Docket No. 172).)  They further argue that,

21  because this court confirmed the JAMS arbitrator's award finding

22  that the JAMS agreement was "null and void," and because it

23  subsequently held that Charter's acquiescence to the JAMS

24  arbitration effected a novation of Harper's first Solution

25  Channel contract — rendering it "dead and extinguished" —

26  Harper's claims do not qualify as "previously subject to any

27  arbitration agreement" under section C(14).  (See id. at 20-22.)

28  Accordingly, they argue that section C(14) excludes Harper's

14

1    claims from coverage under the agreement as well.  (See id.)

2         As noted above, section C(14) provides that the
3    agreement excludes "[a]ny claims that have already been filed in
4    federal or state court at the time you execute this Agreement,
5    provided that such claims were not previously subject to any
6    arbitration agreement."  (Solution Channel Agreement at § C(14)
7    (Docket No. 165-2).)  Thus, because it is undisputed that
8    Harper's claims had already been filed in court when he executed
9    the agreement, (see Opp. to Mot. to Compel Arb. at 20 (Docket No.
10   172)), the only question is whether those claims "were . . .
11   previously subject to any arbitration agreement," (Solution
12   Channel Agreement at § C(14) (Docket No. 165-2)).  The court
13   concludes that they were.

14        While Harper was employed by Charter, he consented to
15   the JAMS Agreement, and later to the Solution Channel Agreement.
16   Plaintiffs argue that the JAMS arbitrator's determination that
17   the JAMS Agreement was invalid means that Harper's claims were
18   never "subject to" that agreement, contending that claims are
19   only "subject to" an arbitration agreement if they are validly
20   required to be arbitrated under that agreement.  (See Opp. to
21   Mot. to Compel Arb. at 20 (Docket No. 172).)

22        The court assumes, for these purposes, that plaintiffs'
23   construction of "subject to" is correct, such that Harper's
24   claims were not "previously subject to" the JAMS Agreement.  Even
25   so, it is clear that they were nonetheless "previously subject
26   to" the Solution Channel Agreement.  Although this court
27   determined that there was a subsequent novation, extinguishing
28   that agreement, the fact remains that for a period of time --

1    beginning when Harper first executed the Solution Channel

2    Agreement and ending with Charter's acquiescence to the JAMS

3    arbitration -- Charter could have asserted the Solution Channel

4    Agreement against Harper with respect to any wage-and-hour claims

5    he had.  Under the plain meaning of "previous" -- earlier in time

6    -- Harper's claims, at the time he executed the Solution Channel

7    Agreement in May 2021, were "previously subject to" the earlier-

8    signed copy of the same agreement.  As such, Harper's claims are

9    not excluded from arbitration under section C(14).[5]

10            To the extent that Harper challenges Charter's ability

11   to compel him to arbitrate his individual claims arising out of

12   his prior employment because his latest execution of the Solution

13   Channel Agreement occurred when he applied for another position,

14   (see id. at 14), at least one other district court in California

15   has already held that the Solution Channel Agreement applies in

16   such circumstances.  In Durruthy v. Charter Communications, LLC,

17   like in this case, the plaintiff was hired by Charter, was later

18   terminated, subsequently reapplied for employment, and in doing

19   so executed the agreement, which Charter then sought to enforce

20   against her.  Durruthy, 20-CV-1374-W-MSB, 2020 WL 6871048, at *1

21   (S.D. Cal. Nov. 23, 2020).  As the court in the Southern District

22   _____

23        [5]    Plaintiffs contend that to find that Harper's claims
     were previously subject to the initial Solution Channel

24   Agreement, the court would need to reconsider whether that
     agreement was extinguished by the previously mentioned novation,

25   which they argue the court is precluded from doing under the law
     of the case doctrine.  (See Opp. to Mot. to Compel Arb. at 21

26   (Docket No. 172).)  However, plaintiffs are mistaken in their
     logic, as finding that an applicable agreement had terminated is

27   not the same as concluding that it was never applicable in the
     first place.  Although the court did the former, it did not do

28   the latter.

                                    16

of California observed:

> The Agreement covers "any dispute arising
> out of or relating to [an applicant's]
> preemployment application and/or employment
> with Charter or the termination of that
> relationship . . . ."  The Agreement does
> not limit its application to future
> employment, nor does it exclude claims from
> prior employment periods.  Therefore, an
> objective reading supports that "employment"
> reasonably means any employment period
> between the two parties of the agreement.
> . . . . Plaintiff's alleged lack of consent
> to arbitrate claims from her prior
> employment period with Defendant are absent
> from the Agreement, and "unexpressed
> subjective intentions are irrelevant
> . . . ."

Id. at *4-5 (quoting Martinez v. BaronHR, Inc., 51 Cal.
App. 5th 962, 970 (2020)) (alterations in original).  This court
agrees with the Durruthy court's analysis of this issue.[6]

For the foregoing reasons, the court concludes that the
Solution Channel Agreement applies to Harper's claims.

B.   Unconscionability

Plaintiffs also argue that the Solution Channel
Agreement is unconscionable.  (See id. at 22-38; Opp. to Mot. to
Compel Arb. at 19-34 (Docket No. 173).)  If true, this would mean
that the contract was not validly entered into in the first
instance, allowing the court to invalidate the agreement pursuant
to the FAA's saving clause.  See Concepcion, 563 U.S. at 339.

"Unconscionability under California law has 'both a
procedural and a substantive element, the former focusing on
oppression or surprise due to unequal bargaining power, the

---

[6]   This court's agreement with the Durruthy court's
evaluation of the Solution Channel Agreement, however, does not
extend to its unconscionability analysis.

17

1    latter on overly harsh or one-sided results.'" Kilgore v.

2    KeyBank, Nat'l Ass'n, 673 F.3d 947, 963 (9th Cir. 2012) (quoting

3    Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th

4    83, 99 (2000)).  While courts "use a 'sliding scale' in analyzing

5    these two elements . . . . [n]o matter how heavily one side of

6    the scale tips . . . , both procedural and substantive

7    unconscionability are required for a court to hold an arbitration

8    agreement unenforceable."  Id. (citing Armendariz, 24 Cal. 4th at

9    99).

10            This court previously assessed whether the Solution

11   Channel Agreement is unconscionable in the related action between

12   plaintiff Harper and Charter.  See Harper v. Charter Comms., LLC,

13   2:19-cv-01749 WBS DMC, 2019 WL 6918280, at *5-6 (E.D. Cal. Dec.

14   18, 2019).  There, the court determined that the agreement was

15   not procedurally unconscionable, relying in large part on the

16   fact that when Harper was first confronted with the Solution

17   Channel Agreement, it was via an email notifying employees of

18   their ability to opt out of the agreement within thirty days.

19   Id. at *1, 5 (citing Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d

20   1052, 1058-59 (9th Cir. 2013) (en banc) (deeming an arbitration

21   agreement not procedurally unconscionable because it noted the

22   option to opt out within sixty days of signing)).  Here, on the

23   other hand, there is no indication that plaintiffs were given the

24   same option to opt out; indeed, they assert that they received

25   none, (see Opp. to Mot. to Compel Arb. at 24 (Docket No. 172);

26   Opp. to Mot. to Compel Arb. at 21 (Docket No. 173)), which

27   Charter does not contest, (see Def.'s Reply at 15-17 (Docket No.

28   182); Def.'s Reply at 16-18 (Docket No. 183)).

                                  18

The Ninth Circuit has previously held that an arbitration agreement was procedurally unconscionable where it was presented to employees "on an adhere-or-reject basis," with no opportunity to opt out.  See Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1172 (9th Cir. 2003); see also Steele v. Am. Mortg. Mgmt. Servs., 2:12-cv-00085 WBS JFM, 2012 WL 5349511, at *4-5 (E.D. Cal. Oct. 26, 2012) (holding pre-employment arbitration agreement procedurally unconscionable because it did not contain an opt-out clause).  Conversely, it has also held that an arbitration agreement that included an opt-out provision was not procedurally unconscionable.  See Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1211 (9th Cir. 2016).

Thus, an arbitration agreement that individuals are required to sign as a condition of employment, with no ability to opt out, is procedurally unconscionable, though Ninth Circuit precedent also establishes that this form of procedural unconscionability is "low" on California's sliding scale analysis.  See Poublon, 846 F.3d at 1261.  In such a situation, if "there is no other indication of oppression or surprise, then the agreement will be enforceable unless the degree of substantive unconscionability is high."  Id.

Regardless of the particular degree of procedural unconscionability present here, however, in order for their unconscionability defense to succeed, plaintiffs must also show that the agreement is substantively unconscionable.  See Kilgore, 673 F.3d at 963.  And as this court previously held in the related action between Harper and Charter, in which Charter sought to enforce the Solution Channel Agreement against him with

19

1   respect to claims not present in the current litigation, the

2   agreement is not substantively unconscionable.  See Harper, 2019

3   WL 6918280, at *5-6.[7]  Because the agreement at issue in this

4   litigation is the same as the one upon which the court ruled in

5   the separate litigation, and plaintiffs do not allege that it has

6   changed,[8] the court again concludes that the Solution Channel

7   Agreement is not substantively unconscionable.

8       Because the Solution Channel Agreement is not

9   substantively unconscionable, plaintiffs' unconscionability

10  defense must fail.

11      C.   California Labor Code Section 432.6

12      [7]   Specifically, the court determined that (1) the
    Solution Channel review process was not one-sided, as Harper
13  contended, but rather its requirements applied equally to
    employees and to Charter; (2) the agreement did not enable
14  Charter to conclusively decide whether a claim is arbitrable,
    instead providing claimants the ability to proceed with
15  arbitration on this and other issues; and (3) a provision of the
    agreement requiring "each party [to] bear its own attorney's fees
16  regardless of the action brought," although unenforceable under
    California law, could be severed pursuant to the agreement's
17  severability clause in light of the court's determination that
    the agreement was "not otherwise permeated by unconscionability."
18  See Harper, 2019 WL 6918280, at *5-6 (citing Serpa v. Cal. Sur.
    Investigations, Inc., 215 Cal. App. 4th 695, 709-10 (2d Dist.
19  2013)).
20      [8]   Although plaintiff Harper refers to the Solution
    Channel Agreement to which he consented the first time as the
21  "Old SC Agreement" and the one to which he consented when re-
    applying as the "New SC Agreement," his bases for these
22  differences in nomenclature are that the former was included in
    an email informing him that he could opt out, whereas the latter
23  was not — not that the agreement itself had changed.  (See Opp.
    to Mot. to Compel Arb. at 9 n.1 (Docket No. 172).)
24      Moreover, the Solution Channel Agreement is dated
    September 25, 2017 — well before plaintiffs Turner, Vazquez, and
25  Abascal first applied for employment with Charter — further
    indicating that it had not changed between when plaintiff Harper
26  first signed it and when they did.  (See Solution Channel
    Agreement (Docket No. 165-2); supra Section II.B.)
27

28

1         Finally, in supplemental briefing, plaintiffs argue

2 that the Ninth Circuit's recent decision in <u>Chamber of Commerce</u>

3 <u>of the United States v. Bonta</u>, — F.4th —, 2021 WL 4187860 (9th

4 Cir. Sept. 15, 2021), precludes enforcement of the Solution

5 Channel Agreement against Harper. (<u>See</u> Not. of Supp. Auth. at 2

6 (Docket No. 196).) That decision upheld part of California Labor

7 Code section 432.6, which prohibits employers from "requir[ing]

8 any applicant for employment or any employee to waive any right,

9 forum, or procedure" established under the Labor Code or

10 California Fair Employment and Housing Act as a condition of

11 employment, on the basis that it was not preempted by the FAA.[9]

12 <u>See</u> <u>id.</u> at *4-10; Cal. Lab. Code § 432.6(a).

13         Plaintiffs contend that under <u>Chamber of Commerce</u>,

14 Charter's use of the Solution Channel Agreement violates section

15 432.6 because Harper's consent to the agreement was a mandatory

16 condition for consideration of his application and for any

17 subsequent employment, with no ability to opt out. (<u>See</u> Not. of

18 Supp. Auth. at 2 (Docket No. 196).) Per <u>Chamber of Commerce</u>'s

19 clear language, however, whether this requirement violated

20 section 432.6 has no effect on the court's present decision to

21 enforce the Solution Channel Agreement: "§ 432.6 does not make

22 invalid or unenforceable any agreement to arbitrate, <u>even if such</u>

23 <u>agreement is consummated in violation of the statute</u>." 2021 WL

24 4187860, at *7 (emphasis added); <u>see also</u> 2021 WL 4187860, at *6

25

26         [9] Because section 432.6 came into effect after Turner,
Vazquez, and Abascal executed the Solution Channel Agreement, but

27 before Harper did in May 2021, plaintiffs only contend that the
Ninth Circuit's decision applies to Harper. (<u>See</u> Not. of Supp.

28 Auth. at 2 n.1 (Docket No. 196).)

("§ 432.6 cannot be used to invalidate, revoke, or fail to enforce an arbitration agreement . . . .").

The most that Chamber of Commerce does to aid employees who seek to challenge arbitration agreements is to simply reaffirm the applicability of the FAA's saving clause to arbitration agreements under section 432.6.  See id. at *6 (citing Cal. Lab. Code § 432.6(f) ("Nothing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the [FAA].")) (other citations omitted).  In doing so, the Ninth Circuit observed, in dicta:

> [A]n employee may attempt to void an arbitration agreement that he was compelled to enter as a condition of employment on the basis that it was not voluntary.  If a court were to find that such a lack of voluntariness is a generally applicable contract defense that does not specifically target agreements to arbitrate, the arbitration agreement may be voided in accordance with saving clause jurisprudence.

Id. at *9.  However, here the court has addressed Harper's "generally applicable contract defense[s]" and determined that they do not apply here.  Chamber of Commerce thus has no impact on this decision.

For the foregoing reasons, the court will grant Charter's motions to compel arbitration of plaintiffs Harper, Turner, Vazquez, and Abascal's individual claims.

D.   Motions to Dismiss or Stay Judicial Proceedings

In its motion to compel arbitration of Harper's Labor Code and UCL claims, Charter requests that, should the court grant that motion, the court stay this case -- including Harper's PAGA claim -- pending arbitration of the other claims.  (See Mot.

to Compel Arb. re Harper at 23-24 (Docket No. 162).)   Charter
suggests that although it has not sought arbitration of the PAGA
claim, staying proceedings as to the PAGA claim would avoid
conflicting rulings between this court as to the PAGA claim and
the arbitrator as to the other claims.   (See id. at 24.)
Plaintiffs oppose this request, pointing out that because this
court will not be bound by any rulings the arbitrator might make,
staying Harper's PAGA claim would not in fact avoid conflicting
rulings.  (See Opp. to Mot. to Compel Arb. at 38-39 (Docket No.
172).)   They further argue that proceedings as to the PAGA claim
should not be stayed because of the distinct nature of a PAGA
claim, which belongs to the state rather than to Harper.  (See
id. at 39.)

        Further, in its motion to compel arbitration of Turner,
Vazquez, and Abascal's claims, Charter also requests that, should
the court grant that motion, the court dismiss those plaintiffs
from the case.  (See Mot. to Compel Arb. re Turner, Vazquez, &
Abascal at 20-21 (Docket No. 165).)  Plaintiffs oppose this
request and instead request that the court stay proceedings as to
these plaintiffs pending arbitration of their individual claims.
(See Opp. to Mot. to Compel Arb. at 35 (Docket No. 173).)   In
response to the court's questioning at oral argument, counsel for
plaintiffs indicated that they preferred a stay of plaintiff
Sinclair's individual claims pending arbitration of the other
plaintiffs' individual claims.

        The FAA provides that, where a suit presents "issue[s]
referable to arbitration under an agreement in writing for such
arbitration," the court "shall on application of one of the

1   parties stay the trial of the action until such arbitration has

2   been had."  9 U.S.C. § 3.  Further, the Supreme Court has stated

3   that "[i]n some cases, it may be advisable to stay litigation

4   among the nonarbitrating parties pending the outcome of the

5   arbitration."  Moses H. Cone Memorial Hosp. v. Mercury Constr.

6   Corp., 460 U.S. 1, 20 n.23 (1983).

7          Because plaintiffs have requested a stay of Turner,

8   Vazquez, and Abascal's individual claims, the court will stay

9   those claims pending arbitration.  Additionally, because Charter

10  has requested that the court otherwise stay this case pending

11  arbitration of Harper's individual claims, because plaintiffs'

12  counsel supported a stay of Sinclair's individual claims at oral

13  argument, and because the court agrees that a stay of Sinclair's

14  claims pending arbitration is "advisable," the court will stay

15  Sinclair's individual claims pending arbitration as well.

16         However, because a stay would impede vindication of

17  California's interests in enforcing the Labor Code through

18  representative PAGA actions, discussed above, and because the

19  PAGA claim represents a distinct "action" in this case, the court

20  will not stay Harper's PAGA claim.  See Jarboe v. Hanlees Auto

21  Grp., 53 Cal. App. 5th 539, 557 (1st Dist. 2020) ("Because a PAGA

22  claim is representative and does not belong to an employee

23  individually, an employer should not be able dictate how and

24  where the representative action proceeds.").

25         IT IS THEREFORE ORDERED that Charter's Motions to

26  Compel Arbitration (Docket Nos. 162, 165) be, and the same hereby

27  are, GRANTED.

28         IT IS FURTHER ORDERED that, as to the claims presented

in Counts One through Nine of the Second Amended Complaint only,
this action is STAYED pending arbitration of plaintiff Harper,
Turner, Vazquez, and Abascal's individual claims.

Dated:  October 12, 2021

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE