Jamin S. Soderstrom, Bar No. 261054
jamin@soderstromlawfirm.com
SODERSTROM LAW PC
1 Park Plaza, Suite 600
Irvine, California 92614
Tel: (949) 667-4700
Fax: (949) 424-8091

*Counsel for Plaintiffs, Putative Class Members,*
*and Aggrieved Employees*

Joseph W. Ozmer II (SBN 316203)
jozmer@kcozlaw.com
Nathan D. Chapman (SBN 338735)
nchapman@kcozlaw.com
J. Scott Carr (SBN 136706)
scarr@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
333 S. Grand Avenue, Suite 2225
Los Angeles, California 90071
Tel: (213) 493-3980
Fax: (404) 400-7333

*Counsel for Defendant Charter Communications, LLC*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LIONEL HARPER, DANIEL SINCLAIR, HASSAN TURNER, LUIS VAZQUEZ, and PEDRO ABASCAL, individually and on behalf of all others similarly situated and all aggrieved employees,<br><br>Plaintiffs,<br><br>v.<br><br>CHARTER COMMUNICATIONS, LLC,<br><br>Defendant. | Case No.    2:19-cv-00902-WBS-DMC<br><br>**ORDER GRANTING JOINT MOTION, CONFIRMING FINAL AWARD OF ARBITRATOR, AND ENTERING JUDGMENT (VAZQUEZ ARBITRATION)** |

Plaintiff Luis Vazquez and Defendant Charter Communications, LLC jointly submitted Notice of Final Award of Arbitrator and Joint Stipulation and Motion to Confirm Final Award and Enter Judgment (Vazquez Arbitration), which provides as follows:

WHEREAS, on October 13, 2021, the Court granted Charter's motion to compel individual arbitration of Vazquez's claims under the Mutual Arbitration Agreement (also known as the Solution Channel Agreement), and stayed his individual claims pending the completion of arbitration proceedings. Dkt. 202.

WHEREAS, on September 12, 2023, Arbitrator Claude D. Ames, Esq., who was appointed by the American Arbitration Association (AAA) and presided over the arbitration between Vazquez and Charter, issued a Final Award that concluded the arbitration. **Exhibit 3** (Final Award).

NOW, THEREFORE, Vazquez and Charter stipulate and jointly move the Court to: (1) issue an order pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9 and 13, confirming the Final Award; (2) file such order with the clerk for the entry of judgment thereon; and (3) file the following papers with the clerk in accordance with 9 U.S.C. § 13:

    a.    the Mutual Arbitration Agreement, attached as **Exhibit 1**;

    b.    the AAA's appointment of the Arbitrator, attached as **Exhibit 2**;

    c.    the Final Award, attached as **Exhibit 3**; and

    d.    the Court order dated October 13, 2021, attached as **Exhibit 4** (also in the Court's record as Docket 202).

Having reviewed the Final Award, and finding no basis to vacate, modify, or correct the Final Award pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9–11 (the parties having raised none), and pursuant to the parties' stipulation, the Court hereby **GRANTS** the joint motion and confirms the Final Award in full.

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 9 and 13, the Court attaches the following papers and instructs the clerk to file them with this **ORDER**:

    a.    the Mutual Arbitration Agreement, attached as **Exhibit 1**;

    b.    the AAA's appointment of the Arbitrator, attached as **Exhibit 2**;

    c.    the Final Award, attached as **Exhibit 3**; and

1

2

     d.     the Court order dated October 13, 2021, attached as **<u>Exhibit 4</u>** (also in the Court's record as Docket 202).

3

4

5

6

     The Parties' joint motion is **GRANTED**, the Final Award is **CONFIRMED**, and **JUDGMENT IS ENTERED**. The clerk shall docket this judgment pursuant to Federal Arbitration Act, 9 U.S.C. § 13, and it shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action.

7

8

     **IT IS SO ORDERED AND ADJUDGED. LET JUDGMENT BE FORTHWITH ENTERED ACCORDINGLY.**

9

10

Dated:  September 28, 2023

11

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**MUTUAL ARBITRATION AGREEMENT**



**NOTICE**

PLEASE READ THE FOLLOWING MUTUAL ARBITRATION AGREEMENT ("AGREEMENT") CAREFULLY. IF YOU ACCEPT THE TERMS OF THE AGREEMENT (WHETHER YOU ARE AN APPLICANT, CURRENT EMPLOYEE, OR FORMER EMPLOYEE), YOU ARE AGREEING TO SUBMIT ANY COVERED EMPLOYMENT-RELATED DISPUTE BETWEEN YOU AND CHARTER COMMUNICATIONS (CHARTER) TO BINDING ARBITRATION. YOU ARE ALSO AGREEING TO WAIVE ANY RIGHT TO LITIGATE THE DISPUTE IN A COURT AND/OR HAVE THE DISPUTE DECIDED BY A JURY.

## MUTUAL ARBITRATION AGREEMENT

A. **Arbitration Requirement.** You and Charter mutually agree that, as a condition of Charter considering your application for employment and/or your employment with Charter, any dispute arising out of or relating to your pre-employment application and/or employment with Charter or the termination of that relationship, except as specifically excluded below, must be resolved through binding arbitration by a private and neutral arbitrator, to be jointly chosen by you and Charter.

B. **Covered Claims.** You and Charter mutually agree that the following disputes, claims, and controversies (collectively referred to as "covered claims") will be submitted to arbitration in accordance with this Agreement:

   1. all disputes, claims, and controversies that could be asserted in court or before an administrative agency or for which you or Charter have an alleged cause of action related to pre-employment, employment, employment termination or post-employment-related claims, whether the claims are denominated as tort, contract, common law, or statutory claims (whether under local, state or federal law), including without limitation claims for: collection of overpaid wages and commissions, recovery of reimbursed tuition or relocation expense reimbursement, damage to or loss of Charter property, recovery of unauthorized charges on company credit card; claims for unlawful termination, unlawful failure to hire or failure to promote, wage and hour-based claims including claims for unpaid wages, commissions, or other compensation or penalties (including meal and rest break claims, claims for inaccurate wage statements, claims for reimbursement of expenses); unlawful discrimination or harassment (including such claims based upon race, color, national origin, sex, pregnancy, age, religion, sexual orientation, disability, and any other prohibited grounds), claims for unlawful retaliation, claims arising under the Family Medical Leave Act, Americans with Disabilities Act or similar state laws, including unlawful denial of or interference with a leave of absence, claims for unlawful denial of accommodation or failure to engage in the interactive process, whistleblower claims, claims for violations of the Sarbanes-Oxley Act, claims for violations of Occupational Safety and Health Administration or other safety or occupational health, whether arising before, during or after the termination of your employment, claims related to background and any and all other pre-employment and employment checks, including any claims brought under the Fair Credit Reporting Act and/or similar federal, state or local statutes or ordinances;

   2. all disputes, claims, and controversies set forth in Section B.1 above, whether made against Charter, or any of its subsidiaries, parent, or affiliated entities, or its individual officers, directors, shareholders, agents, managers, or employees (in an official or personal capacity, if such claim against the employee arises from or in any way relates to your pre-employment or employment relationship with Charter); and

   3. all disputes related to the arbitrability of any claim or controversy.

© 2017 Charter Communications



C. **Excluded Claims.** All other claims not covered under Section B above will not be submitted to arbitration under this Agreement.  In addition, the following claims are specifically excluded from arbitration under this Agreement:

1.   Claims for workers' compensation benefits (other than retaliation for pursuing such claims);

2.   Claims for unemployment compensation benefits (other than retaliation for pursuing such claims);

3.   Claims arising under the National Labor Relations Act;

4.   Claims for violations of the Employee Retirement Income Security Act of 1974, or for breach of employee benefits or welfare plans that contain procedures for resolution of disputes under those plans, which shall be governed by those procedures;

5.   Claims arising under the Health Insurance Portability and Accountability Act of 1996;

6.   Claims for injunctive or other equitable relief related to unfair competition and the taking, use or unauthorized disclosure of trade secrets or confidential information;

7.   Claims arising under separation or severance agreements or non-compete agreements (unless arbitration is provided for under the terms of the agreement);

8.   Claims related to corrective action or other performance management that does not result in termination of employment;

9.   Claims older than the statute of limitations applicable to such claims;

10.  Claims of theft or embezzlement or any criminal conduct;

11.  Claims over the validity of any party's intellectual property rights;

12.  Any claims covered by a collective bargaining agreement, a severance agreement, or a written employment contract (although nothing in this Agreement shall limit the applicability of any arbitration or other dispute resolution provision contained in those agreements);

13.  Any claims expressly non-arbitrable by statute, including 12 U.S.C. §5567(d)(2); 7 U.S.C. §26(n); or 18 U.S.C. §1514A(e)(2);

14.  Any claims that have already been filed in federal or state court at the time you execute this Agreement, provided that such claims were not previously subject to any arbitration agreement.

Nothing in this Agreement shall prevent you from filing and pursuing the following: an administrative proceeding before the Equal Employment Opportunity Commission (EEOC) or an equivalent state or local agency (although if you choose to pursue the claim, any proceeding on the merits or for damages will be subject to arbitration); a proceeding before the National Labor Relations Board (NLRB); a claim for medical and/or disability benefits under applicable workers' compensation laws; or a claim for unemployment compensation benefits.

D. **Individual Claims Limitation and Representative, Collective, and Class Action Waiver.** You and Charter agree that both parties may only bring claims against the other party in their individual capacity and not as a plaintiff or class member in any purported class or representative proceeding, whether those claims are covered claims under Section B, or excluded claims under Section C.  Additionally, the arbitrator shall not be permitted to order consolidation of claims or a representative, class, or collective, arbitration.



E. **Time Limits.** The aggrieved party must give written notice of the claim, in the manner required by this Agreement, within the time limit established by the applicable statute of limitations for each legal claim being asserted. To be timely, any claim that must be filed with an administrative agency or body as a precondition or prerequisite to filing the claim in court, must be filed with Solution Channel within the time period by which the charge, complaint or other similar document would have had to be filed with the agency or other administrative body. Whether a demand for arbitration is untimely is an affirmative defense, and will be decided by the arbitrator before any hearing on the merits of the aggrieved party's claim. If you file a charge or complaint with an administrative agency or body, any participation by Charter in the proceeding shall not be deemed a waiver of your obligation to arbitrate your claims pursuant to this Agreement. You agree not to assert, and agree to waive, any argument that Charter's participation in such a proceeding acts as a waiver or modification of the parties' agreement to arbitrate.

F. **Claim.** To pursue arbitration of a dispute under this Agreement, you must first submit a written claim at www.CharterSolutionChannel.com, a site hosted by a third party designated by Charter. In your claim, you must (1) describe the nature and basis of the claim or dispute, (2) set forth the specific relief sought, and (3) include a sworn verification that the dispute is covered by this Agreement and that the information submitted in the notice is accurate. In the event that Charter intends to seek arbitration of a dispute under this Agreement, it must send by certified mail to the individual's last known address, a written claim that meets the requirements of this Section F.

G. **Location.** Any arbitration hearing conducted under this Agreement will take place within 100 miles of the Charter office to which you last reported during your employment as of the date of the filing of the Notice, or the Charter office at which you sought employment, unless another location is mutually selected by the parties.

H. **Selection of Arbitrator.** The arbitration shall be held before one arbitrator who is a current member of the American Arbitration Association (AAA) and is listed on the Employment Dispute Resolution Roster. Within 45 days after submission of the claim, Charter will request from the AAA a list of at least five arbitrators willing to hear and decide the dispute. Within 20 days after receipt of the list from the AAA, the parties will select an arbitrator to hear and resolve the dispute and will notify the AAA of the selection of an arbitrator.

I. **Conduct of Arbitration.**

1. *Rules.* Arbitration hearings will be conducted pursuant to the Solution Channel Program Guidelines and the arbitrator shall have the sole authority to determine whether a particular claim or controversy is arbitrable.

2. *Authority of the Arbitrator.* The arbitrator will decide all discovery disputes related to the arbitration. Unless the parties agree to submit written arguments in lieu of a hearing on the merits of the claim[s], the arbitrator will schedule and conduct an evidentiary hearing, at which the arbitrator will hear testimony and receive evidence. The arbitrator shall apply the governing law applicable to any substantive claim asserted, including the applicable law necessary to determine when the claim arose and any damages.

3. *Waiver of Hearing.* The parties may, at any time prior to a hearing, mutually agree to forego a hearing, and instead submit all evidence and argument to the arbitrator in writing.

4. *Burden of Proof.* The arbitrator will apply the burdens of proof and law applicable to the claim, had the claim been adjudicated in court.

5. *Decision.* The arbitrator will issue a decision within 30 days after the close of an arbitration hearing, or at a later time on which the parties agree. The decision will be signed and dated by the arbitrator, and will contain



express findings of fact and the legal reasons for the decision and any award, except as otherwise provided for under the Federal Arbitration Act.

J.   **Enforcement of the Decision.** Judgment on the arbitrator's decision may be entered in any court having jurisdiction over the matter, within 45 days following its issuance.

K.   **Arbitration Costs.** Charter will pay the AAA administrative fees and the arbitrator's fees and expenses.  All other costs, fees and expenses associated with the arbitration, including without limitation each party's attorneys' fees, will be borne by the party incurring the costs, fees and expenses.  The parties agree and acknowledge, however, that the failure or refusal of either party to submit to arbitration as required by this Agreement will constitute a material breach of this Agreement.  If any judicial action or proceeding is commenced in order to compel arbitration, and if arbitration is in fact compelled or the party resisting arbitration submits to arbitration following the commencement of the action or proceeding, the party that resisted arbitration will be required to pay to the other party all costs, fees and expenses that they incur in compelling arbitration, including, without limitation, reasonable attorneys' fees.

L.   **Jury Trial and Litigation Waiver.** You and Charter understand that, by agreeing to arbitration, both parties are waiving their right to demand a jury in any claim that is subject to arbitration under this Agreement.  In addition, in the event a dispute between you and Charter is not arbitrable under this Agreement for any reason and is pursued in court, you and Charter agree to waive any right to a jury trial that might otherwise exist.  Although this Agreement does not preclude either party from filing timely charges with any applicable administrative agency, neither party will ever seek or accept any damages, remedies, or other relief (any right to which is hereby waived) except through the binding arbitration process set forth in this Agreement.

M.   **Conflicts.** In the event of a conflict between this Agreement and the Solution Channel Program Guidelines, the terms of this Agreement will control.

N.   **No Retaliation.** Charter will not retaliate against you for seeking, in good faith, to resolve a dispute pursuant to this Agreement.

O.   **Employment-At-Will.** This Agreement in no way alters the at-will employment relationship between you and Charter.  You and Charter are free to terminate the employment relationship at any time for any lawful reason, and your employment is not for any specific duration.

P.   **Entire Agreement.** This Agreement sets for the complete agreement of the parties on the subject of resolution of the covered disputes, and supersedes any prior or contemporaneous oral or written understanding on this subject; provided, however, that this Agreement will not apply to the resolution of any charges, complaints, or lawsuits that have been filed with an administrative agency or court before the Effective Date of this Agreement.

Q.   **Severability.** The parties explicitly acknowledge and agree that the provisions of this Agreement are both reasonable and enforceable.  However, if any portion or provision of this Agreement (including, without implication of limitation, any portion or provision of any section of this Agreement) is determined to be illegal, invalid, or unenforceable by any court of competent jurisdiction and cannot be modified to be legal, valid, or enforceable, the remainder of this Agreement shall not be affected by such determination and shall be valid and enforceable to the fullest extent permitted by law, and said illegal, invalid, or unenforceable portion or provision shall be deemed not to be a part of this Agreement.  The only exception to this severability provision is, should the dispute involve a representative, collective or class action claim, and the representative, collective, and class action waiver (Section D) is found to be



invalid or unenforceable for any reason, then this Agreement (except for the parties' agreement to waive a jury trial) shall be null and void with respect to such representative, collective, and/or class claim only, and the dispute will not be arbitrable with respect to such claim(s).

R.     **Federal Arbitration Act.** This Agreement will be governed by the Federal Arbitration Act.

S.     **Consideration.** You agree that Charter has offered you sufficient consideration for this Agreement, including, without limitation, consideration of your application for employment with Charter, your employment with Charter, and/or Charter's mutual agreement to arbitrate disputes.

T.     **Termination.** This Agreement survives the termination of your employment with Charter (including if you are later re-employed by and/or if your employment with Charter terminates again).

U.     **Voluntary.** You acknowledge that you have carefully read this Agreement, fully understand what it means, and are entering into it voluntarily.

V.     **Effective Date.** This Agreement is effective and you are legally bound by the terms of Charter's Solution Channel and this Agreement, as of the date of your consent to participate in Solution Channel.

# EXHIBIT 2

**AAA APPOINTMENT OF ARBITRATOR**

AMERICAN
ARBITRATION
ASSOCIATION®  |  INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

Southeast Case Management Center
Charles Dorsey
Assistant Vice President
2200 Century Parkway
Suite 300
Atlanta, GA 30345
Telephone: (404)325-0101
Fax: (877)395-1388

July 29, 2022

Jamin S. Soderstrom, Esq.
Soderstrom Law PC
1 Park Plaza, Suite 600
Irvine, CA 92614
Via Email to: jamin@soderstromlawfirm.com

J. Scott Carr, Esq.
Kabat Chapman & Ozmer LLP
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Via Email to: scarr@kcozlaw.com

     Re:    Case Number: 01-22-0002-2071
             Luis Vazquez v. Charter Communications, LLC

Dear Parties:

Inasmuch as there were no objections to the appointment of Claude Ames, Esq., his appointment is hereby confirmed by the American Arbitration Association (the AAA).

Accordingly, a telephonic Arbitration Management Conference needs to be scheduled. Please confer with the other side and provide mutually agreeable dates and times from August 12 - 26, 2022.

The parties are requested to advise the undersigned of their availability on or before **August 5, 2022**.

We look forward to working with you and should there be any questions, please do not hesitate to contact the undersigned.

Sincerely,

/s/ Karen D. Smith, on behalf of

Jenn Ashenfelter
Manager of ADR Services
Direct Dial: (401)354-2372
Email: JennAshenfelter@adr.org
Fax: (877)395-1388

Enclosure

cc:    Nathan D. Chapman, Esq.; Chad Williams, Esq.; Diana Alderete, Esq.

# EXHIBIT 3

**FINAL AWARD DATED SEPTEMBER 12, 2023**

## AMERICAN ARBITRATION ASSOCIATION

### Employment Arbitration Tribunal

LUIS VAZQUEZ,

              Claimant,

v.

CHARTER COMMUNICATIONS, LLC,

              Respondent.

Re: Classification of Luis Vazquez

Case No. 01-22-0002-2071

ARBITRATOR'S
DECISION AND AWARD

Before:  Claude Dawson Ames, Arbitrator

Appearances:

**For Luis Vazquez:**

Jamin S. Soderstrom, Esq.
Soderstrom Law P.C.
3 Park Plaza, Suite 100
Irvine, CA 92614

**For Charter Communications, LLC:**

Nathan D. Chapman, Esq.
Kabat Chapman & Ozmer LLP
171 17th Street Northwest, Suite 1550
Atlanta, GA 30363

# I

## **INTRODUCTION**

This arbitration proceeding involves a dispute over the proper job classification of Claimant Luis Vazquez ("Vazquez" or "Claimant") during his three weeks of training before being fully hired by Charter Communications, LLC ("Charter" or "Respondent") as a direct sales representative. The parties selected Claude Dawson Ames, Esq., to serve as Arbitrator and stipulated that this employment dispute was properly before him for a final and binding resolution. This case is being administered by the American Arbitration Association ("AAA").

The evidentiary hearing took place remotely on June 13, 2023. All witness testimony was under oath, and a stenographic transcript was taken of the proceedings. The parties were afforded an opportunity to present documentary and testimonial evidence and examine witnesses. The parties submitted their timely post-hearing briefs on August 1, 2023, and the Arbitrator officially closed the record on August 2, 2023.

# II

## **ISSUES**

Did the Claimant spend more than 50% of his working time outside the office engaged in sales-related activities and therefore exempt from California's minimum wage, overtime, meal break, and rest break requirements?

Did Respondent misclassify Claimant as an exempt outside salesperson under California law, and, if so, did he suffer any Labor Code violations?

## III

## <u>STATEMENT OF FACTS</u>

Respondent, Charter Communications, LLC ("Charter" or "Respondent") hired Claimant, Luis Vazquez ("Vazquez"), to work out of its Bakersfield, California office as a Direct Sales Representative ("DSR"), also known as a door-to-door salesperson in 2019. Charter sells cable, internet, and wireless mobile phone services to individuals through door-to-door solicitation. Charter advertised the DSR position as an outside salesperson required to complete three weeks of training. (JX 3) Vazquez received an offer letter on October 14, 2019, after interviewing for the position. (JX 5)

The offer letter specifically stated that the base salary would be $19,200 plus commission and that Vazquez would not be entitled to overtime. (JX 5) According to the wage statement for the first week of training, Vazquez received a $500 advance on commission. (JX 14) Vazquez also received another $500 advance for the second week of training even though he made no sales. (JX 15) According to the Commission Plan, Vazquez received on his second day of work and was entitled to receive a $500 advance commission for the first five pay periods regardless of whether he made a sale. (JX 18)

Vazquez's first day of work was November 1, 2019, and he participated in three weeks of training until November 21, 2019. Vazquez worked for Charter as a DSR until he resigned on March 12, 2020. (JX 23) Vazquez alleges Charter misclassified him as an exempt employee during his three weeks of training. Vazquez contends he was not paid a minimum wage, was denied overtime pay, rest, and meal breaks, and did not receive timely, complete, or accurate wage statements. He then filed this claim and joined a class action lawsuit brought by former Charter trainees.

A.     **The Training**

Charter's training for DSRs had two primary components: classroom training and field training, which involved shadowing an experienced DSR to observe how customer interactions are conducted and how in-the-field sales pitches are made. On the first day of work, Vazquez testified he spent a few hours in the Bakersfield office, where he received his schedule and completed some paperwork. Vazquez reported that on the first day, Charter also took him and other trainees to lunch, which lasted approximately 90 minutes before he joined an experienced DSR in the field to begin his hands-on training.

The first three days of classroom instruction involved a virtual self-guided review of manuals and other materials. On the fourth day of classroom training, an instructor-led the training. During the three weeks of training, except for Saturdays, Vazquez spent approximately ten (10) days in the classroom for training. The classroom training usually began between 10:00 and 11:00 in the morning and lasted approximately four (4) hours a day, except for two days when it may have lasted as much as five hours. After the in-office training, Vazquez would meet the experienced DSR in the field for another 4 hours of hands-on training.

Vazquez testified that he typically finished classroom training between 1:00 p.m. and 2:30 p.m. and went directly into the field with his experienced DSR, where he remained until approximately 8:00 p.m. Vazquez could not recall how long it took him to get onto the field each day. While Vazquez testified at his deposition and at the arbitration hearing that he typically arrived in the field around 2:30 p.m., he contradicted this testimony when he testified that maybe it was closer to 3:00 p.m. or 4:00 p.m. when he arrived in the field.

According to Vazquez, he was never given a rest or meal break during the four hours of classroom training and was only permitted to take bathroom breaks as needed. Classroom

instruction began on November 6, 2019, and the last class and graduation took place on November 19, 2019. Vazquez received his lead list on November 14, 2019 (JX 25) and made his first sale that day. (JX 26)   Vazquez spent the last two days of the training, approximately nine hours each day, in the field on his own as a DSR.

Linda Arnold, Charter's Director of Learning and Development, testified that the classroom training lasted four hours each day and that there were at least two 15-minute breaks during the classroom training. Raul Salcedo, Charter's Director of Residential Connectivity, explained that the in-field training is a necessary component to develop the peer-to-peer learning opportunity and that the focus of the training was to incorporate as much actual sales exposure as possible. Training includes participating in the sales pitch and entering orders on the Charter-provided tablets. The goal at the conclusion of the training is that the new hires feel comfortable making their own sales based on the intense hands-on shadowing with experienced DSRs.

## B.     <u>Compensation</u>

Salcedo testified that Charter considers all DSRs, including exempt trainees, and this employment status information is communicated to all new hires at the time of hire. (JX 5) Salcedo explained that new hires are told at the outset that they will receive a base salary plus commission. (JX 18) Salcedo testified that during the ramp-up period, including the three weeks of training, new hires receive an advance commission in the amount of $500 for the first five pay periods. New hires are also told that they can schedule their own rest and meal breaks once they are on their own in the field, but during the training period, trainees are free to take comfort breaks as needed, and the instructor typically takes two breaks during the four-hour classroom training. New hires are also told that they will not receive any overtime.

After he resigned for health reasons, Vazquez joined a class action lawsuit challenging Charter's practice with new hires during the training period. Vazquez testified at a deposition before the arbitration hearing, and Charter's counsel pointed out several inconsistencies between Vazquez's deposition testimony and his testimony at the arbitration hearing.

## IV

## <u>POSITION OF THE PARTIES</u>

### A.  <u>Vazquez's Position:</u>

Charter violated California labor laws by misclassifying Vazquez as an exempt employee, denying him the Fair Labor Standards Act protections, including providing rest and meal breaks, minimum and overtime wages, and providing timely, complete, and accurate wage statements. Charter is liable for violating these Labor Code requirements, and as a result, Vazquez is entitled to be compensated appropriately and to receive any and all penalties imposed on Charter.

Charter has not met its burden of proof that it properly classified Vazquez as an exempt employee during his three-week training period in November 2019. Charter failed to establish that Vazquez spent 50% of his time outside the office engaged in sales-related activities. During his three-week training, Charter did not require Vazquez to devote most of his time outside of the office engaged in sales-related activity. In fact, Charter cannot establish that an exemption existed for each of the three weeks of training, as there were some weeks when Vazquez spent more time participating in classroom instruction. Charter cannot classify Vazquez as an exempt employee if he was not exempt throughout the training period.

Vazquez only qualifies as an exempt employee when he is "actually" selling. Therefore, any time Vazquez spent outside of the office that did not specifically involve his active involvement in negotiating his own sales does not count when determining exempt status. For

example, during the first week, even though Vazquez spent half of his time outside of the office shadowing an experienced DSR, he did not spend any time actually selling anything on his own behalf. Likewise, in weeks two and three, even though he spent more than 50% of the time outside of the office, he was only engaged in actual selling less than 50% of the time (6.1% in week two and 49.5% in week three). Vazquez did not spend any time actually selling until November 14, 2019, just 5 days before the conclusion of the training period. Charter did not expect Vazquez to spend more than 50% of his time actually "selling" because they did not give him his leads list until November 14, 2019, and still expected him to spend at least four hours in the office participating in classroom training.

Since Charter is unable to establish Vazquez spent 50% of his training time actually "selling", it cannot escape the requirements to pay Vazquez minimum wage and overtime pursuant to California law. Moreover, Charter's misclassification also entitles Vazquez to statutory penalties because of the misclassification and Labor Code violations. Labor Code §515(d)(2) requires non-exempt employees to be paid a minimum wage for working 40 hours per week, and any work more than eight hours in a single workday entitles the non-exempt employee to overtime. During the three-week training period, Vazquez worked over eight hours on a given day on numerous occasions, yet he never received a fixed minimum wage or overtime wages.

Charter is also responsible for meal and rest break violations. Charter provided no evidence that it "affirmatively" carved out time during the three-week training period for Vazquez to take two 10-minute and one 30-minute lunch breaks.  Even if Vazquez could find time to take a break and have lunch, it does not relieve Charter of the responsibility to provide these statutorily required breaks. In addition, under the Code, Charter was required to maintain records that Vazquez

received daily breaks. There were no such records submitted in this matter. Accordingly, Charter is liable for failing to compensate Vazquez for rest and meal breaks.

Charter failed to maintain complete and accurate wage statements. Labor Code §226 requires that an employer provide "an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), . . . (5) net wages earned, . . . and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." The November 21, 2019, and December 5, 2019, wage statements provided by Charter fail to accurately reflect the number of hours Vazquez worked and the compensation he should have received during the training periods. Based on Charter's failure to provide the required information on the two wage statements, Vazquez is entitled to recover damages.

Likewise, Vazquez is entitled to waiting time penalties based on Charter's failure to pay him minimum wage and overtime. Labor Code §§201-202 provides that unpaid wages must be made when the employment relationship is terminated. Any defense proffered by Charter that it was unnecessary because Vazquez was an exempt employee is unreasonable and in bad faith. Accordingly, Charter should be penalized for waiting time penalties, costs, and attorney fees due to this Labor Code violation.

Finally, Vazquez is entitled to an award in his favor because Charter failed to give him a complete copy of his personnel records within the statutory 30-day period as requested. On April 26, 2021, Vazquez submitted a request to Charter's outside counsel for all personnel records related to his job performance. When the request was accepted, Vazquez was never told to submit the request to a different person. Yet, on May 26, 2021, when Charter responded to the request, Charter failed to produce all of Vazquez's personnel records. Specifically, the production did not

include the Employee Handbook, Vazquez's commission plan documents, the Code of Conduct or timekeeping policy, or all of Vazquez's job performance documents. Charter's failure to provide a complete personnel file violates Labor Code §1198.5, and Vazquez is entitled to the statutory penalty in the amount of $750 plus costs and attorney fees.

Charter has not met its burden of proof that Vazquez was an exempt employee during the training period. As such, Vazquez is entitled to recover damages for the multiple Labor Code violations that occurred because of Charter's intentional and willful misclassification.

**B. <u>Charter's Position</u>**

Charter properly classified Vazquez as an exempt employee because even during his training period, Vazquez spent more than 50% of his time outside of the office making sales calls and other sales-related activities. Vazquez meets the criteria of an exempt salesperson and is not entitled to meal breaks, rest breaks, overtime, or minimum wage. The California Supreme Court identified the criteria for exempting outside salespeople in *Ramirez v. Yosemite Water Co.*, (1999) 20 Cal.4th 785. The Court defined an "outside salesperson as any adult who customarily and regularly works more than half the working time away from the employer's place of business selling.... or obtaining orders." Here, Vazquez falls squarely within this definition and is therefore exempt.

First, during Vazquez's training, he shadowed an experienced salesperson in the field, negotiating sales and practicing his sales pitch between 4 to 7 hours a day in the field during the three weeks of his training. Vazquez only spent a maximum of four (4) hours a day in the classroom, and that was only during the first two weeks of his training. After his classroom training concluded, Vazquez worked exclusively in the field and did not go into the office. Vazquez confirmed that out of the 50 hours he worked during each week of his training, he spent a minimum

of thirty (30) hours in the field and most weeks much more than that, and definitely, more than 50% of his time was spent in the field as required to be considered exempt under California law. (*Ramirez*, 20 Cal.4[th] 785, 801; Wage Order No. 4-2001 §2(M).) The Court in *Ramirez* held that to determine if the employee is exempt, the arbitrator must examine "the realistic requirements of the job and how the employee is expected to spend his or her time." *Id.* Vazquez acknowledged that he worked 50 hours a week during the first two weeks of employment and 60 hours a week during his third week of training.[1]  Based on this admission, if he spent half of the time in the field on sales-related activities, he was properly classified as an exempt employee.

Vazquez testified that he went into the field every day he worked during the three-week training period. He also spent at least 4 hours in the field each Saturday he worked during the training period and 4.5 to 5 hours in the field on his first and third day of training. Thereafter, he spent 5.5 to 7 hours in the field during the remainder of his training and even spent up to 9 hours in the field on November 20 and 21, 2019. Vazquez confirmed that he spent at least 30 of the 50 hours in the field during his first week of training. During the second week, Vazquez spent a minimum of 31.5 hours out of 50 hours in the field, and during the third week, he spent a minimum of 38.5 hours in the field out of the 60 hours he worked. Based on these minimum hours he spent in the field and out of office, Vazquez clearly exceeded the 50% threshold requirement for an exemption pursuant to *Ramirez* and the Wage Order.

Second, while in the field, Vazquez acknowledged spending his time exclusively on sales and sales-related activities. Specifically, he shadowed experienced DSRs, knocked on doors to sell Charter products and services, received his own leads, and even made his first sale before

---

[1] There was some discrepancy in Vasquez's testimony regarding how much time was spent in the classroom.  The discrepancy was not only inconsistent with Vasquez's prior deposition testimony but also with the testimony given during the arbitration hearing.

completing his new-hire training period. Charter intentionally designed its in-office training to be shorter than the field training, as Vazquez was expected to spend most of his time there. While Vazquez spent the first few days completing paperwork and other onboarding tasks, such as reviewing self-guided orientation modules before going into the field, it was not until day 5 that he participated in four hours of instructor-led classroom training a day. The classroom training was always followed by at least 5 hours of sales-related activity in the field. Accordingly, Vazquez spent most of his training time in the field and outside the office, consistent with the description of exempt employees.  His job was advertised as a door-to-door sales position that required him to generate new business by identifying and engaging with potential customers in the field, and his compensation expressly included commission payments. Vazquez's claims of misclassification also failed based on Vazquez's prior sales experience and the fact he was aware he had applied for a field sales position.

However, even if he was misclassified, Vazquez did receive appropriate meal and rest breaks during the classroom component. The classroom training incorporated a 15-minute break every two hours of instruction, and he was free to take breaks at any other time as necessary, either in the field or in the office. Vazquez was also given the opportunity to take a lunch break. For example, Charter treated the new trainees to a 90-minute lunch at a local restaurant on the first day. On other training days, while there was no required or set time for lunch, Vazquez could have easily taken a lunch break before joining the DSR in the field. Vazquez never testified that he was denied either rest breaks or meal breaks, even though it was not required for exempt employees. Vazquez testified that he could not recall skipping lunch during his training period. Absent evidence that Charter forced Vazquez to skip his meal break or denied him his lunch break, Vazquez's misclassification claim fails.

Vazquez's wage and waiting time claims also fail. To prevail on wage and waiting time penalties, Vazquez must establish knowing and intentional or willful violation of California law. There is no such evidence of willful violation because Charter had a good faith belief that it had properly classified Vazquez as an exempt employee. Therefore, it neither intentionally nor knowingly failed to pay Vazquez consistent with the minimum wage rates associated with non-exempt employees.

Finally, Charter contends it provided Vazquez with all relevant documents even though he never properly requested certain documents from Charter. Vazquez failed to provide evidence that he requested his employment records; however, Charter voluntarily provided his personnel records in a timely manner and, therefore, should not be penalized for failing to respond to a request that was not substantiated. Additionally, Vazquez was not a credible witness because he repeatedly contradicted himself; therefore, all his testimony should be excluded.

Charter has established that it properly classified Vazquez as an exempt employee, and even if he was not exempt, Vazquez's Labor Code claims fail, and Charter is entitled to an award in its favor.

## V

## <u>DECISION</u>

Charter bears the burden of persuasion in this case to show it properly classified Vazquez as an exempt outside direct sales employee during his three-week training in November 2019. While Vazquez contends Charter failed to pay him minimum and overtime wages during the three-week training period and denied his rest and meal breaks, he failed to provide evidence to support these claims. Vazquez also alleges he is entitled to waiting time penalties for Charter's failure to pay him all the wages due to him. Moreover, Charter should be penalized for failing to respond to

a request for his employment records and failing to provide complete and accurate wage statements. Charter argues that it properly classified Vazquez as an exempt employee based on the advertised job description (JX 3) and that Vazquez spent more than fifty percent of his time in the field engaged in sales-related activities.  Accordingly, Charter maintains that there is no evidence it violated California labor laws or that Vazquez is entitled to any additional wages for the time spent during his three weeks of training.

After careful consideration and review of the evidence record before me, including the parties' arguments, relevant documents, legal citations, testimony of the witnesses, and their post-hearing briefs, the Arbitrator finds in favor of Respondent Charter Communications, LLC.

### 1. *Vazquez was an Exempt Employee*

First, Vazquez failed to present sufficient evidence to refute Charter's claim that he was properly classified as an exempt employee during his training period. According to Vazquez, he did not spend the required 51% of his time outside of the office engaged in sales-related activities. Vazquez's evidence, however, was simply not credible at arbitration. He provided inconsistent testimony regarding the amount of time he was in the office and the amount of time he was in the field. The inconsistency of his testimony was further complicated by the chart he submitted and his pre- and post-hearing briefs. Based on his chart, Vazquez contends he spent significantly less than 50% of his time in the field and should have been entitled to protections of California Labor Law and under the FLSA. However, Vazquez contradicted his deposition testimony wherein he acknowledged he received his leads list on the third day of training, which indicates that he was actively engaged in sales-related activities early in his training. At arbitration, Vazquez changed his statement and testified he did not receive the leads list until November 14, 2019, but he also made his first sale that same day. Regardless of when Vazquez received the list, there is no dispute

that the classroom training only lasted a maximum of four hours a day. Vazquez testified that after the classroom training, he frequently spent 5.5 to 7 hours a day in the field during his training.

Vazquez testified he was not denied rest or meal breaks, but his post-hearing brief asserts he was not provided rest and meal breaks as promised and was not given a tool for recording and recovering missed breaks. The contradictions in his testimony and hearing brief undermine Vazquez's claim that Charter misclassified him as an exempt employee. Hence, his testimony was not credible, and this Arbitrator is inclined to discount the self-serving testimony that frequently changed even during the hearing. Notwithstanding Vazquez's claims that he was non-exempt and that Charter was required to compensate him according to the rules outlined in the Fair Labor Standards Act ("FLSA"), Charter has nonetheless met its burden of proof and clearly established that Vazquez was an exempt employee.

California case law provides guidance on interpreting the Industrial Welfare Commission wage orders to determine whether an employee is exempt under the FLSA, especially where the employee performs both sales and non-sales tasks. *Ramirez v. Yosemite Water Company, Inc.* (1999) 20 Cal.4th 785, is found dispositive here. *Ramirez* relied on Wage Order No. 7-80 2(1) and defines an exempt employee as one who spends more than half of their time in the field engaged in sales-related activities away from the employer's place of business. The Court concluded that an outside salesperson is not just determined based on the amount of time spent in the field but also on the realistic requirements of the job. A careful review of the facts and examination of all the credible testimony supports the finding that Vazquez was an exempt employee during his three-week training period.  As discussed below, Charter has met its burden of proof that it properly classified Vazquez as an exempt employee.

The Arbitrator finds that Vazquez's frequent contradictions and unsupported claims fail to support his allegations of misclassification and Labor Code violations. Vazquez testified that during his training, he was only in the office for the first week of virtual classroom instruction and only for approximately four hours a day. The fact that subsequent testimony and arguments in Vazquez's brief contradict these statements is troubling. Accordingly, notwithstanding Vazquez's inconsistencies in testimony and arguments, Charter's exempt classification of Vazquez is appropriate once the Ramirez analysis is applied to the credible evidence.

According to the undisputed evidence, Vazquez's DSR position was advertised as a door-to-door salesperson, requiring him to spend most of his time selling Charter products and services in the field. (JX 3) The training he received during the three weeks was designed to develop and refine his sales acumen. Although some training time was spent in the office, Vazquez confirmed that he shadowed experienced DSRs in the field for up to 7 hours a day. (TR at 69:15-85:12) This training model was consistent with the salesperson's job description and the nature of the DRS position that Vazquez was hired to perform.

Vazquez even acknowledged that his goal was to make sales while in the field, and he used the time to mirror experienced DSRs and develop his sales pitch. He could only refine and improve this skill by working in the field. Although Vazquez contends that the time spent in the field during the first week of training cannot be counted as a sales-related activity because he was not actually "selling," his analysis is consistent with the holding in *Ramirez.* Even if Vazquez did not make any sales during this period, he was actively engaged in a sales-related activity.

 Vazquez observed an experienced DSR engaging with clients and making a sales pitch. He was in the field performing sale-related activities and learning to enter orders on the company-provided tablet. Vazquez testified he completed his first sale before his training was complete.

Based on the credible and corroborated evidence presented in this case, the Arbitrator finds that Charter properly classified Vazquez as an exempt employee.

### 2. *Charter Expected Vazquez to Engage in Sales-Related Activity*

When Charter advertised the position of direct sales representative, it expected that anyone hired for this position would work in the field, outside of the office, selling their products and services. As a result, Charter designed a training program that focused on outside sales-related activities, limiting the in-classroom instruction to a few hours a day and only during the first ten days of the training period. In addition to viewing a few hours of self-guided virtual in-classroom instruction, Vazquez was assigned to mirror and shadow experienced DSRs in the field, interacting with customers and observing the sales process firsthand.

Vazquez testified that on the first day, he went into the field with an experienced DSR and spent more and more time in the field during his three-week training. In fact, on his third day of training, Vazquez testified that he only spent an hour in the office doing classroom training before going into the field. (TR at 69:15-71:5)

Based on the evidence, the focus was clearly on Vazquez's direct hands-on experience in the field, not classroom instruction. Moreover, Vazquez was given his list of leads as early as the third training day. (TR at 65:10-23) Although Vazquez was not expected to do homework during his training period, he was expected to develop the field skills necessary to make verifiable sales transactions with customers based on hands-on instruction from the experienced DSRs. Given these facts by Charter, Vazquez clearly falls within the *Ramirez* requirements for identifying exempt employees satisfying the exempt employee criteria.

### 3. *Charter Did Not Violate the California Labor Code*

Vazquez contends Charter violated the California Labor Code when it failed to provide him

with complete and accurate wage statements and when it failed to respond to his request for his personnel records. Charter contends that Vazquez has no proof the request was properly delivered to Charter instead of the outside lawyer representing Charter in an unrelated case. Charter voluntarily provided Vazquez with a copy of his personnel file and relevant information. Vazquez could not provide evidence that he submitted a request for personnel records to the proper individuals. Since the personnel records were sent timely, Vazquez is not entitled to penalty payments, and his claim for violating the California Labor Code fails.

The evidence supports the conclusion that Charter properly classified Luis Vazquez as an exempt employee. Vazquez was not entitled to rest and meal breaks or minimum and overtime wages.  Accordingly, for the reasons stated above, Luis Vazquez's claim is hereby denied, and he is not entitled to recover any damages from the Respondent.

## VI

## <u>CONCLUSION</u>

The administrative fees of the American Arbitration Association, totaling $2,950.00, and the compensation of the Arbitrator, totaling $62,812.50, shall be borne as incurred by Charter.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

I, Claude Dawson Ames, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Respectfully submitted,

Dated: September 12, 2023             /s/ ***Claude Dawson Ames***
                                     Claude Dawson Ames, Arbitrator

---

Arbitrator's Decision and Award

# EXHIBIT 4

**OCTOBER 13, 2021 ORDER COMPELLING ARBITRATION**

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   LIONEL HARPER, DANIEL SINCLAIR,       No. 2:19-cv-00902 WBS DMC
     HASSAN TURNER, LUIS VAZQUEZ, and
13   PEDRO ABASCAL, individually and
     on behalf of all others
14   similarly situated and all           ORDER RE: DEFENDANT'S MOTIONS
     aggrieved employees,                 TO COMPEL ARBITRATION
15
                 Plaintiffs,
16
          v.
17
     CHARTER COMMUNICATIONS, LLC,
18
                 Defendant.
19

20

21                          ----oo0oo----

22        Plaintiffs Lionel Harper, Daniel Sinclair, Hassan

23   Turner, Luis Vazquez, and Pedro Abascal ("plaintiffs") brought

24   this putative class action against their former employer, Charter

25   Communications, alleging various violations of the California

26   Labor Code.  Among other things, plaintiffs allege that Charter

27   misclassified them and other California employees as "outside

28   salespersons," failed to pay them overtime wages, failed to

                                   1

provide meal periods or rest breaks (or premium wages in lieu

thereof), and provided inaccurate wage statements.  (See

generally Second Amended Complaint ("SAC") (Docket No. 147).)

Charter now moves to (1) compel arbitration of plaintiff Harper's

claims and stay the action and (2) compel arbitration of

plaintiff Turner, Vazquez, and Abascal's claims and dismiss them

from the case.  (Mots. to Compel Arbitration (Docket Nos. 162,

165).)[1]

I.   Facts & Procedural History

        Much of this case's factual background is set forth in

the court's accompanying Order Re: Plaintiffs' Motion to Modify

the Scheduling Order and for Leave to File a Third Amended

Complaint.  Accordingly, the court will not repeat it here except

where relevant to the instant motions.

    A.   Plaintiff Harper

        Plaintiff Harper worked for Charter from September 2017

to March 2018.  (SAC at ¶ 5 (Docket No. 147).)  Upon hire, Harper

signed an agreement to arbitrate "any and all claims, disputes,

and/or controversies between [Harper] and Charter arising from or

related to [Harper's] employment with Charter," designating JAMS

---

[1]     The parties have requested that the court take judicial
notice of two filings in Harper's related FEHA case, other
documents filed in this litigation, the American Arbitration
Association's rules and procedures, and two unpublished Los
Angeles Superior Court decisions addressing Charter's motions to
compel arbitration in other cases.  (See Docket Nos. 171, 184,
185.)  Plaintiffs object to Charter's request as to the Los
Angeles Superior Court decisions.  (See Docket No. 191.)  Because
the court does not find these materials relevant to this matter
or helpful in deciding any of the issues currently before the
court, however, the court declines to take judicial notice of
these materials.

1  as the arbitration provider and stating that JAMS rules,

2  procedures, and policies would govern arbitrations under that

3  agreement (the "JAMS Agreement"). (Order re Mot. to Compel Arb.

4  at 2 (Docket No. 24).) The JAMS Agreement included a waiver of

5  representative, collective, and class actions (the "Waiver") and

6  a severance and so-called "poison pill" provision. (Id. at 2.)

7  The severance provision stated that if any part of the agreement

8  was found to be void or unenforceable, that part would be severed

9  and the remainder enforced. (Id. at 2-3.) It went on to state

10 one exception (the "poison pill"): that if a dispute involved a

11 representative, collective, or class action claim, and the Waiver

12 were found to be invalid or unenforceable, "then th[e] entire

13 Agreement . . . shall be null and void and the dispute will not

14 be arbitrable." (Id. at 3.)

15      In October 2017, while Harper was still employed by

16 Charter, Charter adopted a new arbitration agreement requiring

17 arbitration of claims via "Solution Channel," Charter's

18 employment-based legal dispute resolution program, which provided

19 for arbitration under the rules of the American Arbitration

20 Association (the "Solution Channel Agreement"). (Id. at 3.)

21 When announcing the change, Charter notified employees that they

22 would be bound by the Solution Channel Agreement unless they

23 opted out within thirty days. (Id.) Harper did not do so.

24 (Id.)

25      In November 2018, Harper filed a Demand for Arbitration

26 and Request for Rulings as to Inarbitrability with JAMS, seeking

27 a ruling on whether his employment-related grievances against

28 Charter could be arbitrated under the JAMS Agreement. (Id. at 5-

3

1  6.)  Charter consented to and participated in the ensuing

2  arbitration process with JAMS, and in April 2019 an arbitrator

3  issued an award finding that Harper's wage-and-hour claims were

4  inarbitrable and dismissing the arbitration.  (Id. at 6; see Mot.

5  to Confirm Arb. Award, Ex. 16 ("Order of Dismissal"), at 157-66

6  (Docket No. 9-1).)

7        Specifically, the arbitrator determined that because

8  pre-dispute waivers of representative claims brought under PAGA

9  are unenforceable under California law, the JAMS Agreement Waiver

10 could not be enforced.  (Order of Dismissal at 159-61 (Docket No.

11 9-1) (citing Iskanian v. CLS Transp. L.A. LLC, 59 Cal. 4th 348,

12 384 (2014)).)  The arbitrator accordingly determined that this

13 activated the poison pill, nullifying the entire agreement.

14 (Id. at 163-65.)  The arbitrator rejected Charter's argument that

15 the poison pill be limited so as to nullify the agreement only as

16 to the representative, collective, or class action claim at issue

17 as contrary to the JAMS Agreement's plain text, which included no

18 such limitation.  (Id.)

19       In May 2019, after Harper had initiated this action in

20 state court, Charter sought to enforce the Solution Channel

21 Agreement against Harper, who refused.  (Order re Mot. to Compel

22 Arb. at 6-7 (Docket No. 24).)  In August 2019, this court

23 confirmed and entered judgment pursuant to the JAMS arbitration

24 award.  (Id. at 19.)  Further, the court found that there had

25 been a novation as a result of Charter's acquiescence to

26 arbitration under the JAMS Agreement rather than the Solution

27 Channel Agreement, held that any rights Charter had as against

28 Harper under the Solution Channel Agreement with respect to his

1    wage-and-hour claims were thus "dead and extinguished," and

2    denied a motion by Charter to compel arbitration under the

3    Solution Channel Agreement.  (Id. at 18-20.)[2]

4          In May 2021, Harper again sought employment with

5    Charter via an online application.  (Fries Decl. at ¶ 16, Ex. D

6    (Docket No. 162-1).)  When proceeding through Charter's online

7    application, applicants are presented with a webpage featuring

8    information about Charter's Solution Channel Agreement, with

9    links to the agreement itself and to Solution Channel Program

10   Guidelines, both of which applicants may save and print.  (Id. at

11   ¶¶ 7-10.)  To proceed with their application, applicants are

12   required to affirmatively agree to be bound by the Solution

13   Channel Agreement by clicking an "I Agree" button.  (Id. at

14   ¶ 11.)  They are informed that if they do not agree, they will be

15   removed from consideration for employment; their application is

16   not submitted, and they are given the option to begin the

17   application process again.  (Id. at ¶¶ 12-13.)  On May 23, 2021,

18   Harper consented to the Solution Channel Agreement and submitted

19   an online application to Charter.  (Id. at ¶ 16, Ex. D.)

20   _____

21        [2]     In late 2019, the court also adjudicated a separate,
     related action between Harper and Charter brought under

22   California's Fair Employment and Housing Act ("FEHA").  See
     Harper v. Charter Comms., LLC, 2:19-cv-01749 WBS DMC, 2019 WL

23   6918280 (E.D. Cal. Dec. 18, 2019).  There, Harper had also sought
     to arbitrate his FEHA claims under the JAMS agreement, but this

24   time Charter did not participate.  Id. at *2.  The court held
     that because "Charter did not engage with [Harper's] FEHA claims"

25   in the manner it had with his wage-and-hour claims, there had
     been no novation of arbitration agreements with respect to the

26   FEHA claims.  Id. at *3.  After determining that the Solution
     Channel Agreement applied to Harper's FEHA claims and was valid,

27   the court granted a motion by Charter to compel arbitration of
     those claims under that agreement.  Id. at *3-6.

28

                                  5

1        B.    <u>Plaintiffs Turner, Vazquez, and Abascal</u>

2        In addition to consenting to the Solution Channel

3 Agreement in order to complete Charter's online application,

4 individuals who accept offers of employment from Charter are

5 again required to consent to the same agreement, or else they

6 cannot become a Charter employee.  (Fries Decl. re Turner at

7 ¶¶ 9-18 (Docket No. 165-2).)  Plaintiff Turner submitted an

8 online application on May 23, 2018, consenting to the Solution

9 Channel Agreement, and subsequently completed Charter's employee

10 onboarding process, consenting to the agreement again.  (<u>Id.</u> at

11 ¶¶ 8, 19, Exs. A & B.)  Plaintiff Vazquez did the same,

12 submitting his application on October 9, 2019.  (Fries Decl. re

13 Vazquez at ¶¶ 8, 19, Exs. A & B.)  Plaintiff Abascal did as well,

14 submitting his application on November 5, 2019.  (Fries Decl. re

15 Abascal at ¶¶ 8, 19, Exs. A & B.)

16        C.   <u>The Solution Channel Agreement</u>

17        The Solution Channel Agreement contains several

18 provisions currently at issue.  It requires parties to the

19 agreement to resolve "all disputes, claims and controversies that

20 could be asserted in court or before an administrative agency for

21 which you or Charter have an alleged cause of action related to

22 pre-employment, employment, employment termination or post-

23 employment-related claims," including wage-and-hour-related

24 claims, through binding arbitration.  (Fries Aff., Ex. C

25 ("Solution Channel Agreement"), at §§ A, B(1) (Docket No. 165-

26 2).)

27        The agreement specifically excludes certain claims from

28 arbitration, including "[a]ny claims that have already been filed

1  in federal or state court at the time you execute this Agreement,

2  provided that such claims were not previously subject to any

3  arbitration agreement." (Id. at § C(14).)  It also includes a

4  merger clause, providing that the Solution Channel Agreement

5  represents the complete agreement between parties on the

6  resolution of covered disputes, but noting that "this Agreement

7  will not apply to the resolution of any charges, complaints, or

8  lawsuits that have been filed with an administrative agency or

9  court before the Effective Date of this Agreement." (Id. at

10 § P.)  Finally, like the JAMS Agreement, the Solution Channel

11 Agreement includes a waiver of representative, class, or

12 collective action claims.  (Id. at § D.)

13 II.  Analysis

14      The Federal Arbitration Act ("FAA") provides that a

15 written provision in a "contract evidencing a transaction

16 involving commerce to settle by arbitration a controversy

17 thereafter arising out of such contract . . . shall be valid,

18 irrevocable, and enforceable, save upon such grounds as exist at

19 law or in equity for the revocation of any contract."  9 U.S.C.

20 § 2.  Because arbitration is a matter of contract, "the central

21 . . . purpose of the FAA is to ensure that private agreements to

22 arbitrate are enforced according to their terms."  Stolt-Nielsen

23 S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010)

24 (internal quotations omitted); see also Perry v. Thomas, 482 U.S.

25 483, 490 (1987) (under the FAA, arbitration agreements "must be

26 rigorously enforced") (internal quotations omitted, alterations

27 adopted).

28      The FAA "leaves no place for the exercise of discretion

7

1   by a district court, but instead mandates that district courts

2   shall direct the parties to proceed to arbitration on issues as

3   to which an arbitration agreement has been signed." Dean Witter

4   Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985). Accordingly,

5   "the FAA limits courts' involvement to determining (1) whether a

6   valid agreement to arbitrate exists and, if it does, (2) whether

7   the agreement encompasses the dispute at issue." Cox v. Ocean

8   View Hotel Corp., 533 F.3d 1114, 1119 (9th Cir. 2008) (internal

9   quotations omitted).

10          "[A]s a matter of federal law, any doubts concerning

11   the scope of arbitrable issues should be resolved in favor of

12   arbitration, whether the problem at hand is a construction of the

13   contract language itself or an allegation of waiver, delay, or

14   like defense to arbitrability." Moses H. Cone Mem'l Hosp. v.

15   Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); see Poublon v.

16   C.H. Robinson Co., 846 F.3d 1251, 1259 (9th Cir. 2017) (same).

17   Upon a showing that a party has failed to comply with a valid

18   arbitration agreement, the district court must issue an order

19   compelling arbitration.  See Cohen v. Wedbush, Noble Cooke, Inc.,

20   841 F.2d 282, 285 (9th Cir. 1988).

21          The primary exception to courts' obligation to enforce

22   arbitration agreements under the FAA comes from the Act's "saving

23   clause," which "allows courts to refuse to enforce arbitration

24   agreements 'upon such grounds as exist at law or in equity for

25   the revocation of any contract.'" Epic Sys. Corp. v. Lewis, 138

26   S. Ct. 1612, 1622 (2018) (quoting 9 U.S.C. § 2).  Such "generally

27   applicable contract defenses" most frequently include "fraud,

28   duress, or unconscionability," but do not include "defenses that

8

1   apply only to arbitration." <u>AT&T Mobility LLC v. Concepcion</u>, 563

2   U.S. 333, 339 (2011) (internal quotations omitted).

3       A.   <u>Applicability of the Solution Channel Agreement</u>

4         Charter seeks to compel plaintiffs Harper, Turner,

5   Vazquez, and Abascal to submit their California Labor Code and

6   Unfair Competition Law ("UCL") claims to arbitration on an

7   individual basis. (<u>See</u> Mot. to Compel Arb. re Harper at 1

8   (Docket No. 162); Mot. to Compel Arb. re Turner, Vazquez, &

9   Abascal at 1 (Docket No. 165).) Plaintiffs contend that to do

10   so, Charter must prove that (1) a valid agreement to arbitrate

11   exists and (2) the agreement encompasses the claims Charter seeks

12   to arbitrate. (<u>See</u> Opp. to Mot. to Compel Arb. at 16-17 (citing

13   <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1130

14   (9th Cir. 2000)) (Docket No. 172); Opp. to Mot. to Compel Arb. at

15   14 (same) (Docket No. 173).)

16         Turner, Vazquez, and Abascal acknowledge that they each

17   executed the Solution Channel Agreement both when applying for

18   employment with Charter and when accepting their jobs, (<u>see</u> Opp.

19   to Mot. to Compel Arb. at 9-11 (Docket No. 173)), and Harper

20   acknowledges that he did when re-applying for employment with

21   Charter in May 2021, (<u>see</u> Opp. to Mot. to Compel Arb. at 14

22   (Docket No. 172)). On this basis, plaintiffs concede that a

23   valid agreement to arbitrate exists. (<u>See</u> <u>id.</u> at 17; Opp. to

24   Mot. to Compel Arb. at 14 (Docket No. 173).) Accordingly, the

25   question becomes whether the agreement applies to plaintiffs'

26   Labor Code and UCL claims, of which Charter seeks to compel

27

28

1    arbitration.[3]

2          The Solution Channel Agreement provides that "[y]ou and

3    Charter mutually agree that . . . any dispute arising out of or

4    relating to your pre-employment application and/or employment

5    with Charter or the termination of that relationship, except as

6    specifically excluded below, must be resolved through binding

7    arbitration." (Solution Channel Agreement at § A (Docket No.

8    165-2).)  This is followed by a section titled "Covered Claims,"

9    (id. at § B), which specifies that such disputes include "wage

10   and hour-based claims including claims for unpaid wages,

11   commissions, or other compensations or penalties (including meal

12   and rest break claims, claims for inaccurate wage statements,

13   [and] claims for reimbursement of expenses)," (id. at § B(1)).

14   The parties do not dispute that the claims of which Charter seeks

15   to compel arbitration clearly fall into this category.

16          However, that section is followed by another, titled

17   "Excluded Claims," which lists a variety of claims to which the

18   "Covered Claims" section does not apply.  (See id. at § C.)

19   Notably for purposes of the instant motions, these include "[a]ny

20   claims that have already been filed in federal or state court at

21   the time you execute this Agreement, provided that such claims

22   were not previously subject to any arbitration agreement."  (Id.

23

---

24          [3]   Although at oral argument the parties briefly discussed
     whether questions of arbitrability should themselves be submitted
25   to an arbitrator, neither party raised this issue in their
     briefing.  Accordingly, this court will decide whether
26   plaintiffs' claims are arbitrable rather than submit the issue to
     the arbitrator.  See also Momot v. Mastro, 652 F.3d 982, 987 (9th
27   Cir. 2011) (gateway issues of arbitrability are presumptively
     reserved for the court).
28

                                    10

1   at § C(14).)  The aforementioned merger clause, which appears

2   later in the agreement, also provides that "this Agreement will

3   not apply to the resolution of any charges, complaints, or

4   lawsuits that have been filed with an administrative agency or

5   court before the Effective Date of this Agreement."  (Id. at

6   § P.)

7          Plaintiffs argue that these two provisions operate to

8   exclude plaintiffs Vazquez and Abascal's claims from mandatory

9   arbitration under the agreement.  Specifically, they argue that

10  because plaintiff Harper had already filed this action by the

11  time Vazquez and Abascal executed the agreement, their claims

12  qualify as having "already been filed in . . . court" and having

13  "been filed with a[ ] . . . court before the Effective Date of

14  th[e] Agreement" under these provisions.[4]  (See Opp. to Mot. to

15  Compel Arb. at 15-19 (Docket No. 173).)

16         They argue the same as to Harper, given that he

17  executed the operative agreement in May 2021, after bringing this

18  action, and contend that his claims "were not previously subject

19  to any agreement" pursuant to section C(14) because the

20  agreements he previously signed were no longer in effect by May

21  2021.  (See Opp. to Mot. to Compel Arb. at 16-22 (Docket No.

22  172).)  In light of the differing arguments put forward with

23  respect to Harper and to the other plaintiffs for whom Charter

24  seeks to compel arbitration, the court will address the two

25  _____

26         [4]   Plaintiffs do not make this argument with respect to
    plaintiff Turner, as he had already executed the agreement when
27  this litigation began, and therefore they concede that sections
    C(14) and P do not apply to him.  (See Opp. to Mot. to Compel
28  Arb. at 17 n.6 (Docket No. 173).)

                                  11

1   groups separately.

2          1.   <u>Plaintiffs Turner, Vazquez, and Abascal</u>

3          Charter argues that Vazquez and Abascal improperly seek

4   to avoid arbitration by, in essence, piggybacking off of Harper's

5   already-filed claims, which they did not join until well after

6   executing the agreement.  (<u>See</u> Def.'s Reply at 5-10 (Docket No.

7   182).)  It contends that because section C creates exceptions to

8   section B's requirement that various claims be arbitrated, the

9   two sections must be read together, and that because section B by

10  its terms applies to "claims . . . for which <u>you</u> or Charter have

11  an alleged cause of action," the exclusion contained in section

12  C(14) is properly read to exclude only already-filed claims

13  between the <u>signing party</u> and Charter, rather than <u>any</u> already-

14  filed claims to which Charter is a party.  (Solution Channel

15  Agreement at § B(1) (emphasis added) (Docket No. 165-2); <u>see</u> <u>id.</u>

16  at 5-6.)  The court agrees.

17         Because, as a general matter, contract interpretation

18  is a matter of state law, the court looks to California law in

19  construing these provisions.  <u>See</u> <u>DIRECTV, Inc. v. Imburgia</u>, 577

20  U.S. 47, 54 (2015) (citing <u>Volt Info. Scis., Inc. v. Bd. of Trs.</u>

21  <u>of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 474 (1989)).

22  Three provisions of the California Civil Code, governing the

23  interpretation of contracts, are relevant here.  First, "[t]he

24  language of a contract is to govern its interpretation, if the

25  language is clear and explicit, and does not involve an

26  absurdity."  Cal. Civ. Code § 1638.  Second, "[a] contract must

27  be so interpreted as to give effect to the mutual intention of

28  the parties as it existed at the time of contracting, so far as

1   the same is ascertainable and lawful."  Id. at § 1636.  Third,

2   "[t]he whole of a contract is to be taken together, so as to give

3   effect to every part, if reasonably practicable, each clause

4   helping to interpret the other."  Id. at § 1641.

5           Under these provisions, it is clear that section C(14)

6   of the agreement cannot be read to prevent arbitration of Vazquez

7   and Abascal's claims by virtue of Harper's previously filed

8   claim.  Because section C specifically lists exclusions to

9   section B, the two must be read together.  See also id.  Per

10  section B's clear language, claims covered under that section —

11  and thus excluded under section C — are those between "You"

12  (i.e., the individual signatory) "and Charter."  This clearly

13  signifies an intention to require arbitration of claims — and

14  thus, under section C, exclude from arbitration — only claims

15  that might arise as between the signatory and Charter.  See id.

16  at §§ 1636, 1638.  To allow signatories to avoid arbitration of

17  otherwise-covered claims by joining suits filed by individuals

18  not party to the contract would plainly frustrate this intention.

19          For similar reasons, section P likewise does not

20  exclude Vazquez and Abascal's claims from arbitration.  As noted

21  above, the Solution Channel Agreement's core provisions specify

22  that it applies to disputes between "You and Charter."  Although

23  section P does not directly incorporate this language in the

24  manner that section C does, to apply it in plaintiffs' preferred

25  manner would run counter to the contract's central purpose, which

26  is to require arbitration of disputes.  See id. at § 1636.  And

27  to the extent that this omission creates a conflict between

28  sections P and C(14), "in a contract, when a general and

13

1   particular provision are inconsistent, the latter is paramount to

2   the former," meaning that "a particular intent will control a

3   general one that is inconsistent with it." Karpinski v. Smitty's

4   Bar, Inc., 246 Cal. App. 4th 456, 464 (1st Dist. 2016) (internal

5   quotation marks and citation omitted).

6          For these reasons, together with the FAA's mandate that

7   any doubts as to an arbitration agreement's applicability be

8   resolved in favor of arbitration, see Moses H. Cone Mem'l Hosp.,

9   460 U.S. at 24–25; Poublon, 846 F.3d at 1259, the court concludes

10  that the Solution Channel Agreement applies to compel arbitration

11  of Vazquez and Abascal's claims.  Plaintiffs do not contest that

12  the agreement applies to Turner's claims, and sections C(14) and

13  P clearly do not exclude them, as this action had not yet been

14  filed at the time he executed the agreement.  Accordingly, the

15  court concludes that the Solution Channel Agreement applies to

16  Turner's claims as well.

17          2.   Plaintiff Harper

18          Plaintiffs also contend that section P of the agreement

19  excludes Harper's claims from its coverage.  (See Opp. to Mot. to

20  Compel Arb. at 18-19 (Docket No. 172).)  They further argue that,

21  because this court confirmed the JAMS arbitrator's award finding

22  that the JAMS agreement was "null and void," and because it

23  subsequently held that Charter's acquiescence to the JAMS

24  arbitration effected a novation of Harper's first Solution

25  Channel contract — rendering it "dead and extinguished" —

26  Harper's claims do not qualify as "previously subject to any

27  arbitration agreement" under section C(14).  (See id. at 20-22.)

28  Accordingly, they argue that section C(14) excludes Harper's

14

1  claims from coverage under the agreement as well.  (See id.)

2      As noted above, section C(14) provides that the

3  agreement excludes "[a]ny claims that have already been filed in

4  federal or state court at the time you execute this Agreement,

5  provided that such claims were not previously subject to any

6  arbitration agreement."  (Solution Channel Agreement at § C(14)

7  (Docket No. 165-2).)  Thus, because it is undisputed that

8  Harper's claims had already been filed in court when he executed

9  the agreement, (see Opp. to Mot. to Compel Arb. at 20 (Docket No.

10  172)), the only question is whether those claims "were . . .

11  previously subject to any arbitration agreement," (Solution

12  Channel Agreement at § C(14) (Docket No. 165-2)).  The court

13  concludes that they were.

14      While Harper was employed by Charter, he consented to

15  the JAMS Agreement, and later to the Solution Channel Agreement.

16  Plaintiffs argue that the JAMS arbitrator's determination that

17  the JAMS Agreement was invalid means that Harper's claims were

18  never "subject to" that agreement, contending that claims are

19  only "subject to" an arbitration agreement if they are validly

20  required to be arbitrated under that agreement.  (See Opp. to

21  Mot. to Compel Arb. at 20 (Docket No. 172).)

22      The court assumes, for these purposes, that plaintiffs'

23  construction of "subject to" is correct, such that Harper's

24  claims were not "previously subject to" the JAMS Agreement.  Even

25  so, it is clear that they were nonetheless "previously subject

26  to" the Solution Channel Agreement.  Although this court

27  determined that there was a subsequent novation, extinguishing

28  that agreement, the fact remains that for a period of time --

15

1   beginning when Harper first executed the Solution Channel

2   Agreement and ending with Charter's acquiescence to the JAMS

3   arbitration -- Charter could have asserted the Solution Channel

4   Agreement against Harper with respect to any wage-and-hour claims

5   he had.  Under the plain meaning of "previous" -- earlier in time

6   -- Harper's claims, at the time he executed the Solution Channel

7   Agreement in May 2021, were "previously subject to" the earlier-

8   signed copy of the same agreement.  As such, Harper's claims are

9   not excluded from arbitration under section C(14).[5]

10          To the extent that Harper challenges Charter's ability

11  to compel him to arbitrate his individual claims arising out of

12  his prior employment because his latest execution of the Solution

13  Channel Agreement occurred when he applied for another position,

14  (see id. at 14), at least one other district court in California

15  has already held that the Solution Channel Agreement applies in

16  such circumstances.  In Durruthy v. Charter Communications, LLC,

17  like in this case, the plaintiff was hired by Charter, was later

18  terminated, subsequently reapplied for employment, and in doing

19  so executed the agreement, which Charter then sought to enforce

20  against her.  Durruthy, 20-CV-1374-W-MSB, 2020 WL 6871048, at *1

21  (S.D. Cal. Nov. 23, 2020).  As the court in the Southern District

22  _____

23          [5]   Plaintiffs contend that to find that Harper's claims
    were previously subject to the initial Solution Channel
24  Agreement, the court would need to reconsider whether that
    agreement was extinguished by the previously mentioned novation,
25  which they argue the court is precluded from doing under the law
    of the case doctrine.  (See Opp. to Mot. to Compel Arb. at 21
26  (Docket No. 172).)  However, plaintiffs are mistaken in their
    logic, as finding that an applicable agreement had terminated is
27  not the same as concluding that it was never applicable in the
    first place.  Although the court did the former, it did not do
28  the latter.

                                    16

of California observed:

> The Agreement covers "any dispute arising out of or relating to [an applicant's] preemployment application and/or employment with Charter or the termination of that relationship . . . ." The Agreement does not limit its application to future employment, nor does it exclude claims from prior employment periods. Therefore, an objective reading supports that "employment" reasonably means any employment period between the two parties of the agreement. . . . . Plaintiff's alleged lack of consent to arbitrate claims from her prior employment period with Defendant are absent from the Agreement, and "unexpressed subjective intentions are irrelevant . . . ."

Id. at *4-5 (quoting Martinez v. BaronHR, Inc., 51 Cal. App. 5th 962, 970 (2020)) (alterations in original). This court agrees with the Durruthy court's analysis of this issue.[6]

For the foregoing reasons, the court concludes that the Solution Channel Agreement applies to Harper's claims.

B.   Unconscionability

Plaintiffs also argue that the Solution Channel Agreement is unconscionable. (See id. at 22-38; Opp. to Mot. to Compel Arb. at 19-34 (Docket No. 173).) If true, this would mean that the contract was not validly entered into in the first instance, allowing the court to invalidate the agreement pursuant to the FAA's saving clause. See Concepcion, 563 U.S. at 339.

"Unconscionability under California law has 'both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the

---

[6]   This court's agreement with the Durruthy court's evaluation of the Solution Channel Agreement, however, does not extend to its unconscionability analysis.

1    latter on overly harsh or one-sided results.'"  Kilgore v.

2    KeyBank, Nat'l Ass'n, 673 F.3d 947, 963 (9th Cir. 2012) (quoting

3    Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th

4    83, 99 (2000)).  While courts "use a 'sliding scale' in analyzing

5    these two elements . . . . [n]o matter how heavily one side of

6    the scale tips . . . , both procedural and substantive

7    unconscionability are required for a court to hold an arbitration

8    agreement unenforceable."  Id. (citing Armendariz, 24 Cal. 4th at

9    99).

10         This court previously assessed whether the Solution

11   Channel Agreement is unconscionable in the related action between

12   plaintiff Harper and Charter.  See Harper v. Charter Comms., LLC,

13   2:19-cv-01749 WBS DMC, 2019 WL 6918280, at *5-6 (E.D. Cal. Dec.

14   18, 2019).  There, the court determined that the agreement was

15   not procedurally unconscionable, relying in large part on the

16   fact that when Harper was first confronted with the Solution

17   Channel Agreement, it was via an email notifying employees of

18   their ability to opt out of the agreement within thirty days.

19   Id. at *1, 5 (citing Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d

20   1052, 1058-59 (9th Cir. 2013) (en banc) (deeming an arbitration

21   agreement not procedurally unconscionable because it noted the

22   option to opt out within sixty days of signing)).  Here, on the

23   other hand, there is no indication that plaintiffs were given the

24   same option to opt out; indeed, they assert that they received

25   none, (see Opp. to Mot. to Compel Arb. at 24 (Docket No. 172);

26   Opp. to Mot. to Compel Arb. at 21 (Docket No. 173)), which

27   Charter does not contest, (see Def.'s Reply at 15-17 (Docket No.

28   182); Def.'s Reply at 16-18 (Docket No. 183)).

                                  18

1      The Ninth Circuit has previously held that an

2  arbitration agreement was procedurally unconscionable where it

3  was presented to employees "on an adhere-or-reject basis," with

4  no opportunity to opt out.  See Ingle v. Circuit City Stores,

5  Inc., 328 F.3d 1165, 1172 (9th Cir. 2003); see also Steele v. Am.

6  Mortg. Mgmt. Servs., 2:12-cv-00085 WBS JFM, 2012 WL 5349511, at

7  *4-5 (E.D. Cal. Oct. 26, 2012) (holding pre-employment

8  arbitration agreement procedurally unconscionable because it did

9  not contain an opt-out clause).  Conversely, it has also held

10 that an arbitration agreement that included an opt-out provision

11 was not procedurally unconscionable.  See Mohamed v. Uber Techs.,

12 Inc., 848 F.3d 1201, 1211 (9th Cir. 2016).

13      Thus, an arbitration agreement that individuals are

14 required to sign as a condition of employment, with no ability to

15 opt out, is procedurally unconscionable, though Ninth Circuit

16 precedent also establishes that this form of procedural

17 unconscionability is "low" on California's sliding scale

18 analysis.  See Poublon, 846 F.3d at 1261.  In such a situation,

19 if "there is no other indication of oppression or surprise, then

20 the agreement will be enforceable unless the degree of

21 substantive unconscionability is high."  Id.

22      Regardless of the particular degree of procedural

23 unconscionability present here, however, in order for their

24 unconscionability defense to succeed, plaintiffs must also show

25 that the agreement is substantively unconscionable.  See Kilgore,

26 673 F.3d at 963.  And as this court previously held in the

27 related action between Harper and Charter, in which Charter

28 sought to enforce the Solution Channel Agreement against him with

19

1    respect to claims not present in the current litigation, the

2    agreement is not substantively unconscionable.  See Harper, 2019

3    WL 6918280, at *5-6.[7]  Because the agreement at issue in this

4    litigation is the same as the one upon which the court ruled in

5    the separate litigation, and plaintiffs do not allege that it has

6    changed,[8] the court again concludes that the Solution Channel

7    Agreement is not substantively unconscionable.

8         Because the Solution Channel Agreement is not

9    substantively unconscionable, plaintiffs' unconscionability

10   defense must fail.

11        C.   California Labor Code Section 432.6

12        [7]   Specifically, the court determined that (1) the
     Solution Channel review process was not one-sided, as Harper
13   contended, but rather its requirements applied equally to
     employees and to Charter; (2) the agreement did not enable
14   Charter to conclusively decide whether a claim is arbitrable,
     instead providing claimants the ability to proceed with
15   arbitration on this and other issues; and (3) a provision of the
     agreement requiring "each party [to] bear its own attorney's fees
16   regardless of the action brought," although unenforceable under
     California law, could be severed pursuant to the agreement's
17   severability clause in light of the court's determination that
     the agreement was "not otherwise permeated by unconscionability."
18   See Harper, 2019 WL 6918280, at *5-6 (citing Serpa v. Cal. Sur.
     Investigations, Inc., 215 Cal. App. 4th 695, 709-10 (2d Dist.
19   2013)).
          [8]   Although plaintiff Harper refers to the Solution
20   Channel Agreement to which he consented the first time as the
     "Old SC Agreement" and the one to which he consented when re-
21   applying as the "New SC Agreement," his bases for these
     differences in nomenclature are that the former was included in
22   an email informing him that he could opt out, whereas the latter
     was not — not that the agreement itself had changed.  (See Opp.
23   to Mot. to Compel Arb. at 9 n.1 (Docket No. 172).)
          Moreover, the Solution Channel Agreement is dated
24   September 25, 2017 — well before plaintiffs Turner, Vazquez, and
     Abascal first applied for employment with Charter — further
25   indicating that it had not changed between when plaintiff Harper
     first signed it and when they did.  (See Solution Channel
26   Agreement (Docket No. 165-2); supra Section II.B.)

27

28

1          Finally, in supplemental briefing, plaintiffs argue

2     that the Ninth Circuit's recent decision in <u>Chamber of Commerce</u>

3     <u>of the United States v. Bonta</u>, — F.4th —, 2021 WL 4187860 (9th

4     Cir. Sept. 15, 2021), precludes enforcement of the Solution

5     Channel Agreement against Harper.  (<u>See</u> Not. of Supp. Auth. at 2

6     (Docket No. 196).)  That decision upheld part of California Labor

7     Code section 432.6, which prohibits employers from "requir[ing]

8     any applicant for employment or any employee to waive any right,

9     forum, or procedure" established under the Labor Code or

10    California Fair Employment and Housing Act as a condition of

11    employment, on the basis that it was not preempted by the FAA.[9]

12    <u>See</u> <u>id.</u> at *4-10; Cal. Lab. Code § 432.6(a).

13         Plaintiffs contend that under <u>Chamber of Commerce</u>,

14    Charter's use of the Solution Channel Agreement violates section

15    432.6 because Harper's consent to the agreement was a mandatory

16    condition for consideration of his application and for any

17    subsequent employment, with no ability to opt out.  (<u>See</u> Not. of

18    Supp. Auth. at 2 (Docket No. 196).)  Per <u>Chamber of Commerce</u>'s

19    clear language, however, whether this requirement violated

20    section 432.6 has no effect on the court's present decision to

21    enforce the Solution Channel Agreement: "§ 432.6 does not make

22    invalid or unenforceable any agreement to arbitrate, <u>even if such</u>

23    <u>agreement is consummated in violation of the statute</u>."  2021 WL

24    4187860, at *7 (emphasis added); <u>see also</u> 2021 WL 4187860, at *6

25

26         [9]     Because section 432.6 came into effect after Turner,
      Vazquez, and Abascal executed the Solution Channel Agreement, but
27    before Harper did in May 2021, plaintiffs only contend that the
      Ninth Circuit's decision applies to Harper.  (<u>See</u> Not. of Supp.
28    Auth. at 2 n.1 (Docket No. 196).)

                                    21

1 ("§ 432.6 cannot be used to invalidate, revoke, or fail to

2 enforce an arbitration agreement . . . .").

3          The most that Chamber of Commerce does to aid employees

4 who seek to challenge arbitration agreements is to simply

5 reaffirm the applicability of the FAA's saving clause to

6 arbitration agreements under section 432.6.  See id. at *6

7 (citing Cal. Lab. Code § 432.6(f) ("Nothing in this section is

8 intended to invalidate a written arbitration agreement that is

9 otherwise enforceable under the [FAA].")) (other citations

10 omitted).  In doing so, the Ninth Circuit observed, in dicta:

11          [A]n employee may attempt to void an
           arbitration agreement that he was compelled
12         to enter as a condition of employment on the
           basis that it was not voluntary.  If a court
13         were to find that such a lack of
           voluntariness is a generally applicable
14         contract defense that does not specifically
           target agreements to arbitrate, the
15         arbitration agreement may be voided in
           accordance with saving clause jurisprudence.
16

17 Id. at *9.  However, here the court has addressed Harper's

18 "generally applicable contract defense[s]" and determined that

19 they do not apply here.  Chamber of Commerce thus has no impact

20 on this decision.

21          For the foregoing reasons, the court will grant

22 Charter's motions to compel arbitration of plaintiffs Harper,

23 Turner, Vazquez, and Abascal's individual claims.

24     D.   Motions to Dismiss or Stay Judicial Proceedings

25          In its motion to compel arbitration of Harper's Labor

26 Code and UCL claims, Charter requests that, should the court

27 grant that motion, the court stay this case -- including Harper's

28 PAGA claim -- pending arbitration of the other claims.  (See Mot.

22

1  to Compel Arb. re Harper at 23-24 (Docket No. 162).)  Charter

2  suggests that although it has not sought arbitration of the PAGA

3  claim, staying proceedings as to the PAGA claim would avoid

4  conflicting rulings between this court as to the PAGA claim and

5  the arbitrator as to the other claims.  (See id. at 24.)

6  Plaintiffs oppose this request, pointing out that because this

7  court will not be bound by any rulings the arbitrator might make,

8  staying Harper's PAGA claim would not in fact avoid conflicting

9  rulings.  (See Opp. to Mot. to Compel Arb. at 38-39 (Docket No.

10  172).)  They further argue that proceedings as to the PAGA claim

11  should not be stayed because of the distinct nature of a PAGA

12  claim, which belongs to the state rather than to Harper.  (See

13  id. at 39.)

14          Further, in its motion to compel arbitration of Turner,

15  Vazquez, and Abascal's claims, Charter also requests that, should

16  the court grant that motion, the court dismiss those plaintiffs

17  from the case.  (See Mot. to Compel Arb. re Turner, Vazquez, &

18  Abascal at 20-21 (Docket No. 165).)  Plaintiffs oppose this

19  request and instead request that the court stay proceedings as to

20  these plaintiffs pending arbitration of their individual claims.

21  (See Opp. to Mot. to Compel Arb. at 35 (Docket No. 173).)  In

22  response to the court's questioning at oral argument, counsel for

23  plaintiffs indicated that they preferred a stay of plaintiff

24  Sinclair's individual claims pending arbitration of the other

25  plaintiffs' individual claims.

26          The FAA provides that, where a suit presents "issue[s]

27  referable to arbitration under an agreement in writing for such

28  arbitration," the court "shall on application of one of the

23

1   parties stay the trial of the action until such arbitration has

2   been had." 9 U.S.C. § 3.  Further, the Supreme Court has stated

3   that "[i]n some cases, it may be advisable to stay litigation

4   among the nonarbitrating parties pending the outcome of the

5   arbitration."  Moses H. Cone Memorial Hosp. v. Mercury Constr.

6   Corp., 460 U.S. 1, 20 n.23 (1983).

7           Because plaintiffs have requested a stay of Turner,

8   Vazquez, and Abascal's individual claims, the court will stay

9   those claims pending arbitration.  Additionally, because Charter

10  has requested that the court otherwise stay this case pending

11  arbitration of Harper's individual claims, because plaintiffs'

12  counsel supported a stay of Sinclair's individual claims at oral

13  argument, and because the court agrees that a stay of Sinclair's

14  claims pending arbitration is "advisable," the court will stay

15  Sinclair's individual claims pending arbitration as well.

16          However, because a stay would impede vindication of

17  California's interests in enforcing the Labor Code through

18  representative PAGA actions, discussed above, and because the

19  PAGA claim represents a distinct "action" in this case, the court

20  will not stay Harper's PAGA claim.  See Jarboe v. Hanlees Auto

21  Grp., 53 Cal. App. 5th 539, 557 (1st Dist. 2020) ("Because a PAGA

22  claim is representative and does not belong to an employee

23  individually, an employer should not be able dictate how and

24  where the representative action proceeds.").

25          IT IS THEREFORE ORDERED that Charter's Motions to

26  Compel Arbitration (Docket Nos. 162, 165) be, and the same hereby

27  are, GRANTED.

28          IT IS FURTHER ORDERED that, as to the claims presented

in Counts One through Nine of the Second Amended Complaint only,
this action is STAYED pending arbitration of plaintiff Harper,
Turner, Vazquez, and Abascal's individual claims.

Dated:  October 12, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE