# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIONEL HARPER, DANIEL SINCLAIR, HASSAN TURNER, and LUIS VAZQUEZ, individually and on behalf of all others similarly situated and all aggrieved employees,<br><br>    Plaintiffs,<br><br>v.<br><br>CHARTER COMMUNICATIONS, LLC,<br><br>    Defendant. | Case No.   2:19-cv-00902-DC-DMC<br><br>Magistrate Judge Dennis M. Cota<br><br>**ORDER GRANTING JOINT MOTION TO APPROVE AGREEMENT REGARDING ADDITIONAL DISCOVERY MATTERS**<br><br>Close of Discovery:   TBD<br>Trial:   TBD |

    Having read and considered the Stipulation and Joint Motion to Approve Agreement Regarding Additional Discovery Matters (Stipulation), which is signed by all counsel, ECF No. 466, the Court hereby **APPROVES** the Stipulation, **GRANTS** the Joint Motion, and **ADOPTS** the parties' discovery agreement described below as an order of the Court.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Direct Sales Employee New Hire Training Records**

Plaintiffs have requested that Charter search for, collect, and produce all of the following training records for all direct sales employee[1] putative class members and alleged aggrieved employees:

- ***New Hire Training Schedules.*** *See* Dkt. 417–13; Dkt. 417–17; Dkt. 417–19; Dkt. 418–6; Dkt. 426–8; Dkt. 426–9.[2]
- ***New Hire Classroom Training Scheduling Emails.*** *See* Dkt. 417–21; Dkt. 418–6.
- ***New Hire Training Welcome Kits.*** *See* Dkt. 417–20; Dkt. 418–6; Dkt. 418–9.
- ***Supervisor New Hire Training Checklists and Sales Supervisor New Hire Training Schedules.*** *See* Dkt. 417–19.
- ***New Hire Training Guides, Lesson Plans, Agendas, Calendars, and Similar Records.*** *See* Dkt. 417–16; Dkt. 417–17; Dkt. 418–6; Dkt. 418–9.

Charter has represented that (a) it has already searched for, collected, and produced examples of each of the above categories of training records, (b) any additional examples it could recover would be substantially similar to the records it has already produced, and (c) it would cost hundreds of thousands of dollars and take months to search of tens of millions of records and produce any additional examples that it may be able to recover.

The parties have met and conferred and now stipulate and agree to the following:

1. To the extent that training records reflect Charter's expectations for what direct sales employees would do in new hire training, the training records that Charter has already produced reflect its expectations and requirements for new hire trainees for the periods and positions covered by such records.

2. To the extent any training records or schedules reflect hours during which trainings allegedly occurred, it can be assumed that the trainings began and ended on the times reflected on the records. To the extent any training records or schedules reflect certain

---

[1] "Direct sales employees" include Account Executives, Direct Sales Representatives (now called Residential Connectivity Sales Specialists), and Multi-Tenant Sales Representatives.

[2] The docket entries and Bates numbers listed in this Stipulation provide examples of relevant records but do not necessarily reflect all of the relevant records that Charter has produced for each category.

activities, it can be assumed that those activities were performed. The parties do not stipulate, however, that the absence of a reference to a meal or rest period in the record means that meal and rest periods were not provided.

3. For any given training record in any particular position, the start and stop times, lengths, and activities reflected in that record will be presumed to have remained the same until a new version of that record reflects changes to start and stop times, lengths, or activities to be performed (e.g., the lengths of a virtual training class reflected in a 2019 scheduling email remained the same until later scheduling emails reflected different lengths of classes).

4. Charter does not contend that the start and stop times, lengths, and activities reflected in the training records it has already produced are inaccurate or incomplete (e.g., Charter does not contend that training scheduled to start and stop at specific times actually started or stopped at different times, that training scheduled for X hours actually took Y hours, or that the activities identified in the records were not the activities actually performed). By agreeing to the accuracy of the documents, Charter does not agree that every employee scheduled for a particular training attended the training for the full length of the scheduled training. In addition, Charter is entitled to rely on evidence it has already produced to show that trainers may have set aside time for breaks not expressly identified in a training schedule.

5. Charter is permitted, but not required, to supplement its production of these or similar training records. If Charter chooses to supplement its production of training records, then it must (a) do so by January 1, 2026, (b) produce examples of all relevant training records for all direct sales employee positions, (c) certify that the examples are representative of the putative class members and alleged aggrieved employees during the applicable time periods, and (d) meet and confer with Plaintiffs to explain and confirm how it selected such examples and why they are representative.

6. If Charter chooses not to supplement its production of training records, then it will be precluded from arguing or soliciting testimony that there were material changes or

differences to the start and stop times, lengths, and activities reflected in the records that it has already produced.

**Direct Sales Employee WebEx Recordings of Classroom Training Sessions**

Plaintiffs have requested that Charter search for, collect, and produce all WebEx recordings of new hire classroom training sessions that were created between November 19, 2014 and the present.

Charter has confirmed that it cannot recover any WebEx recordings of classroom training sessions that were created before January 2023. Charter has produced a sampling of 28 WebEx recordings of classroom training sessions that were created in 2023 and 2024, and a spreadsheet listing the titles, dates, and start and stop times of WebEx recordings that were created between 2021 and 2024. Charter has represented that it would cost hundreds of thousands of dollars and take months to collect and produce all of the WebEx recordings of classroom training sessions that were created from January 2023 to the present.

The parties have met and conferred and now stipulate and agree to the following:

1. Sixty days before the deadline set for expert disclosures, Charter will produce an updated spreadsheet listing the titles, dates, and start and stop times of all WebEx recordings of new hire classroom training sessions from 2021 through the present.

2. The parties may use the spreadsheet(s) and the sampling of 28 WebEx recordings that Charter has already produced for any otherwise permissible evidentiary purpose.

3. Charter is permitted, but not required, to supplement its production of WebEx recordings. If Charter chooses to supplement its production of WebEx recordings, then it must (a) produce examples for all direct sales employee positions by January 1, 2026, (b) certify that the examples are representative of all putative class members and aggrieved employees during the applicable time periods, and (c) meet and confer with Plaintiffs to explain and confirm how it selected such examples and why they are representative.

**Training Weeks Wage Statements**

Plaintiffs have requested that Charter produce all "training weeks wage statements"[3] for all direct sales employee putative class members and alleged aggrieved employees.

Charter has represented that collecting and producing all training weeks wage statements would be expensive and take weeks or months to complete.

The parties have met and conferred and now stipulate and agree to the following:

1. The thousands of wage statements that Charter has already produced include representative training weeks wage statements.
2. Charter has not materially changed the form or content of its training weeks wage statements since its last production of wage statements.
3. The typical direct sales employee new hire trainee received two training weeks wage statements.
4. If Charter is found liable for classwide or other systematic training weeks wage statement violations, and if Charter and/or Plaintiffs have a good faith belief (based on objective records or data) that certain employees or groups of employees received fewer than or more than two training weeks wage statements during the relevant period, then the parties will meet and confer and agree on a methodology to determine who received only one training weeks wage statement and who received three or more training weeks wage statements.

**No Audits of New Hire Training**

Plaintiffs have requested that Charter collect and produce all records related to any audits or observations that its Internal Audit Service or a similar group conducted related to direct sales employee new hire training, including the amount of time new hire trainees spent performing work activities outside of the office.

Charter has confirmed that there are no responsive records.

---

[3] The parties agree that "training weeks wage statements" are wage statements that cover one or more workdays when a direct sales employee was participating in new hire training.

**Commission Wage Statements**

Plaintiffs have requested that Charter produce all "commission wage statements"[4] for all commission-eligible putative class members and alleged aggrieved employees.

Charter has represented that collecting and producing all commission wage statements would cost tens of thousands of dollars and take weeks or months to complete.

The parties have met and conferred and now stipulate and agree to the following:

1. The thousands of wage statements that Charter has already produced include representative commission wage statements.

2. Charter has not materially changed the form or content of its commission wage statements since its last production of wage statements.

3. As soon as reasonably possible, but by no later than December 31, 2025, Charter will produce a spreadsheet reflecting the relevant information that appeared on each commission wage statement for each commission-eligible putative class member and alleged aggrieved employee, which would include the amount of each commission/incentive payment paid during the relevant period and any corresponding dates attributable to the payment. Charter may be required to update this spreadsheet prior to trial to cover any gap period between the end of the data and the close of the class/PAGA period.

4. The parties shall meet and confer and agree on the commission wage statement information that Charter will include in the records or files it produces.

**Commission Plan Acknowledgment Data**

Plaintiffs have requested that Charter collect and produce all commission plan acknowledgment data for all commission-eligible alleged aggrieved employees.

---

[4] The parties agree that "commission wage statements" are wage statements that include payment of monthly or quarterly commission or commission allowance wages. These payments are identified on wage statements as "Comm Supp" payments for most employees, and as "Ad Sales" payments for Spectrum Reach advertising sales employees.

-6-

Charter has already produced a collection of spreadsheets containing commission plan acknowledgment data and e-learn data. *See* CHAR-HAR 328602-328672. Charter also has confirmed there are no responsive audit records created by its Internal Audit Services personnel.

The parties have met and conferred and now stipulate and agree that sixty days before the deadline set for expert disclosures, Charter will update its previous production of commission plan acknowledgement data and identify what it contends to be the best evidence showing that individual "aggrieved employees" acknowledged the terms of the applicable commission plan documents, and showing the dates that any such acknowledgments occurred.

### Offer Letters for Commission-Eligible Employees

Plaintiffs have requested that Charter collect and produce all offer letters for commission-eligible employees so Plaintiffs can show that Charter gave employees notice that they could earn commissions under the terms of its commission plan documents.

Charter has already produced a sampling of offer letters, and it has represented that it would be expensive and time consuming to collect and produce thousands of offer letters for all commission-eligible employees.

The parties have met and conferred and now stipulate and agree that:

1. All commission-eligible employees received an offer letter informing them that the position they were offered was eligible to earn commissions under the terms of Charter's commission plan documents.

2. Both the offer letters and the commission plan acknowledgment process gave employees notice of Charter's commission plan documents.

3. Employees agreed to the terms of Charter's commission plan documents both by accepting a commission-eligible position and by completing the commission plan acknowledgment process.

### Class and PAGA List and Position Histories

Plaintiffs have requested that Charter produce updated position histories lists and an updated class and PAGA list that identifies all commission-eligible employees and all direct sales employees

who are putative class members and/or alleged aggrieved employees.[5] Plaintiffs also have requested that the class and PAGA list identify the direct sales employee putative class members and alleged aggrieved employees by position (e.g., Account Executive, Direct Sales Representative, Multi-Tenant Sales Representative).

Charter has produced numerous position history spreadsheets and multiple versions of a class and PAGA list. Charter represents that it can produce updated position history spreadsheets and an updated class and PAGA list that identifies (a) all commission-eligible employees, and (b) all direct sales employees by position.[6]

The parties have met and conferred and now stipulate and agree that Charter will produce updated position history spreadsheets and an updated class list within 14 business days of the date of a class certification order as necessary to send class notice to all putative class members (a subset of which are the PAGA "aggrieved employees"). The updated class list will include the same information as the previous class lists, and will also identify the direct sales employees by position. If no class is certified, the parties will meet and confer on a date to update the list as necessary for PAGA purposes.

## Miscellaneous Issues

Plaintiffs have requested confirmation that (1) Charter has completed its collection and production of all "declarant records" (e.g., the training schedules, scheduling emails, and similar emails and records specific to Charter's class member declarants and training facilitators); and (2) Charter has double-checked that it searched for, collected, and produced any and all emails to or from the named plaintiffs during the first four weeks of their employment. Charter has confirmed that it has produced all the responsive documents it could locate and will not be producing further such documents.

The parties have unresolved discovery issues concerning the production of training transcript reports showing when each direct sales employee completed new hire training, lead lists showing when each direct sales employee first received a list of leads to pursue, and disposition data showing the results

---

[5] The parties agree that Plaintiffs have requested certification of a class reaching back to November 19, 2014 for class claims, and has sought PAGA penalties reaching back to September 14, 2017. The end dates for these periods will be set by the Court.

[6] The parties agree that direct sales employees are a subset of commission-eligible employees.

1  of each direct sales employee's sales efforts on leads made during the new hire training period. While
2  they have not reached agreement on these issues, they will continue to meet and confer to attempt to
3  narrow or resolve the issues.

4       All other discovery orders and matters that the Court has previously ruled on or taken under
5  submission shall remain in effect.

6       **IT IS SO ORDERED.**

7  Dated:  November 19, 2025

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE